## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **YOUNG AMERICA'S FOUNDATION**, a Tennessee nonprofit corporation; **STUDENTS FOR A CONSERVATIVE VOICE**, a registered student organization at University of Minnesota; and **BEN SHAPIRO**,<br><br>        Plaintiffs,<br><br>v.<br><br>**ERIC W. KALER**, President of University of Minnesota, in his official and individual capacities; **MICHAEL BERTHELSEN**, Vice President of University Services of University of Minnesota, in his official and individual capacities; **MATTHEW A. CLARK**, Chief of Police of University of Minnesota, in his official and individual capacities; **TROY BUHTA**, Lieutenant of University of Minnesota Police Department, in his official and individual capacities; **ERIK DUSSAULT**, Assistant Director of Student Unions & Activities of University of Minnesota, in his official and individual capacities,<br><br>        Defendants. | Case No. _____<br><br><br>**DEMAND FOR JURY TRIAL**<br><br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, MONETARY DAMAGES, AND ATTORNEYS' FEES AND COSTS** |

Plaintiffs Young America's Foundation ("YAF"), Students for a Conservative Voice ("SCV"), and Ben Shapiro by and through counsel, and for their Verified Complaint against the Defendants, hereby state as follows:

1.      The cornerstone of higher education is the ability of students to participate in the "marketplace of ideas" on campus. That marketplace depends on free and vigorous debate between students and the ability to offer diverse and competing views on current and age-old topics.

1

2.      This case arises from policies and practices of University of Minnesota ("UM" or the "University") and public officials employed by the University that restrict the expressive rights of students and student organizations.

3.      UM has a Large Scale Events Policy and practice that it uses to censor, restrict, and inhibit unpopular student speech, thus unconstitutionally infringing upon students' First Amendment and Fourteenth Amendment rights (the "Speech Suppression Policy").

4.      The Speech Suppression Policy authorizes Defendants to prohibit, chill, oppose and shut down speech with which they, or other students and faculty, disagree.

5.      Defendants have applied the Speech Suppression Policy against Plaintiffs and have stated that they will continue to do so in the future.

6.      The Speech Suppression Policy chills protected student speech and disables students from engaging in debates about important political, cultural, moral and religious topics.

7.      Plaintiff SCV, a registered student organization at the University, submitted a request to bring Plaintiff Ben Shapiro to campus to speak and reserved a number of different rooms on the main campus to ensure that it would have an available space to host the event.

8.      SCV reserved Willey Hall 175 and 125 and confirmed that this space was available for the date of the event. Willey Hall was the preferred location due to the size and location of the venue. Willey Hall is located on the Minneapolis campus near public

transportation routes. The two reserved rooms are adjacent and can be combined to seat a total of 1,056 people.

9.      However, pursuant to the Speech Suppression Policy, the University informed SCV that the event would be considered a large scale event because the University arbitrarily determined that the event represented a significant security concern due to the content and viewpoint to be expressed by Shapiro.

10.     As a large scale event, all of the details of the event, including the location, must be approved by the Large Scale Event Committee.

11.     Even though Willey Hall was available the date of the event, the University refused to allow SCV to hold the event in Willey Hall.

12.     Instead, pursuant to the Speech Suppression Policy, the University forced SCV to hold the event in the Northstar Ballroom on the St. Paul campus. The Northstar Ballroom holds only 400 people and is more difficult to access because it is on the St. Paul campus.

13.     As a result of the forced relocation to the Northstar Ballroom, many students were prevented from attending and participating in the speaking event, and Shapiro was forced to speak to less than half the number of students that desired to attend.

14.     Through their enforcement of the Speech Suppression Policy, the Defendants suppressed Plaintiffs' speech by relocating the event to a smaller, more isolated venue— all because Defendants and others students and faculty members disagreed with the content and viewpoint of Plaintiffs' speech.

15.     This action is premised on the United States Constitution and concerns the denial of Plaintiffs' fundamental rights to free speech, due process, and equal protection of law.

16.     Defendants' Speech Suppression Policy and practices have deprived and will continue to deprive Plaintiffs of their paramount rights and guarantees under the United States Constitution.

17.     Each and every act of Defendants alleged herein was committed by such Defendants, each and every one of them, under the color of state law and authority.

## JURISDICTION AND VENUE

18.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

19.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

20.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-02; the requested injunctive relief pursuant to 28 U.S.C. § 1343, and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and all of the acts described in this Complaint occurred in this district.

## PLAINTIFFS

22.     Plaintiff Young America's Foundation is a nonprofit organization whose mission is to inspire young people by promoting the ideas of individual freedom, a strong national defense, free enterprise, and traditional values.

