# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Young America's Foundation, *a Tennessee nonprofit corporation*, Students for a Conservative Voice, *a registered student organization at the University of Minnesota*, and Ben Shapiro,<br><br>   Plaintiffs,<br><br>v.<br><br>Eric W. Kaler, *President of University of Minnesota, in his official and individual capacities*, Michael Berthelsen, *Vice President of University Services of University of Minnesota, in his official and individual capacities*, Matthew A. Clark, *Chief of Police of University of Minnesota, in his official and individual capacities*, Troy Buhta, *Lieutenant of University of Minnesota Police Department, in his official and individual capacities*, and Erik Dussault, *Assistant Director of Student Unions & Activities of University of Minnesota, in his official and individual capacities*,<br><br>   Defendants. | Case No. 18-cv-1864 (SRN/HB)<br><br><br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

Tyson C. Langhofer, Alliance Defending Freedom, 15100 North 90th Street, Scottsdale, AZ, 85260, David A. Cortman and Travis C. Barham, Alliance Defending Freedom, 1000 Hurricane Shoals Road NE, Suite D-1100, Lawrenceville, GA 30043, Jonathan M. Larcomb, Alliance Defending Freedom, 440 First Street NW, Suite 600, Washington, D.C. 20001, and Theodore C. Landwehr, Landwehr Law Offices, 4034 Seventh Street NE, Columbia Heights, MN 55421, for Plaintiffs.

Carrie Ryan Gallia, Brian J. Slovut, and Daniel J. Herber, University of Minnesota, Office of General Counsel, 360 McNamara Alumni Center, 200 Oak Street SE, Minneapolis, MN 55455, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This case arises at the intersection of two competing freedoms: the freedom of public university student groups, and their invited guest speakers, to exercise their First Amendment rights, and the freedom of public universities to manage their facilities in the manner that best advances the University's educational mission.

Plaintiffs – a University of Minnesota student group, Students for a Conservative Voice, as well as an outside organization dedicated to promoting conservative speech on campus, Young America's Foundation, and a conservative political commentator, Mr. Ben Shapiro – have brought "as-applied" and "facial" challenges to the University of Minnesota's policy for handling "large-scale events," under both the First and Fourteenth Amendments. In their "as-applied" challenge, Plaintiffs focus on the manner in which Defendants applied the University's "large-scale events" policy to a speech given by Mr. Shapiro on February 26, 2018. Defendants have moved to dismiss the complaint in its entirety.

The Court grants Defendants' motion in part and denies it in part. The Court grants Defendants' motion with respect to Plaintiffs' "facial" First Amendment challenge, but denies Defendants' motion with respect to Plaintiffs' "as-applied" First Amendment challenge. Further, the Court grants Defendants' motion with respect to Plaintiffs' Fourteenth Amendment Due Process and Fourteenth Amendment Equal Protection claims. The Court explains its reasoning at greater length below.

## I. BACKGROUND[1]

### A. The Parties

There are three Plaintiffs in this case. Plaintiff Young America's Foundation ("YAF") is a nonprofit organization that was founded by the late conservative thinker William F. Buckley in the 1960s. (Am. Compl. [Doc. No. 25-2] ¶¶ 24, 79.) YAF hosts and co-sponsors conferences and lectures around the country, with the goal of introducing young people and university students to conservative viewpoints. (*Id.*)

Plaintiff Students of a Conservative Voice ("SCV") is a registered student group at the University of Minnesota. (*Id.* ¶ 25.) SCV attempts to introduce their classmates to "alternative," often conservative, viewpoints by way of "flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students." (*Id.* ¶¶ 25-27.) According to SCV, this mission is important because "conservative viewpoints are notably absent from educational instruction at the University of Minnesota." (*Id.* ¶¶ 25-27, 72.)

---

[1]      On January 18, 2019, Plaintiffs moved to amend their complaint to provide further detail on their claims. (*See* Doc. No. 25.) Defendants opposed this request, and argued that the motion was futile because, even accepting the allegations in the Amended Complaint as true, Plaintiffs' claim still failed to state any plausible constitutional violations. (*See* Doc. No. 27.) The Court has considered the facts alleged in the Amended Complaint, and has determined that the motion will be granted to the extent it relates to Plaintiffs' "as-applied" First Amendment claim, and denied to the extent it relates to all of Plaintiffs' other claims; any amendment to the latter set of claims would be futile. *Accord Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 943 (8th Cir. 2000) ("Given the courts' liberal viewpoint towards leave to amend, it should normally be granted absent good reason for a denial," such as "futility of amendment"). However, for ease of reference, the Court will cite to the Amended Complaint in describing the background of this case.

Plaintiff Ben Shapiro is an "American political commentator, nationally syndicated columnist, author, radio talk show host, and attorney." (*Id.* ¶ 28.)

There are five Defendants in this case. Defendant Eric W. Kaler is the President of the University of Minnesota, a public university created by the State of Minnesota. (*Id.* ¶¶ 29-34, 51.) President Kaler "is responsible for the enactment, implementation, and enforcement of [University of Minnesota] policies affecting students, student organizations, faculty, and guests." (*Id.* ¶¶ 52-53.)

Defendant Michael Berthelsen is the Vice President of University Services at the University of Minnesota. (*Id.* ¶ 36.) Plaintiffs allege that Vice President Berthelsen consults with President Kaler over "certain University policies," and "their application to student speech." (*Id.* ¶ 37.)

Defendant Matthew Clark is the Chief of Police at the University of Minnesota. (*Id.* ¶ 40.) Plaintiffs allege that Chief Clark also consults with President Kaler (and Vice President Berthelsen) over "certain University policies," and "their application to student speech." (*Id.* ¶ 41.)

Defendant Troy Buhta is a Lieutenant in the University of Minnesota Police Department. (*Id.* ¶ 44.)

Defendant Eric Dussault is the Assistant Director of Student Unions & Activities at the University of Minnesota. (*Id.* ¶ 48.)

**B. The Large-Scale Events Process ("LSEP")**

This litigation centers around a University of Minnesota student affairs policy called the "Large-Scale Events Process" ("LSEP"). (*See generally* Compl., Ex. 1 [Doc.

4

No. 1-1] ("LSEP").) Because the Complaint does not allege when or how the LSEP came into existence, the Court simply details what the LSEP says on its face. *See Neubauer v. FedEx Corp.*, 849 F.3d 400, 403 (8th Cir. 2017) (noting that, in deciding a motion to dismiss, a court may directly consider "all documents . . . attached to the complaint as exhibits").

The LSEP sets forth a process to be followed "by any registered student group proposing to host a large-scale event on the University of Minnesota campus." (LSEP at 1.) The LSEP first defines "large scale event" as a "student group sponsored event taking place in a large campus venue or outdoor space that will draw a significant amount of the campus population, a large off-campus crowd, or represents a significant security concern (*i.e.*, public figure, celebrity, etc.)." (*Id.*) The LSEP then states that, although a student group has a right to reserve a "large campus venue" for such an event, "the reservation will only be confirmed upon approval by the Large-Scale Events Committee ("LSEC")." (*Id.*) The LSEC includes representatives from various campus departments, such as "the University of Minnesota Police Department, University Services, Parking and Transportation, [and] Student Unions and Activities." (*Id.*) To secure approval from the LSEC for a venue reservation, the student group must put together a "Large Scale Event Proposal," containing a variety of relevant logistical details, and then must meet with the LSEC, if asked. (*Id.*) Ultimately, the LSEC's "determination of whether the campus can support the [student group proposed] event" will be based on factors such as "other events happening on campus, human resources needed to support the event, the impact of

5

the event on the campus community, and the impact of the event on the community surrounding campus." (*Id.*)

Plaintiffs allege that the LSEP is unconstitutional, on its face, under either the First Amendment or the Fourteenth Amendment's Due Process Clause. (*See, e.g.*, Am. Compl. ¶¶ 63-70.) This is largely because the LSEP purportedly "does not provide any objective, non-content-based and non-viewpoint-based criteria for [University officials] to use when deciding to impose [] restrictions on a proposed event," and, further, "does not limit the discretion of [University officials] when deciding whether to apply the policy to student organizations' events." (*Id.* ¶¶ 68-69.)