23.     Plaintiff Students for a Conservative Voice ("SCV") is an expressive, recognized student organization at the University. SCV's purpose is to give students with alternative viewpoints, which cannot be expressed elsewhere on the campus, an outlet to share these opinions.

24.     SCV desires to express its message on the University campus through a variety of means including flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students.

25.     When engaging in these expressive activities, SCV and its members discuss political, religious, social, cultural, and moral issues and ideas.

26.     Plaintiff Ben Shapiro ("Shapiro"), is a resident of North Hollywood, California, and is an American political commentator, nationally syndicated columnist, author, radio talk show host, and attorney.

## DEFENDANTS

27.     Defendant Eric W. Kaler is, and was at all times relevant to this Complaint, the President of University of Minnesota, a public university organized and existing under the laws of the State of Minnesota.

28.     The University of Minnesota Board of Regents has designated the University President as the chief executive officer and administrative head of UM.

29.     Defendant Kaler, as a policy maker, is responsible for the enactment, implementation, and enforcement of University policies and their application to student speech.

30.     Defendant Kaler is responsible for the enactment, implementation, and enforcement of the Speech Suppression Policy.

31.     Defendant Kaler is aware of the Speech Suppression Policy, and has the authority to change the policy, but he has not modified the policy to ensure that the University does not unconstitutionally suppress or hinder speech based upon the content or viewpoint of student speech.

32.     Defendant Kaler was aware of the actions taken by the other Defendants to enforce the Speech Suppression Policy against the Plaintiffs and he ratified those actions by approving of them and because he did not act to stop their actions enforcing the policy.

33.     Defendant Kaler is sued in his official and individual capacities.

34.     Defendant Michael Berthelsen is, and was at all times relevant to this Complaint, the Vice President of University at University of Minnesota, a public university organized and existing under the laws of the State of Minnesota.

35.     Defendant Berthelsen, in consultation with Defendant Kaler, is responsible for the administration, interpretation, and oversight of certain University policies, including the Speech Suppression Policy, and their application to student speech.

36.     Defendant Berthelsen was aware of the actions taken by the other Defendants to enforce the Speech Suppression Policy against the Plaintiffs and he ratified those actions by approving of them and because he did not act to stop their actions enforcing the policy.

6

37.     Defendant Berthelsen is sued in his official and individual capacities.

38.     Defendant Matthew Clark is, and was at all times relevant to this Complaint, the Chief of Police at University of Minnesota, a public university organized and existing under the laws of the State of Minnesota.

39.     Defendant Clark, in consultation with Defendants Kaler and Clark, is responsible for the administration, interpretation, and oversight of certain University policies, including the Speech Suppression Policy, and its application to student speech.

40.     Defendant Clark was aware of the actions taken by the other Defendants to enforce the Speech Suppression Policy against the Plaintiffs and he ratified those actions by approving of them and because he did not act to stop their actions enforcing the policy.

41.     Defendant Clark is sued in his official and individual capacities.

42.     Defendant Troy Buhta is, and was at all times relevant to this Complaint, a Lieutenant in the University of Minnesota Police Department, a public university organized and existing under the laws of the State of Minnesota.

43.     Defendant Buhta possesses the authority to enforce Speech Suppression Policy by determining whether student groups can hold events on campus and by dictating the requirements of the event, including the time and location.

44.     Defendant Buhta enforced the Speech Suppression Policy against SCV when he made the decision that SCV could not hold the Shapiro event in Willey Hall because he deemed Shapiro's speech to be controversial and a security concern.

45.     Defendant Buhta is sued in his official and individual capacities.

46.     Defendant Erik Dussault is, and was at all times relevant to this Complaint, the Assistant Director of Student Unions & Activities the University of Minnesota.

47.     Defendant Dussault enforced the Speech Suppression Policy against SCV when he made the decision that SCV could not hold the Shapiro event in Willey Hall because he deemed Shapiro's speech to be controversial and a security concern.

48.     Defendant Dussault is sued in his official and individual capacities.

## FACTUAL BACKGROUND

49.     UM is a public university created by the State of Minnesota and located in Minneapolis, Minnesota.

50.     The trustees of the UM System have delegated power to Defendant Kaler to act as the administrative head of UM.

51.     Defendant Kaler is responsible for the enactment, implementation, and enforcement of UM policies affecting students, student organizations, faculty, and guests, including the Speech Suppression Policy challenged herein.

## I.      Defendants' Unconstitutional Policy

52.     The University governs use of its facilities by students and student organizations through various policies, including the Speech Suppression Policy.

53.     The Speech Suppression Policy defines a large scale event as one "taking place in a large campus venue or outdoor space that will draw a significant amount of the campus population, a large off-campus crowd, or represents a significant security concern (i.e. public figure, celebrity, etc.). Events may include, but are not limited to; [sic] concerts,

lectures, public appearances, performances and rallies." A copy of the Speech Suppression Policy is attached as Exhibit 1 to this Complaint.