### C. The Shapiro Speech

Sometime in fall of 2017, SCV decided that it wanted to bring Mr. Shapiro to campus for a lecture. This was so because, although SCV found Mr. Shapiro "to be an incredibly articulate, consistent, and academically accomplished leader in conservative thought," SCV "believed that Mr. Shapiro's viewpoints [were] treated unfairly on campus by University of Minnesota faculty and administrators alike." (*Id.* ¶ 77.) With the assistance of YAF, SCV reached out to Mr. Shapiro, and Mr. Shapiro, in turn, agreed to come speak to University of Minnesota students (and members of the surrounding community) on February 26, 2018. (*Id.* ¶¶ 78-80; *see also id.* ¶ 80 (noting that YAF provided "assistance and financial support to bring Mr. Shapiro to the University of Minnesota's campus").)

In October 2017, several months before Mr. Shapiro's speech, SCV informed the University that it intended to bring Mr. Shapiro to campus the following February. (*Id.* ¶

81.) According to Plaintiffs, "[b]efore any specific details were provided by SCV, Defendant Dussault [the Assistant Director of Student Unions & Activities] explicitly informed SCV that the Shapiro event would be subject to [the LSEP] and stated that he would schedule follow up meetings to discuss details." (*Id.* ¶ 83.) Nonetheless, because Defendants had allegedly used the LSEP to relocate one of SCV's prior events (a speech by conservative commentator Lauren Southern) "on three occasions without obtaining SCV's prior permission" (*id.* ¶ 85), Plaintiffs allege that SCV immediately took the initiative of reserving "multiple potential rooms" on the centrally-located Minneapolis campus "to avoid being forced to host the Shapiro event in an undesirable location and to make sure that at least one room was available." (*Id.* ¶ 87.) Because SCV's goal was to hold Mr. Shapiro's speech "in the largest venue available on the Minneapolis campus," the student group "placed reservation requests both verbally and via e-mail for several locations," with seating capacities ranging from 450 to 4,000. (*Id.* ¶¶ 94-96.) Plaintiffs allege that, as of December 6, 2018, at least two of the three rooms SCV reserved were open and available for use on the evening of February 26, 2018 – Mayo Hall, which seats 455 attendees, and Willey Hall, which seats 1,056 attendees. (*Id.* ¶¶ 99-102.) Consequently, on that date, SCV "formally requested use of Willey Hall." (*Id.* ¶ 102.)

Although the University of Minnesota-Twin Cities has a St. Paul campus that is, by Plaintiffs' admission, only a bus ride away from the Minneapolis campus (*id.* ¶ 139), Plaintiffs allege that "they always intended to host the Shapiro lecture on the Minneapolis campus" because that campus is "more convenient for the majority of students," and because hosting the lecture on the St. Paul campus "would inhibit attendance" and

"burden the effectiveness of the speech." (*Id.* ¶¶ 103-04.) Indeed, Plaintiffs allege, "many students on the Minneapolis campus go their entire undergraduate careers without ever visiting the St. Paul campus," in part because evening busses between the two campuses only run every 15-20 minutes. (*Id.* ¶ 139.)

However, in late December 2017, Defendants, acting pursuant to the LSEP, determined that the Shapiro speech would be held in a venue on the St. Paul campus that could accommodate a maximum of 500 attendees. (*Id.* ¶ 105.) Specifically, Plaintiffs allege that Chief of Police Clark sent an e-mail, which was later forwarded to SCV, stating that "the admin has asked that we try to move this visit to the St. Paul campus. It's going to be a security issue with past lectures at other universities." (*Id.* ¶ 106-07; *see also id.* ¶ 108 (alleging that, "upon information and belief," President Kaler and Vice President Berthelsen participated in this decision).) Lieutenant Buhta and Mr. Dussault allegedly concurred with this assessment, and further asserted, in e-mails to SCV, that Willey Hall's "access to the [West Bank] Skyway" rendered the location unsafe to host Mr. Shapiro. (*Id.* ¶¶ 114-18.) In these exchanges, Lieutenant Buhta also referred to the University's decision to move Mr. Shapiro's speech to the St. Paul campus as "unfortunate." (*Id.* ¶ 136.)

Plaintiffs allege that Defendants' security concerns lacked support, especially two months prior to the event, and therefore constituted a mere pretext to "banish" Mr. Shapiro's "controversial" conservative views to an out-of-the-way location, where SCV and Mr. Shapiro would receive less attention from the campus. (*Id.* ¶¶ 105, 113-14.) In further support of this "pretext to discriminate" contention, Plaintiffs allege that (a) the

University "routinely controls access to its West Bank Skyway," including by closing off the Skyway every weekday night after 10:00 PM and all day on Sundays (*id*. ¶¶ 118-23), and (b) concerns about "access to the West Bank Skyway" did not prevent the University and/or student groups from hosting well-known "liberal" public figures with "university-favored viewpoints" in centrally-located lecture halls connected to that Skyway, *i.e.*, Justice Ruth Bader Ginsburg in September 2014, Justice Sonia Sotomayor and U.S. Senator Bernie Sanders in October 2016, former U.S. Senator Al Franken in June 2017, and U.S. Senator Amy Klobuchar, former U.S. Vice President Walter Mondale, U.S. Senator Elizabeth Warren, and then-U.S. Representative Keith Ellison in October 2017. (*Id*. ¶¶ 124-30.)

In response, SCV decided to reserve the North Star Ballroom, a 400-person venue on the St. Paul campus. (*Id*. ¶ 141.) According to Plaintiffs, "[t]ickets for the event sold out in only a few short hours after they were made available," with SCV receiving "725 inquiries within the first 24 hours of offering the tickets." (*Id*. ¶ 142.) This success prompted Plaintiffs to "renew[] their request for use of [the 1,000-seat] Willey Hall." (*Id*. ¶ 143.) Moreover, Plaintiffs allege that, after they renewed their request for Willey Hall, a member of the University's Board of Trustees "sent an e-mail to Defendant Dussault," on January 26, 2018, "requesting further information" about the situation. (*Id*. ¶ 144.) Plaintiffs further allege that this inquiry led the University to hold a press conference on February 9, 2018 to address "the backlash received by the Board of Trustees." (*Id*. ¶ 149.) Plaintiffs describe this press conference, organized by Matt Kramer, Vice President of University Relations, as an "attempt[] to justify" the University's "refusal" to

accommodate "SCV's request for the available Willey Hall venue." (*Id.* ¶¶ 150-51.) It appears that, after this press conference, Plaintiffs did not request to move the Shapiro speech again.

Mr. Shapiro ultimately spoke to a crowd of around 450 people in the North Star Ballroom on February 26, 2018. (*Id.* ¶ 153.) However, Plaintiffs contend, Defendants' actions prevented Plaintiffs from "deliver[ing] their message to hundreds of students that wanted to attend the event," which "deprived" those students "the opportunity to . . . participate in an important dialogue on matters of public concern." (*Id.* ¶ 155.) Moreover, Plaintiffs allege, "[n]o more than two dozen protestors appeared outside the Shapiro lecture on the day of the event." (*Id.* ¶ 113.)

Because of this experience, Plaintiffs' complaint concludes, SCV has "modified, self-censored and suppressed its speech . . . by choosing not to invite certain speakers to campus whose content and viewpoint Defendants or other members of the campus community will consider to be more objectionable or controversial than other speakers." (*Id.* ¶ 193.)

### D. Procedural History

On July 3, 2018, Plaintiff filed a complaint alleging that the LSEP violated the First and Fourteenth Amendment, both facially and as-applied to the Shapiro speech, and accordingly requested damages for past harm, as well as a permanent injunction prohibiting Defendants "from enforcing" the LSEP, or "otherwise disrupting or preventing Plaintiffs from engaging in lawful First Amendment activity at the University." (Compl. Prayer for Relief.) Defendants moved to dismiss the complaint in

its entirety a little over a month later, on August 22, 2018. (*See* Defs.' Br. in Support of Mot. to Dismiss [Doc. No. 16] ("Defs.' Br.").) Full briefing on the motion followed. (*See* Pls.' Br. in Opposition to Defs.' Mot. to Dismiss [Doc. No. 20] ("Pls. Opp. Br."); Defs.' Reply Br. [Doc. No. 23].) The Court, in turn, entertained oral argument on November 30, 2018.