54.     The Speech Suppression Policy does not define "large campus venue or outdoor space," "significant amount of the campus population," "large off-campus crowd," or "significant security concern."

55.     The Speech Suppression Policy provides that registered student groups may reserve large campus venues for events. However, student groups must meet with Student Activities staff and obtain support of the Large Scale Events Committee before a large campus venue reservation can be confirmed.

56.     Pursuant to the policy, student groups must prepare a Large Scale Event Proposal which requires the following information:

1.  A detailed description of the event, including:

    a.  number of expected attendees,

    b.  target audience (i.e., student only, general public, etc.),

    c.  timeline of the event, and

    d.  information on the venue requested including any back up venues (on or off campus);

2.  Group(s) responsible for the event including:

    a.  student groups,

    b.  any organization or agency promoting the event,

    c.  organizations sponsoring or willing to commit funding for the event, and

    d.  vendors providing staging, sound, lighting, or security for the event;

3. Information about the speaker/performer at the event, including:

   a. information on the general "act" by the artist and what will be done at the proposed event,

   b. past performances, any issues or concerns at the past performances, or reasons for security concerns,

   c. rationale for artist selection, such as number of followers on social media, polling research conducted by student group, or past performances,

   d. information on the artist's agency or organizations coordinating their appearance and any promoters.

4. Security/impact to the campus community, including:

   a. plan for security concerns caused by hosting event on campus,

   b. best estimates on impact to traffic, parking, and safety on campus by an crowds formed as a result of event

5. Event marketing, including:

   a. target audience

   b. media to be used

   c. agency responsible for marketing

6. Event ticketing, including:

   a. ticket pricing (UMN student, staff/faculty, alumni, general public)

   b. ticket sales (online, in-person, student group/third party vendor)

   c. ticket structure (general admission, assigned seating)

   d. considerations for refunds/transfers

    e.   plans for ticket management (wristbands, ID checking, scanning)

    f.   plans for handling cash or financial transaction

7.   Projected event budget, including a detailed budget of expected expenses and income for the event.

8.   Financial commitment, including:

    a.   student group contribution (raising funds or already available)

    b.   event partner contribution (other organizations helping plan the event and amount of their contribution)

    c.   list of all sponsors including company make-up and total cash contribution.

57.    The Policy provides that Student Activities staff "will work with campus partners to determine feasibility of hosting the event on campus, and may ask the student group to attend a meeting of the Large Scale Events Committee."

58.    The Large Scale Events Committee consists of members of UMPD, University Services, Parking and Transportation, Student Unions and Activities, and other campus departments impacted by large scale events on campus.

59.    The Large Scale Events Committee "is charged with determining if the campus is able to support proposed large scale events."

60.    The Committee will determine whether "the campus can support the event taking into account issues such as; [sic] other events happening on campus, human resources needed to support the event, impact of the event to the campus community, impact of event on community surrounding campus."

61.    The Speech Suppression Policy does not contain any objective criteria to guide the Defendants, the Committee, or other University administrators in determining whether the campus can support the event.

62.    The Speech Suppression Policy, by applying to events that the University determines in its sole discretion represent a significant security concern, allows the University to discriminate against Plaintiffs and other students at the University based upon the content and viewpoint of their speech.

63.    The Speech Suppression Policy does not provide any objective, non-content-based and non-viewpoint-based criteria for Defendants to use when deciding whether to apply the policy.

64.    The Speech Suppression Policy does not provide any objective, non-content-based and non-viewpoint-based criteria for Defendants to use when deciding whether to allow the event to occur.

65.    The Speech Suppression Policy does not provide any objective, non-content-based and non-viewpoint-based criteria for Defendants to use when deciding the location of the event.

66.    The Speech Suppression Policy does not provide any objective, non-content-based and non-viewpoint-based criteria for Defendants to use when deciding to impose other restrictions on a proposed event, including requiring the student groups to pay for additional security costs.

67.    The Speech Suppression Policy does not limit the discretion of Defendants when deciding whether to apply the policy to student organizations' events.

68.     The Speech Suppression Policy authorizes Defendants to suppress, interfere with, impose additional restrictions or costs, or prohibit unpopular or disfavored speech because they or other members of the University community disagree with the content or viewpoint of the speaker or because the speaker is considered controversial by Defendants or other members of the University community.

## II.     Defendants' Enforcement of Their Unconstitutional Policy

69.     Growing frustrated by the homogeneity of viewpoints presented in University of Minnesota's classrooms, SCV members decided to invite a conservative guest speaker to campus for an academic campus lecture.

70.     Conservative viewpoints are notably absent from educational instruction at the University of Minnesota. And when these viewpoints are addressed in the classroom setting, they are treated with hostility and presented through the lens of progressive ideologies.