## II.    DISCUSSION

Federal Rule of Civil Procedure 8 requires that a complaint present "a short and plain statement of the claim showing that the [plaintiffs are] entitled to relief." Fed. R. Civ. P. 8. However, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and therefore advance a claim into discovery, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Neubauer*, 849 F.3d at 404 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Although "[t]he plausibility standard is not akin to a probability requirement," it does require a complaint to present "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Here, Defendants levy a variety of procedural and substantive attacks on Plaintiffs' complaint, which the Court will address one-by-one. The Court will first consider Defendants' two procedural arguments: One, that Plaintiffs YAF and Mr. Shapiro lack "standing" to bring this suit, and, two, that Plaintiffs have failed to allege

facts personally connecting Defendants Kaler, Berthelsen, and Clark to the decision to move the Shapiro speech.

The Court will then turn to the merits of Plaintiffs' claims. The Court will first address the viability of Plaintiffs' First Amendment claim, both facially and as-applied, as well as Defendants' qualified immunity defense to this claim. After that, the Court will consider Plaintiffs' Fourteenth Amendment Due Process Clause claim. The Court will conclude with an evaluation of Plaintiffs' Fourteenth Amendment Equal Protection claim, alongside Defendants' qualified immunity defense to that claim.

In sum, the Court finds some of Plaintiffs' claims plausible, and other of Plaintiffs' claims implausible.

**A. Standing**

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const., art. III, § 2, cl. 1. Accordingly, any federal court plaintiff must have case-or-controversy "standing" to assert a claim—specifically, a plaintiff must show "(1) that he has suffered an 'injury in fact' that is 'actual or imminent, not conjectural or hypothetical'; (2) that the injury is causally connected to the defendant's allegedly illegal conduct and not to the 'independent action of some third party not before the court'; and (3) that 'it [is] likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision.'" *Wieland v. U.S. Dep't of Health and Human Servs.*, 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Moreover, because "standing is not dispensed in gross," a plaintiff "must demonstrate standing for each claim he seeks to press and for

each form of relief this is sought." *Town of Chester v. Laroe Estates*, 137 S. Ct. 1645, 1650 (2017).

Here, Defendants argue that two of the three Plaintiffs, *i.e.*, YAF and Mr. Shapiro, do not have "standing" to bring this suit, either for injunctive relief (*i.e.*, relief barring Defendants from doing something in the future) or retrospective relief (*i.e.*, relief remedying Defendants' past wrongs). (*See* Defs.' Br. at 9-10.) This is so, Defendants contend, because the complaint does not allege that YAF or Mr. Shapiro was involved with the venue reservation process, or that either party intends on returning to the University of Minnesota to speak. (*Id*.) As such, Defendants argue, neither party suffered an "injury in fact," nor is facing a likelihood of a future "injury in fact." (*Id*.; *accord Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (noting that the only two recognized "injuries in fact" for First Amendment claims seeking "prospective relief" are "a credible threat of prosecution" under a challenged statute or regulation, or "self-censorship").)

The Court agrees with Defendants that Plaintiffs YAF and Mr. Shapiro lack standing to sue for injunctive, or "prospective," relief. This is so because, unlike SCV (Am. Compl. ¶ 193), the Complaint does not allege that either YAF or Mr. Shapiro is engaging in "self-censorship" as a result of the LSEP. *Klahr*, 830 F.3d at 794. In other words, there is no allegation that either YAF or Mr. Shapiro is declining to speak (or fund speech) at the University of Minnesota in the future because of Defendants' actions.

However, the Court finds that both YAF and Mr. Shapiro have standing to sue for *retrospective* relief. The Complaint alleges that Defendants' actions prevented Mr.

Shapiro (as speaker) and YAF (as funder) from "deliver[ing] their message to hundreds of students that wanted to attend the [Shapiro speech]." (Am. Compl. ¶ 155; *see also id.* ¶ 80 (noting that YAF provided "assistance and financial support to bring Mr. Shapiro to campus," in accordance with its mission to introduce college students to "conservative speakers").) This is enough to state an injury-in-fact under the "lenient" standing requirements for First Amendment claims. *See Gerlich v. Leath*, 861 F.3d 697, 704 (8th Cir. 2017) (allegation that university "violated [plaintiffs'] First Amendment rights by . . . preventing their ability to spread [their] message [was] sufficient to establish an injury in fact"); *accord Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) ("The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact."). It is of no moment that YAF funded the speech, rather than spoke itself. *Cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech.").

For these reasons, the Court grants in part and denies in part Defendants' motion with respect to standing.

## B. Personal Involvement

In a constitutional suit like this one, state employees may be sued in either their "official capacity" or their "individual capacity."

With respect to "official capacity" claims, a plaintiff is only permitted to sue a state employee for injunctive and/or declaratory relief, and not for money damages. *See*

*Ex Parte Young*, 209 U.S. 123 (1908). This is because "[a] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent," *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010), and the Eleventh Amendment immunizes state entities, like the University of Minnesota, from damages lawsuits, *see Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996). Therefore, to state a claim against a defendant in their official capacity for injunctive or declaratory relief, a plaintiff must allege "that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." *Raymond v. Univ. of Minn. Bd. of Regents*, 140 F. Supp. 3d 807, 814 (D. Minn. 2015) (quoting *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989)).

With respect to "individual capacity" claims, by contrast, state employees may be sued for money damages. *See* 42 U.S.C. § 1983. Similarly, though, to state a claim against a state employee in their individual capacity, a plaintiff must allege that the state official "personally violated the plaintiff's constitutional rights," or was "involved in 'creating, applying, or interpreting a policy' that [gave] rise to unconstitutional conditions." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)). As such, whether suing a state defendant in their official or individual capacity, a plaintiff must plausibly allege that that official had some kind of personal involvement with the purportedly unconstitutional policy or action.

Here, Defendants argue that Plaintiffs' "official capacity" claims *and* "individual capacity" claims against Defendants Clark, Berthelsen, and Kaler fail for lack of

sufficient allegations of "personal involvement." (*See* Defs.' Br. at 10-14.) Plaintiffs disagree, and argue that the following allegations sufficiently demonstrate "personal involvement": (a) as high-ranking University officials, all three Defendants were ultimately responsible for the LSEP (Am. Compl. ¶¶ 29-42); (b) Defendant Clark's e-mail stated that "the admin" had ordered the Shapiro speech to be moved to St. Paul (*id*. ¶¶ 106-08); and (c) the University held a press conference a month before the speech to justify the "admin's" decision (*id*. ¶¶ 150-51). (*See* Pls.' Opp. Br. at 6-10.) With respect to Defendants Kaler and Berthelsen in particular, Plaintiffs note that, "[w]hile 'the admin' [referenced in Clark's e-mail] could conceivably refer to persons other than Defendants Kaler and Berthelsen, the question of 'to whom the phrase refers' may not be disposed of at the pleadings stage of this case and Plaintiffs must be given the opportunity for discovery." (*Id*. at 9.)

The Court agrees with Defendants with respect to President Kaler, but disagrees with Defendants with respect to Chief of Police Clark and Vice President of University Services Berthelsen. As an initial matter, the Court notes that "it is important that [it] is reviewing a record in which discovery has yet to take place," and must accordingly afford Plaintiffs' complaint all "reasonable inferences." *Bonner*, 552 F.3d at 679 (denying motion to dismiss state prison official based on lack of "personal involvement"); *accord Jackson*, 747 F.3d at 545 (same). However, by the same token, affording a complaint "reasonable inferences" does not require the Court to keep a high-ranking state official in a litigation based on the "sheer possibility" that the official was personally involved in

allegedly unconstitutional decision making. *Iqbal*, 556 U.S. at 678. In reaching its decision here, the Court keeps that balance in mind.

First, the Court finds that the Complaint presents more than a "sheer possibility" that Clark and Berthelsen were personally involved with the LSEP, including its application to the Shapiro speech. With respect to Clark, the Complaint specifically alleges that Clark sent an e-mail explaining why "the admin" was not going to allow Mr. Shapiro to speak on the Minneapolis campus, which Clark then passed along to his Lieutenant, Defendant Buhta, to communicate to SCV. (*See* Am. Compl. ¶¶ 106-07.) As for Berthelsen, the LSEP states that his department, "University Services," is one of the departments responsible for enforcing the LSEP (*see* LSEP at 1), and the Complaint alleges that one of Berthelsen's fellow University Vice Presidents, Matt Kramer of University Relations, gave a press conference "justifying" the University's decision to move the Shapiro speech, one month before the speech occurred. (*See* Am. Compl. ¶¶ 149-52.) It is reasonable to infer from these facts that Berthelsen was involved with, or at least aware of, the "admin's" decisions concerning the Shapiro speech.