71.     The members of SCV wanted more from their college experience. They wanted to be challenged by ideas and to have the opportunity to debate and to think critically.

72.     So, SCV decided to organize an academic lecture to take place on the University of Minnesota's campus.

73.     The purpose this lecture was to introduce a diverse viewpoint to the university community.

74. SCV invited *New York Times'* bestselling author Ben Shapiro to speak at an SCV-hosted campus lecture on February 26, 2018. The lecture was scheduled to take place at 7:00 pm.

75. SCV selected Mr. Shapiro for this event because SCV believed that Mr. Shapiro's viewpoints are treated unfairly on campus by University of Minnesota faculty and administrators alike. SCV also selected Mr. Shapiro because SCV believes Mr. Shapiro to be an incredibly articulate, consistent, and academically accomplished leader in conservative thought.

76. SCV reached out to Young America's Foundation for assistance in bringing Mr. Shapiro to the University of Minnesota campus.

77. Founded by William F. Buckley Jr. in the 1960's, Young America's Foundation is the principal outreach organization of the Conservative Movement. YAF introduces thousands of students to conservative viewpoints through its national conferences and its unparalleled campus lecture program, which is responsible for bringing conservative speakers, like Mr. Shapiro, to hundreds of schools across the country, annually. In 2017, *The New York Times* called YAF, "The Conservative Force."

78. Upon receipt of SCV's request, YAF, in coordination with Mr. Shapiro, agreed to provide assistance and financial support to bring Mr. Shapiro to the University of Minnesota's campus, on February 26, 2018, for an academic lecture.

79. SCV first informed the University about the Shapiro lecture in October 2017 during the process of planning a speech by Lauren Southern, a conservative commentator, which SCV hosted on October 25, 2017.

80.     University officials asked SCV if they planned on hosting any other events during this school year. SCV informed University officials that the group planned on hosting Shapiro on February 26, 2018.

81.     The University enforced the Speech Suppression Policy against SCV during the planning of the Lauren Southern event. The University relocated the location of the speech on three different occasions without obtaining SCV's prior permission.

82.     The event was originally scheduled for Mayo Auditorium. But the University moved the event to Philips-Wangensteen, then to the West Bank Auditorium, and finally to Anderson Hall.

83.     As a result of the University's actions in the Southern event, SCV decided to reserve multiple potential rooms in an attempt to avoid being forced to host the Shapiro event in an undesirable location.

84.     Further, SCV explicitly informed the University not to relocate the Shapiro event without SCV's permission.

85.     Recognizing the high demand to hear a presentation of conservative viewpoints on the University of Minnesota campus, as evidenced by the good turnout for the Southern event, SCV reserved several different lecture halls of differing sizes for the Shapiro lecture.

86.     SCV's goal was to host the lecture in a relatively central location on the Minneapolis campus because the group wanted to introduce the university community to the conservative viewpoints that are notably missing from academic instruction.

87.     SCV believed that a centrally located space on the Minneapolis campus gave it the best opportunity to communicate conservative viewpoints to the University community.

88.     Accordingly, SCV placed reservation holds for several locations including Mayo Auditorium, Ted Mann Concert Hall, and Willey Hall.

89.     Mayo Auditorium is a large lecture hall. It can accommodate 455 attendees and is centrally located on the University's Minneapolis campus.

90.     Ted Mann Concert Hall seats 1,126 people and is located on the Minneapolis campus. After requesting the reservation, SCV learned that the Ted Mann Concert Hall would not be available as a result of a scheduling conflict.

91.     Willey Hall seats roughly 1,056 people and is also located on the Minneapolis campus.

92.     On December 6, 2018, SCV formally requested use of Willey Hall for the Shapiro lecture. When SCV placed the reservation request, Willey Hall was available for reservation.

93.     SCV always intended to host the Shapiro lecture on the Minneapolis campus, largely because the Minneapolis campus is more convenient for the majority of students.

94.     SCV believed that hosting the Shapiro lecture on the St. Paul campus would inhibit attendance for the Shapiro lecture and in doing so, burden the effectiveness of its speech.

95.     However, pursuant to the authority granted in the Speech Suppression Policy, Defendants placed two significant restrictions on the Shapiro lecture which were contrary

to SCV's desires and which resulted in significantly limiting the number of students that were able to attend the Shapiro event: (1) Defendants arbitrarily limited the number of attendees to 500; and (2) Defendants refused to allow the event to occur on the Minneapolis campus but instead banished the event to a location on the St. Paul campus.

96.     On December 21, 2017, Defendant Clark sent an e-mail to Ken Gray, the Director of the University's Continuing Education and Conference Center, stating, "The admin has asked that we try to move this visit to the St. Paul campus. It's going to be a security issue with past lectures at other universities."