By contrast, the Court finds that the Complaint's allegations of "personal involvement" fall short with respect to President Kaler. That Kaler is "responsible for the enactment, implementation, and enforcement of [University of Minnesota] policies affecting students, student organizations, faculty, and guests" (*id*. ¶¶ 52-53), and that the University held a press conference about the Shapiro speech, show nothing more than a "sheer possibility" that President Kaler was the "admin" referenced by Clark's e-mail, or that Kaler is responsible for the creation and enforcement of the LSEP. *Iqbal*, 556 U.S. at

678. Indeed, on its face, the LSEP appears to simply be a "Student Unions & Activities" policy, rather than the kind of official school policy a University President would normally be involved with. (*See* LSEP.) Thus, these facts are unlike the Ninth Circuit decision cited by Plaintiffs, in which a majority of the panel found that a plaintiff student group sufficiently pleaded "personal involvement" by Oregon State University's President in the application of a "newspaper collection bin" policy because the complaint cited e-mails showing that the President "knew that [his] subordinate," the University's Director of Facilities Services, was enforcing the at-issue policy against plaintiffs, yet "did nothing to stop him." *Or. St. Univ. Student All. v. Ray*, 699 F.3d 1053, 1070-71 (9th Cir. 2012). There is no allegation giving rise to a "reasonable inference" that President Kaler had such knowledge of his subordinates' actions here. *Jackson*, 747 F.3d at 545. However, this dismissal is without prejudice should discovery reveal that President Kaler was involved in the decision to move the Shapiro speech to St. Paul.

For these reasons, the Court grants in part and denies in part Defendants' motion with respect to personal involvement.

### C. The First Amendment Claim

As the Court noted at the outset, Plaintiffs' complaint is best understood as a "facial" challenge to the LSEP, on the one hand, and an "as-applied" challenge to the manner in which Defendants "applied" the LSEP to the Shapiro speech, on the other hand. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982) (noting that, in contrast to an as-applied challenge, a "facial challenge means a claim that a law [or policy] is invalid *in toto*, and therefore incapable of any

valid application"). The Court will accordingly analyze Plaintiffs' First Amendment claim on those terms. *Accord Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329 (8th Cir. 2011).

Before delving into the merits of Plaintiffs' "facial" and "as-applied" challenges, however, the Court will first determine the proper legal standard under which to review this First Amendment claim.

### 1. *The Applicable First Amendment Standard*

In relevant part, the First Amendment provides that state actors "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; amend. XIV. Virtually all non-violent political speech is protected by the First Amendment, even when "hurtful," "offensive," or "disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). Moreover, because public universities are creatures of state government, the First Amendment's dictates unquestionably apply on their campuses. *See Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819 (1995); *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006). Indeed, the Supreme Court has noted, the "danger" of "chilling individual thought and expression" is "especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 2520; *accord Bowman*, 444 F.3d at 979.

That said, it is equally unquestionable that public universities, just like any governmental entity, "may legally preserve the property under its control for the use to which it is dedicated." *Rosenberger*, 515 U.S. at 829 (quoting *Lamb's Chapel v. Center*

*Moriches Sch. Dist.*, 508 U.S. 384, 390 (1993)); *see also Victory Found.*, 640 F.3d at 333 ("[I]t is well-established that the government need not permit all forms of speech on property that it owns and controls."). Because "[a] university's mission is education," federal courts have "never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities," nor required that a university either "make all of its facilities equally available to students and nonstudents alike," or "grant free access to all of its grounds or buildings." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).

In recognition of this delicate balance between the First Amendment rights of individual speakers and the property rights of university proprietors, the Supreme Court and Eighth Circuit have generally held that both university property (like lecture halls) and university programming (like student activity funds) are "limited public forums." *See Christian Legal Soc. v. Martinez*, 561 U.S. 661, 679 (2010); *Rosenberger*, 515 U.S. at 828-29; *Gerlich*, 861 F.3d at 704-05; *Bowman*, 444 F.3d at 977-80. This is so because, for the most part, universities "open [their nonpublic] property, *limited* to use by certain groups," *e.g.*, students, faculty, employees, *or* "dedicated solely to the discussion of certain subjects," *e.g.*, student-or-university-sponsored lectures. *Christian Legal Soc.*, 561 U.S. at 679 n.11 (emphasis added). In a limited public forum, the states may place restrictions on First Amendment-protected speech so long as those restrictions are "reasonable in light of the purpose served by the forum," and do not "discriminate against speech on the basis of its viewpoint." *Rosenberger*, 515 U.S. at 829; *accord Powell v. Noble*, 798 F.3d 690, 700 (8th Cir. 2015); *Victory Found.*, 640 F.3d at 334-35.

However, the Eighth Circuit has enunciated a narrow exception to this general rule. That is, if a university "intentionally opens" a portion of its campus "for expressive conduct . . . but not limited to a particular type of speech or speaker," that portion of campus is deemed a "designated public forum." *Bowman*, 444 F.3d at 976. Restrictions on speech in "designated public forums" are evaluated under the "traditional public forum" framework, which is the exacting standard courts apply when reviewing attempts to restrict speech occurring on streets, sidewalks, and public parks. *See Ball v. City of Lincoln, Neb.*, 870 F.3d 822, 730 (8th Cir. 2017) (explaining that, in a "traditional public forum," the "government's ability to permissively restrict expressive conduct is very limited," and any "*content*-based restriction on speech" will be subject to "strict scrutiny"); *but cf. Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) (noting that, even in a traditional public forum, "content-neutral time, place, and manner requirements," such as noise ordinances or parade permit requirements, are generally permissible).

In *Bowman*, for instance, the Eighth Circuit found that the common areas outside the University of Arkansas's student union were "designated public forums," because the University "permit[ed] both University Entities and Non–University Entities to speak at these locations," and because there was "little evidence that the University intended to limit the use of [those] University space[s] to a particular type of speech or speaker." *Id.* at 979; *accord Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011) (noting that "a school creates a designated public forum *only when* school authorities have by policy or practice opened those facilities for *indiscriminate use by the general public*," such as

where a university has a demarcated "free speech zone" where anyone in the public may speak) (emphases added).

Here, Defendants argue that "limited public forum" analysis should govern the Court's treatment of the LSEP, because the LSEP primarily involves access to places like "classrooms" and "concert halls." (*See* Defs.' Br. at 15-16.) Plaintiffs, by contrast, argue that a stricter form of scrutiny should apply, such as that applied to "designated public forums," because venues subject to the LSEP, like Willey Hall, are purportedly "public forum[s] for speech and expressive activity by registered student groups at the University." (Pls.' Br. at 11.)

The Court agrees with Defendants, and will accordingly evaluate Plaintiffs' First Amendment claim under the "limited public forum" standard of review. The Court reaches this conclusion for a few reasons. First, every case cited by Plaintiffs in support of applying strict scrutiny involves government regulating access to traditional public forums (outside the university context), or is otherwise readily distinguishable. *See, e.g.*, *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (striking down ordinance regarding the fees a county administrator can charge parade organizers); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) (striking down ordinance granting mayor authority to grant or deny applications for annual permits to place newsracks on public property); *Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009) (striking down Missouri's specialty license plate statute).

By contrast, virtually every recent case involving a First Amendment speech challenge to a university policy, regulation, or action has been analyzed under the

"limited public forum" framework. *See, e.g.*, *Martinez*, 561 U.S. at 679; *Rosenberger*, 515 U.S. at 828-29; *Gerlich*, 861 F.3d at 704-05; *Bloedorn*, 631 F.3d at 1232-33; *Young Am. Found. v. Napolitano*, No. 17-cv-2255 (MMC), 2018 WL 1947766, at *3 (N.D. Cal. Apr. 25, 2018); *Kushner v. Buhta*, No. 16-cv-2646 (SRN/SER), 2018 WL 1866033, at *10 (D. Minn. Apr. 18, 2018); *Bus. Leaders in Christ v. Univ. of Iowa*, No. 17-cv-80 (SMR/SBJ), 2018 WL 4701879, at *9 (S.D. Iowa Jan. 23, 2018); *Keister v. Bell*, 240 F. Supp. 3d 1232, 1240 (N.D. Ala. 2017); *Students for Life USA v. Waldrop*, 162 F. Supp. 3d 1216, 1233 (S.D. Ala. 2016).