97.     Defendant Clark also communicated to Defendant Buhta that the Shapiro event was to be moved to the St. Paul campus, per "the admin."

98.     Applying the Speech Suppression Policy, the University vested Defendants, including Clark and Buhta, with unbridled discretion and they exercised such discretion in rejecting SCV's reservation request for Willey Hall.

99.     No University guideline or policy led Defendants Clark or Buhta to conclude that Willey Hall was not a suitable venue for Shapiro lecture.

100.    Defendants restricted the size of the Shapiro lecture to 500 people, which unbeknownst to SCV, disqualified Willey Hall and other larger lecture halls requested by SCV for the Shapiro event.

101.    Defendant Buhta was concerned about the community's reaction to Mr. Shapiro's speech.

102.    Based on the content of Mr. Shapiro's speech and his concerns for the community's potential reaction to Mr. Shapiro's speech, Defendant Buhta rejected SCV's reservation request for Willey Hall because of its "access from the skyway."

103.    On December 21, 2016, Defendant Buhta emailed Defendant Dussault regarding his decision to reject SCV's reservation request.

104.    Shortly thereafter, Defendant Dussault relayed Defendant Buhta's decision to SCV, notifying SCV members that they could not host Ben Shapiro in Willey Hall.

105.    In his email to SCV, Defendant Dussault echoed Defendant Buhta's decision that because Willey Hall "has access from the skyway," it would not be an option for the Shapiro event.

106.    The skyway that Defendant Buhta cited as rationale for rejecting SCV's reservation request for Willey Hall is the "West Bank Skyway."

107.    The "West Bank Skyway" connects Blegen Hall to Willey Hall, creating a walkway for people to walk over Washington Avenue.

108.    The University has the ability to control access to its West Bank Skyway.

109.    In fact, the University routinely controls access to its West Bank Skyway. According to the University's website, the West Bank Skyway is open to the University community Monday through Friday from the hours of 6:00 am to 10:00 pm. On Saturdays, the West Bank Skyway is open to the University community from 7:00 pm to 10:00 pm. On Sundays, the West Bank Skyway is closed.

110.    The University further limits the general public's access to the West Bank Skyway. The general public has a more limited access to it. The West Bank Skyway is

open to the general public for use Monday to Friday from the hours of 7:00 am to 7:00 pm. It is open to the general public on Saturdays from 7:00 am to 4:00 pm. It is closed to the general public on Sundays.

111.    Despite the University's ability to, and history of, controlling access to the West Bank Skyway, Defendants cite the Skyway as justification for rejecting SCV's reservation request for Willey Hall.

112.    This is particularly alarming considering "access from the skyway" did not prevent other invited speakers, who present university-favored viewpoints from speaking in Mondale Hall.

113.    Willey Hall and Walter Mondale Hall are located in connecting buildings. Students can access Walter Mondale Hall by entering Willey Hall. Furthermore, students can access Walter Mondale Hall by crossing the West Bank Skyway into Willey Hall and then walking across Willey Hall into Walter Mondale Hall.

114.    Yet, this same skyway did not prohibit Justice Ruth Bader Ginsburg from speaking in Walter Mondale Hall on September 16, 2014.

115.    Nor did the Skyway prohibit the University from hosting Democratic Senator Amy Klobuchar and Former U.S. Vice President Walter Mondale, on the Minneapolis campus in Mondale Hall in October 2017.

116.    The University hosted Justice Sonia Sotomayor on the Minneapolis campus in the Northrop Memorial Auditorium in October 2016.

117.    After rejecting SCV's reservation request for Willey Hall, Defendant Buhta suggested two significantly smaller locations for the Shapiro lecture – the Continuing Education and Conference Center and the North Star Ballroom.

118.    The Continuing Education and Conference Center seats 392 people.

119.    Describing the Continuing Education and Conference Center, Defendant Buhta stated, "the best part is the building is all by itself and much easier to secure inside with ample room outside. There isn't any significant transportation routes nearby."

120.    The North Star Ballroom seats slightly more than 400 people.

121.    Both the Continuing Education and Conference Center and the North Star Ballroom are located on the St. Paul campus.

122.    Although multiple venues were available, the University failed to approve any of SCV's reservation requests for venues located on the Minneapolis campus even though they were available at the time of the event.

123.    Because the University only approved venues located on the St. Paul campus, SCV reserved the North Star Ballroom for the Shapiro lecture.

124.    Due to the demand for the event, the University agreed to add 49 additional seats, for a total capacity of 449. However, the additional seats had obstructed views due to the pillars in the room.

125.    As a result of Defendants' actions, Plaintiffs were unable to deliver their message to hundreds of students that wanted to attend the event and those students were deprived the opportunity to attend the Shapiro lecture and to participate in an important dialogue on matters of public concern.