Second, although Plaintiffs could argue that "designated public forum" analysis applies because the LSEP, by its own terms, applies to both "indoor and outdoor areas," the latter of which the public may generally access, that argument is misplaced. (*See* LSEP (stating that the policy applies to "student group sponsored events taking places in a large campus venue *or outdoor space*") (emphasis added).) Most importantly, unlike *Bowman* and *Bloedorn*, which involved universities placing restrictions on persons attempting to speak in outdoor campus locations that the university had intentionally opened for "indiscriminate use by the general public," *Bloedorn*, 631 F.3d at 1231, there is no plausible allegation here that Defendants have "opened [their outdoor] facilities," with respect to *hosting* large-scale events, "for indiscriminate use by the general public." *Id*. Indeed, the whole point of the LSEP is to prevent even student groups from hosting such "large-scale" events, anywhere on campus, without first securing the university's permission. This is important because, in the forum analysis, the state's intention controls over all else. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802

(1985) ("The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.").

Finally, although Plaintiffs' counsel argued at the motion hearing that strict scrutiny should at least apply with respect to the *student plaintiffs* (SCV), because, unlike Mr. Shapiro or YAF, they were the ones "the [limited] forum [of Willey Hall] was created for" (Nov. 30, 2018 Hr'g Tr. at 17), the Eighth Circuit rejected an analogous argument only a few years ago. *See Powell* 798 F.3d at 700 n.2 (concluding that First Amendment "case law" does not distinguish between plaintiffs "completely exclude[d] from a forum," and plaintiffs "inside a forum"). Moreover, although some older, out-of-circuit precedent supports Plaintiffs' proposed distinction between "student plaintiffs" and "outside plaintiffs," *see, e.g.*, *ACLU v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005), the Supreme Court's most recent precedent on the matter effectively holds that "limited public forum" analysis applies to student group plaintiffs, even when those plaintiffs are the ones the "limited forum was created for." *See generally Martinez*, 561 U.S. at 679-85.

For these reasons, the Court will review Plaintiffs' First Amendment claim under the standard applicable to "limited public forums."

### 2. *Plaintiffs' Facial Challenge to the LSEP*

As Plaintiffs' Complaint makes clear, Plaintiffs are waging a "facial" First Amendment challenge to the entire LSEP, and are accordingly seeking "injunctive relief" preventing the University from enforcing the LSEP writ large. (*See, e.g.*, Am. Compl. ¶

195, Prayer for Relief.) The Court will review the plausibility of this aspect of Plaintiffs'

First Amendment claim first.

As an initial note, it is well-established that, in the First Amendment context,

"[f]acial challenges . . . are disfavored." *Phelps-Roper v. City of Manchester, Mo.*, 697

F.3d 678, 685 (8th Cir. 2012); *accord Nat'l Endowment for the Arts v. Finley*, 524 U.S.

569, 580 (1998) (describing "facial invalidation" of a statute or regulation as "strong

medicine," best employed "sparingly and only as a last resort"). This is especially so in

the educational setting, where "neither [the Eighth Circuit] nor the Supreme Court has

ever applied a stringent, facial standard of judicial supervision to the discretionary

decisions of schools officials administering a [limited] educational forum." *Victory*

*Found.*, 640 F.3d at 337; *accord Young Am. Found.*, 2018 WL 1947766, at *5 (rejecting

facial First Amendment challenge to university policy); *Bus. Leaders in Christ*, 2018 WL

4701879, at *12 (same).

With that background principle in mind, the relevant inquiry is whether the

Complaint plausibly alleges that the LSEP, on its face, either (1) is not "reasonable in

light of the purpose served by the [university] forum," or (2) "discriminate[s] against

speech on the basis of its viewpoint." *Rosenberger*, 515 U.S. at 829.

### a. *Reasonableness*

As to the first criteria, the Supreme Court has "repeatedly stressed that a State's

restriction on access to a limited public forum 'need not be the most reasonable or the

only reasonable limitation.'" *Martinez*, 561 U.S. at 692 (quoting *Cornelius*, 473 U.S. at

808). Indeed, "control over access to a [limited public] forum may be based on the

subject matter of the speech, on the identity or status of the speaker, or on the practical need to restrict access for reasons of manageability or the lack of resources to meet total demand." *Victory Found.*, 640 F.3d at 335 (emphasis added); *accord Powell*, 798 F.3d at 701. In the university context, the Supreme Court has also "cautioned courts . . . to resist substitut[ing] their own notions of sound educational policy for those of the school authorities which they review," and to give "decent respect" to officials' decisions about how best to manage their student programs. *Martinez*, 561 U.S. at 686-87 (cleaned up).

Even viewing the allegations in the light most favorable to Plaintiffs, the Complaint fails to plausibly allege that the LSEP, on its face, constitutes an unreasonable restraint on campus speech. The LSEP merely states that a registered student group must "have [the] support of the [LSEC] before a large campus venue reservation can be confirmed," and that, in determining whether the campus can support a large-scale event, the LSEC may consider "other events happening on campus, human resources needed to support the event, [the] impact of the event to the campus community, [and the] impact of [the] event on [the] community surrounding campus." (LSEP.) In other words, the LSEP functions as a kind of permit requirement for students wishing to hold "large-scale events" on campus property, *i.e.*, limited public forums.

Given the "significant public safety interest[s]" universities have in "accommodating crowds," "minimizing the disruption of the educational setting," and "coordinating the use of limited space by multiple entities," this kind of requirement is imminently reasonable. *Bowman*, 444 F.3d at 981; *id*. at 991 (Bye, J., concurring) (same); *see also Powell*, 798 F.3d at 701 (noting that "limiting congestion and disruption is, of

26

course, a legitimate and reasonable goal," in the context of a First Amendment challenge to state fair crowd control rules) (cleaned up). Indeed, virtually every court to consider an analogous "permit requirement" on a university campus, whether under the "limited public forum" standard or the more stringent "designated public forum" standard, has upheld the requirement. *See, e.g.*, *Bloedorn*, 631 F.3d at 1236-41; *Bowman*, 444 F.3d at 980-81; *Keister*, 240 F. Supp. 3d at 1240-42; *Riemers v. State ex rel. Univ. of North Dakota*, 767 N.W.2d 832, 840-41 (N.D. 2009); *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) (upholding city park permit requirement for groups of 50 or more, and noting that such a requirement allows the government "to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event"); *Josephine Havlak Photo., Inc. v. Vill. of Twin Parks*, 864 F.3d 905, 914-19 (8th Cir. 2017) (relying on *Thomas* in upholding city park permit requirement for *any* form of commercial activity).

Plaintiffs' only notable argument to the contrary is to contend that the LSEP is unreasonable because it "applies everywhere on the [University of Minnesota] campus," and therefore "does not leave open ample alternative means" for Plaintiffs, especially SCV, to communicate and disseminate their message. (Pls.' Br. at 19-20; *cf. Victory Found.*, 640 F.3d at 335 (noting that "[t]he reasonableness of a restriction on access is supported when substantial alternative channels remain open for the restricted communication") (cleaned up).) However, this argument misses the forest for the trees. On its face, the LSEP only sets forth a bureaucratic requirement for a *particular kind* of

campus speech Plaintiffs wish to engage in, *i.e.*, hosting a large-scale event on University property. This requirement is, at worst, a minor impediment in the way of Plaintiffs' overall ability to disseminate their message. *See also Martinez*, 561 U.S. at 690-91 (noting all the ways a contemporary university student group can communicate and disseminate their message, even without official school support). While University of Minnesota students (including SCV) may not like that the LSEP potentially prevents them from receiving their "first choice" in venue, "the First Amendment does not demand unrestricted access to a [limited public] forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Powell*, 798 F.3d at 701.

Accordingly, the Court finds that the Complaint fails to plausibly allege that the LSEP is facially unreasonable.