126.    In contrast, the University has a long history of welcoming Leftist or progressive viewpoints on the Minneapolis campus.

## ALLEGATIONS OF LAW

127.    At all times relevant to this Complaint, each and all of the acts and policies related to the Defendants alleged herein were attributed to the Defendants who acted under color of a statute, regulation, custom, or usage of the State of Minnesota.

128.    The Defendants knew or should have known that by enforcing the Speech Suppression Policy against Plaintiffs because the Defendants disagreed with the content and viewpoint of Plaintiffs' speech, the Defendants violated Plaintiffs' constitutional rights.

129.    SCV is suffering irreparable harm from the Defendants' Speech Suppression Policy.

130.    SCV has no adequate or speedy remedy at law to correct or redress the deprivation of its rights by the Defendants.

131.    Unless the Speech Suppression Policy is enjoined, SCV will continue to suffer irreparable injury.

### FIRST CAUSE OF ACTION
### <u>Violation of Plaintiffs' First Amendment Right</u>
### <u>to Freedom of Speech</u>
### <u>(42 U.S.C. § 1983)</u>

132.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–131 of this Complaint.

133.    Speech is entitled to comprehensive protection under the First Amendment.

134.   The First Amendment rights of free speech extend to campuses of state universities.

135.   Willey Hall is a public forum for speech and expressive activities by students enrolled at the University.

136.   The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination in the public forums for student speech and expression on the campus of a public university.

137.   A public university's ability to restrict speech—particularly student speech—in a public forum is limited.

138.   Under the First Amendment's Free Speech Clause, a prior restraint on citizens' expression is presumptively unconstitutional, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content and viewpoint neutral reasonable time, place, and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication.

139.   Defendants' Speech Suppression Policy and their practice of refusing to allow student organizations to use certain venues on campus if Defendants believe the event is "controversial" violates the First Amendment facially and as-applied because it is a prior restraint on speech in areas of campus that are traditional or designated public fora for UM students.

140.   Unbridled discretion to discriminate against speech based on its content or viewpoint violates the First Amendment regardless of whether that discretion has ever been unconstitutionally applied in practice.

141.   Defendants' Speech Suppression Policy and their practice of refusing to allow student organizations to use certain venues on campus if Defendants consider the event to be "controversial" is based on listeners' reactions and violates the First Amendment facially and as-applied because they grant UM officials unbridled discretion to discriminate against speech based on its content or viewpoint.

142.   Defendants violated Plaintiffs' First Amendment rights by refusing to allow SCV to use Willey Hall because Defendants determined, with their unbridled discretion, that the Shapiro Event involved "controversial activity."

143.   Defendants engaged in content- and viewpoint-based discrimination by examining whether Plaintiffs' speech was "controversial" and how listeners might react to the speech.

144.   Defendants' Speech Suppression Policy and associated practice of refusing to allow certain student organizations to use certain venues for "controversial" events constituted an unconstitutional "time," "place," and "manner" restriction that violated Plaintiffs' right to freedom of speech and expression.

145.   The Speech Suppression Policy punishes disfavored speech because it allows University officials to move SCV to a smaller, more remote location based on the number of protestors that may choose to attend and protest—or blockade—SCV's event.

146.    Defendants' Speech Suppression Policy and associated practice does not provide the narrow, objective, or definite standards that are constitutionally required to limit the discretion of UM officials in deciding whether to apply the policy to a student organization event.

147.    Defendants' Speech Suppression Policy and associated practice does not require UM officials to provide written justification for their decision to impose restrictions on student speech.

148.    Defendants' Speech Suppression Policy and associated practice provides no appeal process that students may utilize when restrictions are imposed on their events.

149.    These grants of unbridled discretion to UM officials facially violate the First Amendment because they create a system in which speech is reviewed without constitutionally sufficient standards, thus giving students no way to prove that imposing restrictions on their event was based on unconstitutional considerations.

150.    Because Defendants have failed to establish narrow, objective, and definite standards governing the imposition of restrictions on student organization events, there is a substantial risk that UM officials will engage in content and viewpoint discrimination when addressing those applications.

151.    The First Amendment's prohibition against content and viewpoint discrimination requires Defendants to provide adequate safeguards to protect against the improper imposition of restrictions based on the content or viewpoint of students' speech.

152.    Defendants' Speech Suppression Policy and associated practice are neither reasonable nor valid time, place, and manner restrictions on speech because they are not

content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

153.    While Defendants have an interest in maintaining a safe campus, the imposition of restrictions on "controversial" or disfavored speech but not other speech is not narrowly tailored to Defendants' interest.

154.    If restrictions are imposed under Defendants' Speech Suppression Policy, SCV events have no alternative channels of communication because the policy applies everywhere on campus.