### b. *Viewpoint Discrimination*

Of course, "the existence of reasonable grounds for limiting access to a [limited public] forum will not save a regulation that is in reality a façade for viewpoint-based discrimination." *Cornelius*, 473 U.S. at 811.There are two ways in which a university policy can facially discriminate on the basis of viewpoint. First, a university policy may discriminate on the basis of viewpoint when the university's "rationale for its regulation of speech is the specific motivating ideology or the opinion or perspective of the speaker." *Gerlich*, 861 F.3d at 705.  For instance, a university can neither adopt a policy "allow[ing] a group of Republicans or Presbyterians to meet [in university facilities] while denying Democrats or Mormons the same privilege," *Widmar*, 454 U.S. at 281 (Stevens, J., concurring), nor refuse to fund religious student publications while

continuing to fund all other political student publications, *Rosenberger*, 515 U.S. at 825, 831. However, if a university policy "draws no distinction between groups based on their message or perspective," it is "textbook viewpoint neutral." *Martinez*, 561 U.S. at 694-95.

That said, a university policy may also discriminate on the basis of viewpoint if the policy vests "unbridled discretion in a government official" to control speech. *Roach*, 560 F.3d at 869. This is so because, "without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *Id*. (quoting *Lakewood*, 486 U.S. at 763-64). For example, in the Oregon State University case mentioned above, the Ninth Circuit found that a student group plaintiff adequately pleaded "unbridled discretion" when a university "policy" restricting the location of student newspaper distribution bins was neither "written" nor "otherwise established by practice," and hence provided "no standards by which [university] officials could be limited." *Ray*, 699 F.3d at 1065.[2]

---

[2]    Admittedly, it is not clear if the Eighth Circuit even applies this law in the educational setting. *See Victory Found.*, 640 F.3d at 337 (suggesting that a First Amendment "unbridled discretion" challenge may not apply "to the discretionary decisions of school officials administering a [limited public] educational forum"). Nonetheless, the Court will consider an "unbridled discretion" argument here because, while the Eighth Circuit law is unclear on this point, multiple other circuit courts have squarely held that the "unbridled discretion doctrine" applies to limited public forums. *See, e.g.*, *Children First Found., Inc. v. Fiala*, 790 F.3d 328, 343-44 (2d Cir. 2015) (holding that "the unbridled discretion doctrine applies in the context of nonpublic forums," and noting that every circuit to have directly considered the question has held likewise).

Because there is no dispute that the LSEP is viewpoint-neutral on its face, Plaintiffs primarily rely on an "unbridled discretion" argument. (*See* Pls.' Br. at 11-15.) In particular, Plaintiffs contend that the LSEP unduly risks viewpoint discrimination because it vests Defendants with "unbridled discretion" to (a) "determine which events must comply with the restrictions of the policy," (b) "approve or decline any event," and/or (c) "impose restrictions on any event such as the location of the event, the time of the event, the size of the event, and whether to charge security fees, etc." (*Id*. at 11-13.) Plaintiffs also note that the LSEP "requires no written justification for placing any restrictions on a speaker," and fails to offer an "appeal process or other recourse if the restrictions are applied in error." (*Id*. at 14.)

The Court disagrees. First, almost all of the "unbridled discretion" cases cited by Plaintiffs involved state government regulations in "traditional public fora," and hence provide little guidance in this situation. (*See supra* at 22.) Indeed, as the Court noted above, it is unclear to what extent this "unbridled discretion" case law even applies in the educational setting. (*See id*. at n.2.) However, assuming this case law applies, the LSEP provides sufficient criteria by which to guide the discretion of the LSEC. The policy is only limited to "student group sponsored large-scale events," not to "any" event, as Plaintiffs suggest, and it provides specific examples of those kinds of events. (*See* LSEP (listing examples as "events taking place in a large campus venue or outdoor space that will draw a significant amount of the campus population, a large off-campus crowd, or presents a significant security concern (i.e., public figure, celebrity, etc)").) Moreover, although the LSEP vests the LSEC with significant discretion to approve, deny, or alter a

venue request for a "student sponsored large-scale event," the Policy provides sufficient criteria by which to guide this discretion: the LSEC must consider "other events happening on campus," "human resources needed to support the event," "the impact of the event on the campus community," and "the impact of the event on the surrounding community." (*Id.*) Importantly, too, as its title suggests, the LSEP is a collaborative "process" between student groups, administration, and other campus stakeholders (including campus police and parking authorities), rather than a binary "yes/no" permit from the Director of Student Services. Given this collaborative context, the lack of a written decision or appeals process is not particularly troubling. *Cf. Victory Found.*, 640 F.3d at 337 (noting that a school district backpack flyer distribution policy did not vest the district with "unbridled discretion," in part because the policy was created "with input from various sources").

The (admittedly scant) on-point case law further buttresses this conclusion. As best the Court can tell, virtually every recent "unbridled discretion" challenge to a *written* university policy or procedure has been rejected, even when the policy uses similarly broad verbiage. *Compare, e.g.*, *Southworth v. Bd. of Regents of Univ. of Wis.*, 307 F.3d 566, 590-92 (7th Cir. 2002) (upholding university policy for allocating student group funds, even though policy gave university committee discretion to determine if a "substantially equivalent service" was already being provided to students, or if a student group was offering the campus an "identifiable educational service"); *Collegians for a Constructive Tomorrow v. Bd. of Regents of Univ. of Wis.*, 820 F. Supp. 2d 932, 942-46 (W.D. Wis. 2011) (same) *with Ray*, 699 F.3d at 1065 (upholding challenge to university

policy because it was "not written or otherwise established by practice"); *Southworth*, 307 F.3d at 592 (upholding challenge to university "travel grant" policy because, unlike all other student funding decisions, the "Finance Committee did not provide *any* criteria governing the award of travel grants") (emphasis added).[3]

Indeed, a recent Northern District of California decision rejected an "unbridled discretion" challenge to the University of California-Berkeley's (strikingly similar) "Major Events Policy," which the university had employed when accommodating a speech by (the same) Mr. Shapiro. *See Young Am.'s Found.*, 2018 WL 1947766, at *5 n.10 (finding the terms "likely to significantly affect campus safety and security" and "has a substantial likelihood of interfering with other campus functions or activities," "sufficiently definite" for First Amendment purposes); *but cf. id.* at *4 (finding that a predecessor policy to the "Major Events Policy," the "High-Profile Speaker Policy," *was* potentially susceptible to an "unbridled discretion" challenge because the policy was "unwritten," and therefore included "no standards, either through the policy's terms or its history of enforcement, to limit any implementing officials' discretion").

All told, Plaintiffs fail to set forth plausible allegations that, on its face, the LSEP vests the University with such "unbridled discretion" that it "raises the specter of . . .

---

[3]     Admittedly, the criteria listed in these "student group funding" cases are far more detailed than those listed in the LSEP. *See, e.g.*, *Southworth*, 307 F.3d at 588. The funding policies also provided student applicants an appeals process if their funding request was denied. *Id*. However, by its own terms, the LSEP is only concerned with the (far simpler) inquiry of *where* "large-scale," student-hosted events may be held. As such, it is unsurprising that the LSEP sets forth a less rigorous bureaucratic process than the funding processes at issue in *Southworth* and *Collegians*.

viewpoint censorship." *Roach*, 560 F.3d at 869. This is especially so in light of the Supreme Court's command to give university officials' "decent respect" in determining how best to manage their student programs and facilities. *Martinez*, 561 U.S. at 686-87.

For these reasons, the Court grants Defendants' motion with respect to Plaintiffs' facial First Amendment challenge.

### 3. *Plaintiffs' As-Applied Challenge to the LSEP*

The Court now turns to Plaintiffs' "as-applied" First Amendment challenge. Plaintiffs argue that, when the allegations recited in Section I.C, *supra*, are taken as true and viewed in the light most favorable to Plaintiffs, it is plausible to infer that Defendants "banished" Mr. Shapiro's speech to the St. Paul campus, not because of genuine "security concerns," but because his conservative message was seen as "controversial" on a liberal university campus. (*See* Pls.' Br. at 15-17.) What is more, Plaintiffs point out, even if Defendants did not themselves find Mr. Shapiro's speech disagreeable, viewpoint discrimination may still have occurred if Defendants moved Mr. Shapiro's speech simply to appease liberal students, faculty, or community members, without a genuine security concern to justify that appeasement. (*See id*. at 18; *accord Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 502-03 (9th Cir. 2015) (noting that, even in a limited public forum, a "heckler's veto" may be a form of "viewpoint discrimination" if "asserted fears of hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed"); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (en banc) (similarly holding that it is not "constitutionally

valid" to curtail speech in a limited public forum simply because "other persons on the [] campus object[] to [the speaker's] viewpoint").)