155.    The First Amendment's Freedom of Speech Clause prohibits a public university from imposing restrictions on student speech based on overbroad regulations.

156.    Defendants' Speech Suppression Policy and associated practice are overbroad because they prohibit and restrict protected expression.

157.    Defendants' Speech Suppression Policy and associated practice chill, deter, and restrict Plaintiffs from freely expressing their beliefs.

158.    SCV has modified, self-censored, and suppressed its speech because of the Speech Suppression Policy by choosing not to invite certain speakers to campus whose content and viewpoint Defendants or other members of the campus community will consider to be more objectionable or controversial than other speakers.

159.    Defendants' Speech Suppression Policy and associated practice violate Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

160.    Pursuant to 42 U.S.C. §§ 1983 and 1988, SCV is entitled to a declaration that Defendants' Speech Suppression Policy facially violates its First Amendment right to freedom of speech and an injunction against Defendants' policy and actions. Additionally, Defendants violated Plaintiffs' First Amendment rights through their assessment of restrictions on Plaintiffs pursuant to the Speech Suppression Policy and Plaintiffs are entitled to judgment for damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**Violation of Plaintiffs' Fourteenth Amendment Right**
**to Due Process of Law**
**(42 U.S.C. § 1983)**

161.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–131 of this Complaint, as if set forth fully herein.

162.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the right to due process of law and prohibits Defendants from promulgating and employing vague standards that allow for content and viewpoint discrimination in Defendants' handling of Plaintiffs' on-campus expression.

163.    The government may not regulate speech based on policies that permit arbitrary, discriminatory, and overzealous enforcement.

164.    The government may not regulate speech based on policies that cause persons of common intelligence to guess at their meaning and differ as to their application.

165.    Defendants' Speech Suppression Policy and associated practices contained no criteria to guide administrators when deciding whether to impose restrictions on Plaintiffs' or other student organizations' expressive activities.

166.    Defendants' Speech Suppression Policy is impermissibly vague and ambiguous and was incapable of providing meaningful guidance to Defendants in determining whether to impose restrictions on Plaintiffs' and other student organizations' expressive activity.

167.    The Speech Suppression Policy authorizes Defendants to impose restrictions on Plaintiffs' expressive activity based upon vague and undefined terms such as "large campus venue or outdoor space," "significant amount of the campus population," "large off-campus crowd," or "significant security concern."

168.    Defendants violated Plaintiffs' Fourteenth Amendment rights by imposing restrictions on their speech pursuant to the Speech Suppression Policy.

169.    The lack of criteria, factors, or standards in Defendants' Speech Suppression Policy and associated practice renders the policy and practice unconstitutionally vague facially and as-applied in violation of Plaintiffs' right to due process of law under the Fourteenth Amendment.

170.    SCV has modified, self-censored, and suppressed its speech because of the Speech Suppression Policy by choosing not to invite certain speakers to campus whose content and viewpoint Defendants or other members of the campus community will consider to be more objectionable or controversial than other speakers.

171.   Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm. Plaintiffs are entitled to an award of monetary damages and equitable relief.

172.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants' Speech Suppression Policy facially and as-applied violates their Fourteenth Amendment right to due process of law and an injunction against Defendants' policy and actions. Additionally, Defendants violated Plaintiffs' Fourteenth Amendment rights through their imposition of restrictions on Plaintiffs pursuant to the Speech Suppression Policy and Plaintiffs are entitled to judgment for damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## THIRD CAUSE OF ACTION
### Violation of Plaintiffs' Fourteenth Amendment Right
### to Equal Protection of the Law
### (42 U.S.C. § 1983)

173.   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–131 of this Complaint, as if set forth fully herein.

174.   The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs the equal protection of the laws, which prohibits Defendants from treating Plaintiffs differently than similarly situated persons.

175.   The government may not treat someone differently as compared to similarly situated persons when such differential treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

176.   SCV is similarly situated to other student organizations at UM. Shapiro and the Foundation are similarly situated to all other non-students that are invited onto UM's campus.

177.   Defendants violated the Equal Protection Clause of the Fourteenth Amendment through their enforcement of the Speech Suppression Policy against Plaintiffs because Defendants disagreed with the content and viewpoint of Plaintiffs' speech.

178.   Defendants' enforcement of the Speech Suppression Policy prevented students and members of the public from attending the Shapiro event and thus prevented Plaintiffs' from conveying their message to their intended audience.

179.   By ratifying and effectuating a heckler's veto through the enforcement of the Speech Suppression Policy, Defendants denied Plaintiffs the right to use a public forum for their expressive activity based on the content and viewpoint of Plaintiffs' message in violation of the Equal Protection Clause of the Fourteenth Amendment.