In response, Defendants argue that it is implausible that viewpoint discrimination occurred here because "the allegations in the complaint make it clear that the University acted only on the basis . . . of providing for the security of members of the campus community, as well as maintaining the education environment of the University." (Defs.' Br. at 19.) Moreover, Defendants contend, "Plaintiffs have not alleged facts giving rise to the inference of the existence of a nexus between the views of potential protestors and Defendants' actions." (*Id*. at 20.)

On this point, the Court agrees with Plaintiffs. Taken together, and viewed in the light most favorable to Plaintiffs, the allegations in the Complaint plausibly allege that Plaintiffs' "controversial" viewpoint may have motivated Defendants' decisions with respect to the Shapiro speech. For instance, contrary to Defendants' argument that the Complaint "makes clear" that the University acted "only on the basis" of security concerns, the Complaint alleges that "Defendants decided to move the event to the St. Paul campus two months before the event and in the absence of any specific information regarding the event at the University." (Am. Compl. ¶ 109.) This allegation matters because, "in the absence of any specific information" about planned protests in response to Mr. Shapiro, or other potentially disruptive behavior, it is plausible that Defendants' decision to move the speech to the St. Paul campus may have been based merely on concerns that some "persons on the [] campus objected to [Mr. Shapiro's] viewpoint," which, the Eighth Circuit has held, is not a "constitutionally valid reason" to prohibit

someone from speaking in an otherwise-available limited public forum like Willey Hall. *See Burnham*, 119 F.3d at 676 (finding that University of Minnesota-Duluth officials violated history professors' First Amendment rights when it required them to remove photographs of themselves holding firearms from a departmental display case, simply because some campus members found the photographs "insensitive" and "inappropriate").[4]

Further, the Complaint alleges that numerous well-known liberal speakers were allowed to speak in centrally-located University spaces connected to the skyway (all of whom had some need for security by virtue of their celebrity), while Mr. Shapiro, a well-known conservative speaker, was barred from doing so, based in large part on the purported "security concerns" raised by Willey Hall's "access to the skyway." (*See* Am. Compl. ¶¶ 114-30.) Taken as true, this kind of "unique scrutiny" raises a plausible allegation of viewpoint discrimination, given the Eighth Circuit's recent holding that "imposing" "unique scrutiny" on a campus speaker with a particular viewpoint, as compared to other speakers who do not share that viewpoint, potentially suggests that

---

[4]    Defendants appended a document to their Motion to Dismiss suggesting that SCV first raised security concerns about this event. (*See* Herbert Aff. [Doc. No. 17].) This document potentially supports Defendants' argument that "security concerns" were not "speculative," even two months before the event. *Seattle Mideast*, 781 F.3d at 502-03. (*See* Defs.' Br. at 19; Defs.' Reply Br. at 9.) However, because this document is outside the pleadings, and its import is disputed by Plaintiffs (*see* Pls.' Br. at 17; Am. Compl. ¶ 91), the Court declines to consider it as this stage. *See Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014) (holding that courts cannot consider "matters outside the pleadings" in deciding a motion to dismiss, including "any written or oral evidence . . . in opposition to the pleading that . . . does not merely reiterate what is said in the pleadings").

impermissible viewpoint discrimination is afoot. *See Gerlich*, 861 F.3d at 705-07 (denying university officials' motion for summary judgment on First Amendment claim, largely because of the "unique scrutiny" officials gave to plaintiff, a pro-marijuana student group, when rejecting plaintiff's application for use of the university's trademark).

For these reasons, the Court denies Defendants' motion with respect to Plaintiffs' as-applied First Amendment challenge.[5]

### 4. *Defendants' Qualified Immunity Defense*

Of course, even if the facts alleged in the Complaint plausibly suggest that Defendants violated Plaintiffs' First Amendment rights, the doctrine of qualified immunity requires the Court to dismiss Plaintiffs' claim if the constitutional right Defendants allegedly violated was not "clearly established" as of late December 2017. *Gerlich*, 861 F.3d at 704 (cleaned up). This requirement insures that government officials have "fair warning" that their treatment of a group or person is potentially unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Although "clearly established law should not be

---

[5]     This case can be distinguished from the University of California-Berkeley Ben Shapiro case, where the District Court granted the majority of the university's motion to dismiss plaintiffs' as-applied First Amendment claim. *See Young Am.'s Found.*, 2018 WL 1947766, at \*7-9. There, both the complaint and exhibits attached to the complaint made clear that, on Berkeley's campus, violent protests had actually broken out at an event featuring a different conservative commentator in February 2017, only a few months before Mr. Shapiro's August 2017 speech. *See, e.g.*, *id*. at \*1 (noting that, in February 2017, "dozens of black-clad, masked agitators and demonstrators[,] appearing to act in concert, set fires and threw objects at buildings in downtown Berkeley near the campus to protest [the] appearance," of Milo Yiannopoulous, a "contentious conservative writer"). The Complaint does not allege that Defendants faced an analogous security risk here.

defined at a high level of generality," "there need not be a case directly on point" for a constitutional right to be clearly established. *Gerlich*, 861 F.3d at 708 (cleaned up); *see also id.* at 711 (Kelly, J., concurring) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). Importantly, too, in evaluating whether a right was "clearly established" in the "specific context of [a] case," courts must accept as true all allegations in the complaint and "take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *cf. Kong v. City of Burnsville*, No. 16-cv-3634 (SRN/HB), 2018 WL 6591229, at *16-17 (D. Minn. Dec. 14, 2018) (applying this principle in denying defendants' summary judgment motion for qualified immunity).

Here, Defendants argue that, because there is no clearly-established "First Amendment right" for university student groups "to reserve any building on campus to host an outside speaker," they are entitled to qualified immunity. (Defs.' Br. at 15, 30-32.) Defendants further contend that "[a] reasonable official in Defendants' position, knowing of potential security concerns regarding the Shapiro event, could not have known that moving the Shapiro event to the North Star Ballroom to limit potential disruption to campus in pursuit of maintaining an educational environment on campus would violate the Constitution." (*Id.* at 31-32.) By contrast, Plaintiffs argue that "the Supreme Court has long recognized that the Constitution protects the right to exercise speech on public university campuses, free of government-backed heckler's vetoes, arbitrary restrictions, and viewpoint discrimination," and that Defendants are therefore

"not entitled to qualified immunity" on this claim. (Pls.' Br. at 26 (citing *Widmar*, 454 U.S. at 277).)

It is true, as a general matter, that the Supreme Court and Eighth Circuit have "long" "recognized that if a university creates a limited public forum, it may not engage in viewpoint discrimination within that forum." *Gerlich*, 861 F.3d at 709. However, because there are disputed factual issues regarding Defendants' decision to move the Shapiro speech to the St. Paul campus, and whether that decision amounted to viewpoint discrimination, the Court will reserve resolving whether this "clearly established law" gave Defendants "fair warning" that their conduct potentially violated the First Amendment until at least summary judgment, when a proper factual record has been developed. To rule otherwise, especially at this nascent stage of litigation, would be to define this "case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 572 U.S. at 657; *accord Young Am.'s Found.*, 2018 WL 1947766, at *12 (denying motion to dismiss the surviving, plausible part of plaintiffs' as-applied First Amendment claim on qualified immunity grounds, "in light of unresolved factual issues pertaining to defendants' stated security concerns," and because it was "preferable to defer resolution of the immunity question until the record [was] more fully developed").

For these reasons, the Court denies Defendants' qualified immunity motion with respect to Plaintiffs' as-applied First Amendment challenge.