180.   By granting use of a public forum to people whose views the Defendants find acceptable, but denying use to those expressing less favored views through the enforcement of the Speech Suppression Policy, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

181.   By refusing to enforce other policies and regulations pursuant to Speech Suppression Policy, based on the adverse reaction of others to the content and viewpoint of Plaintiffs' message, the Defendants have deprived Plaintiffs of the equal protection of the law guaranteed by the Fourteenth Amendment.

182.   By refusing to protect Plaintiffs' speech activity pursuant to the Speech Suppression Policy and permitting and participating with blockaders to engage in unlawful, disorderly, and disruptive conduct designed to silence Plaintiffs' message based on its content and viewpoint, the Defendants imposed a heckler's veto and deprived Plaintiffs of the equal protection of the law guaranteed by the Fourteenth Amendment.

183.   The Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiffs.

184.   The Defendants have treated other similarly situated individuals differently than Plaintiffs because Defendants have chosen not to enforce or apply, and would not enforce or apply, the Speech Suppression Policy against other speakers that have been invited to speak on campus because Defendants do not disagree with such speakers' views or they believe such views to be acceptable to the University community.

185.   Plaintiff SCV will be hosting events on the UM campus in the coming semesters. There is a real and immediate threat that Defendants will violate SCV's Fourteenth Amendment rights through their enforcement of the Speech Suppression Policy due to the content and viewpoint of SCV's speech.

186.   Plaintiff SCV has modified, prohibited, and suppressed its speech because of the Speech Suppression Policy by choosing not to invite certain speakers to campus whose content and viewpoint the Defendants or other members of the campus community would consider to be more objectionable or controversial than other speakers.

187.   Because of the Defendants' actions, Plaintiffs have suffered, and continue to suffer irreparable harm.  They are entitled to an award of monetary damages and equitable relief.

188.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that the Defendants violated their Fourteenth Amendment right to equal protection of the law and an injunction against the Defendants' Speech Suppression Policy and actions in their official capacity.  Additionally, Plaintiffs are entitled to damages against Defendants in their individual capacity in an amount to be determined by the evidence and this Court, and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

(A)   A declaratory judgment that the Defendants' Speech Suppression Policy and associated practices, facially and as-applied violate Plaintiffs rights under the First Amendment and Fourteenth Amendment;

(B)   A preliminary and permanent injunction both facially and as-applied prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Speech Suppression Policy and otherwise disrupting or preventing Plaintiffs from engaging in lawful First Amendment activity at the University;

(C)     Compensatory and nominal damages for the violation of Plaintiffs' First and

        Fourteenth Amendment rights;

(D)     Plaintiffs' reasonable attorneys' fees, costs, and other costs and

        disbursements in this action pursuant to 42 U.S.C. § 1988; and

(E)     All other further relief to which Plaintiffs may be entitled.


 Respectfully submitted this 3rd day of July, 2018.

                                          By: s/ Theodore C. Landwehr

TYSON C. LANGHOFER*                            THEODORE C. LANDWEHR
AZ Bar No. 32589                               MN Bar No.  239458
ALLIANCE DEFENDING FREEDOM                     LANDWEHR LAW OFFICES
15100 N. 90th Street                           4034 7th Street NE
Scottsdale, Arizona 85260                      Columbia Heights, MN 55421-2801
Telephone: (480) 444-0020                      Telephone: (763) 781-7898
Fax: (480) 444-0021                            Fax: (763) 781-7898
tlanghofer@ADFlegal.org                        tland@landwehrlaw.com

DAVID A. CORTMAN*
GA Bar No. 188810
TRAVIS C. BARHAM*
GA Bar No. 753251
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Fax: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

*Pro Hac Vice Applications
Forthcoming


                          *Attorneys for Plaintiffs*

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury of all matters so triable herein.

By: s/  Theodore C. Landwehr
THEODORE C. LANDWEHR
*Attorney for Plaintiffs*

## **VERIFICATION OF COMPLAINT**

I, _Mitchell Bendis_, President of Students for a Conservative Voice, and a citizen of the United States and a resident of the State of Minnesota, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this __29__ day of June, 2018, at _Minneapolis_, Minnesota

_Mitchell Bendis_, President
Students for a Conservative Voice

34

## **VERIFICATION OF COMPLAINT**

I, Patrick X. Coyle, Jr., Vice President of Young America's Foundation, and a citizen of the United States and a resident of the State of Virginia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this **26** day of June, 2018, at _____, Virginia.

Patrick X. Coyle, Jr., Vice President
Young America's Foundation

## VERIFICATION OF COMPLAINT

I, Ben Shapiro, a citizen of the United States and a resident of the State of California, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this _29ᵗʰ_ day of June, 2018, at _Los Angeles_, California.

Ben Shapiro