### D. The Fourteenth Amendment Due Process Claim

The Due Process Clause of the Fourteenth Amendment bars state actors from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. A statute or government policy that potentially deprives a person of First Amendment "liberties" may violate the Due Process Clause "if the statute . . . fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (cleaned up). For instance, in *Stephenson v. Davenport Comm. Sch. Dist.*, the Eighth Circuit invalidated a school district regulation mandating suspension and/or expulsion for students displaying "gang signs," because the regulation potentially threatened First and Fourteenth Amendment liberties, and because the use of "the term 'gang,' without more," rendered the regulation "fatally vague." 110 F.3d 1303, 1310 (8th Cir. 1997).

However, the Eighth Circuit has recently suggested that this "void-for-vagueness" doctrine applies with less force, if at all, to regulations and government policies that impose only "modest consequences" for failure to comply with the policy. *Powell v. Ryan*, 855 F.3d 899, 903 (8th Cir. 2017) (rejecting a void-for-vagueness challenge to state fair rules against "impeding traffic," in part because the only consequence for violating the rule was "ejection from the state fair"); *see also Keating v. Univ. of South Dakota*, 569 Fed. App'x 469, 471 (8th Cir. 2014) (holding, in the context of a void-for-vagueness challenge to university code of conduct, "when . . . an enactment does not impose criminal penalties, due process tolerates a lesser degree of specificity than it would from a criminal statute") (citing *Village of Hoffman Estates*, 455 U.S. at 498–99);

*Bandy v. Comm. of Corr.*, No. 13-cv-2209 (JRT/LIB), 2016 WL 1271469, at *7 (D. Minn. Mar. 31, 2016) (finding the void-for-vagueness doctrine "inapplicable" because "the challenged language [was] not a criminal or civil enforcement provision and no sanction was imposed based on [plaintiff's] failure to comply with the Policy"), *aff'd*, 683 Fed. App'x 551 (8th Cir. 2017); *cf. Beckles v. United States*, 137 S. Ct. 886, 893-95 (2017) (holding that the void-for-vagueness doctrine does not even apply to the federal Sentencing Guidelines, in part because the Guidelines are "purely discretionary" and "do not regulate the public by prohibiting any conduct").

Here, Plaintiffs essentially repackage their First Amendment "unbridled discretion" facial challenge into a Fourteenth Amendment "void-for-vagueness" facial challenge. (*See* Pls.' Br. at 21-23.) In other words, Plaintiffs contend that, because the terminology in the LSEP is "vague," "student cannot know how to structure their requests to hold a speaking event and Defendants can grant or deny requests in a discriminatory way." (*Id*. at 22.) This vagueness purportedly results in student groups refraining from speaking at all. (*Id*.; *cf. Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (noting that the void-for-vagueness doctrine is important in the First Amendment context because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked").) In response, Defendants argues that the void-for-vagueness doctrine is inapposite because the LSEP "provides for no sanctions for failure to comply, other than a potential inability to hold [an] event as planned." (Defs.' Br. at 25.)

The Court agrees with Defendants. First, in light of the aforementioned Eighth Circuit law, the Court is skeptical that the void-for-vagueness doctrine applies here in any appreciable way. Although the LSEP certainly implicates First Amendment liberties, in that it imposes a procedural requirement for students seeking to engage in protected speech, the LSEP in no way "sanctions" potentially protected speech in the sense that that term is normally used; the only consequence of failing to secure approval for a large-scale event from the LSEC is not being able to host an event on campus or having to re-schedule the event for a later date. *Compare with Stephenson*, 110 F.3d at 1310 (finding doctrine applicable where school district regulation potentially barred protected speech, such as religious tattoos, under threat of suspension or expulsion). Moreover, even assuming the doctrine applies, Plaintiffs' challenge would fail for the same reason their "unbridled discretion" challenge failed. (*See supra* at 29-32.) Simply put, there is no plausible allegation that the LSEP, on its face, fails "to provide a [student] of ordinary intelligence fair notice of what [kind of events are subject to the LSEP], or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder*, 561 U.S. at 18; *accord Young Am.'s Found.*, 2018 WL 1947766, at *11 (rejecting void-for-vagueness challenge to "Major Events Policy" for same reasons the Court rejected "unbridled discretion" challenge).

For these reasons, the Court grants Defendants' motion with respect to Plaintiffs' Due Process claim.

### E. The Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment bars state actors from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.  If a state actor "classifies" between similarly-situated persons "on the basis of a suspect class, such as race, or 'impinges on personal rights protected by the Constitution,'" such as the First Amendment's free speech guarantee, the Equal Protection Clause requires courts to subject that action to "strict scrutiny." *Schmidt v. Ramsey*, 860 F.3d 1038, 1047 (8th Cir. 2017) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Under that demanding standard of review, courts must only uphold the state actor's classification if it is "suitably tailored to serve a compelling state interest." *Id*. The Equal Protection Clause and the First Amendment's prohibition on viewpoint discrimination are "closely intertwined," as, under either constitutional provision, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). As such, some out-of-circuit courts have argued that an Equal Protection claim "rise[s] and fall[s]" with the viewpoint discrimination prong of a plaintiff's as-applied First Amendment claim. *Ray*, 699 F.3d at 1067 (denying motion to dismiss Equal Protection claim where plaintiff stated an as-applied First Amendment claim, and observing that the Supreme Court "has noted that one analysis will often control both claims") (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983)); *accord Bible Believers v. Wayne Cty.*, 805 F.3d 228, 256-57 (6th Cir. 2015) (same); *Young Am.'s Found.*, 2018 WL 1947766, at *11 (same).

However, outside of *Young Am.'s Found.* (an unpublished decision arising out of the Northern District of California), there is virtually no law applying the Equal Protection clause in the context of a limited public forum, as-applied student free speech challenge. And, even then, *Young Am.'s Found.* provides only a cursory discussion of this law.

Here, the parties offer various merits arguments for and against finding an Equal Protection claim. (*Compare* Pls.' Br. at 23-24 *with* Defs.' Br. at 27-29.) However, the Court finds that qualified immunity plainly protects Defendants from an Equal Protection claim, and that, therefore, the Court need not rule on the merits of this claim. *See Pearson v. Callahan*, 555 U.S. 223, 231, 237 (2009) (holding that courts may resolve a qualified immunity solely by reference to the "clearly established" prong of analysis, and encouraging courts to decide qualified immunity defenses on that prong when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right"); *accord Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985, 1016 (D. Minn. 2014) (granting qualified immunity to University officials based solely on an analysis of the "clearly established" prong of qualified immunity). Simply put, there was no "clearly established law" putting Defendants on notice in December 2017 that their conduct potentially violated the Equal Protection clause. *Gerlich*, 861 F.3d at 704. In contrast to Plaintiffs' First Amendment claim, the Court cannot locate "a robust consensus of cases of persuasive authority," much less "controlling authority," applying the Equal Protection clause to a limited public forum, as-applied student free speech claim like this one. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Admittedly, it appears

that most plaintiffs alleging analogous facts to Plaintiffs do not bring an Equal Protection claim alongside their First Amendment claim. But, without at least one published decision giving Defendants "fair and clear warning" that their decision to move the Shapiro speech to St. Paul potentially violated the Equal Protection clause, liability does not lie. *Id.* at 746 (Kennedy, J., concurring).

For these reasons, the Court grants Defendants' motion with respect to Plaintiffs' Equal Protection claim.

## III.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [Doc. No. 14] is **GRANTED IN PART AND DENIED IN PART**, and that Plaintiffs' Motion to Amend their Complaint [Doc. No. 25] is **GRANTED IN PART AND DENIED IN PART**.

Plaintiffs' facial First Amendment challenge, Plaintiffs' Fourteenth Amendment Due Process claim, and Plaintiffs' Fourteenth Amendment Equal Protection claim are **DISMISSED WITH PREJUDICE**.

Plaintiffs' surviving as-applied First Amendment claim against Defendant Eric Kaler is **DISMISSED WITHOUT PREJUDICE**. If discovery reveals evidence of President Kaler's personal involvement in the relevant actions in this litigation, Plaintiffs may move to re-join President Kaler as a Defendant under Fed. R. Civ. P. 20.

Plaintiffs should file an Amended Complaint, setting forth only the surviving claim under this decision, and the allegations relevant to that claim, in the next seven (7)

days. In accordance with the Federal Rules of Civil Procedure, Defendants must answer the Amended Complaint within 14 days of service. *See* Fed. R. Civ. P. 15(a)(3).

Dated:  February 26, 2019                    s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge