# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Young America's Foundation; Students for a Conservative Voice; and Ben Shapiro, | Civil No. 18-cv-01864 (SRN/HB) |
| Plaintiffs, | |
| v. | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Michael Berthelsen, in his official and individual capacities; Matthew A. Clark, in his official and individual capacities; Troy Buhta, in his official and individual capacities; Erik Dussault, in his official and individual capacities; and Eric Kaler, in his individual capacity. | |
| Defendants. | |

In its Memorandum Opinion and Order on Defendants' motion to dismiss Plaintiffs' complaint, the Court narrowed this case to a single issue: whether Defendants engaged in viewpoint discrimination in violation of the First Amendment by "banishing Mr. Shapiro's speech to the St. Paul campus, not because of genuine security concerns, but because his conservative message was seen as controversial on a liberal university campus . . . or simply to appease liberal students, faculty, or community members, without a genuine security concern to justify that appeasement." *Young Am.'s Found. v. Kaler*, 370 F. Supp. 3d 967, 989 (D. Minn. 2019).

The facts simply do not support Plaintiffs' claim.  It is undisputed that the student organizers of Plaintiff Ben Shapiro's appearance on campus raised genuine security concerns in their very first oral and written communications with University officials about the event.  It is undisputed that Plaintiff Young America's Foundation, which supported the event, expected the student organizers to coordinate with campus police to ensure that the event would be safe for all in attendance.  It is undisputed that Mr. Shapiro shared this expectation.  It is undisputed that the student organizers worked closely with Defendants Assistant Director of Student Unions & Activities Erik Dussault and Lieutenant Troy Buhta on the planning of the event, that they found Mr. Dussault and Lieutenant Buhta to be respectful and responsive, and that they never told either Mr. Dussault or Lieutenant Buhta that they were dissatisfied with scheduling the event on the St. Paul portion of the University's Twin Cities campus.  And, finally, it is undisputed that Mr. Shapiro appeared on campus as scheduled, before a full audience, and supported by a live stream.

The Supreme Court has counseled that the decisions of university officials regarding the use of campus facilities are "due decent respect."  *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 686–87 (2010).  The decision-making at issue here was collaborative and reasonable.  Plaintiffs cannot show that any University official engaged in viewpoint discrimination or restricted their speech in violation of the First Amendment.  Therefore, Defendants respectfully ask the Court to grant their motion for summary judgment in its entirety.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.      Student Unions & Activities at the University of Minnesota**

Part of the University's Office of Student Affairs, Student Unions & Activities (SUA) comprises, among other things, three student union facilities and a student activities office.  (Deposition of Maggie Towle, October 2, 2019 (Declaration of Carrie Ryan Gallia in Support of Defendants' Motion for Summary Judgment ("Ryan Gallia Decl.") Ex. A), at 7:16–8:7.)  Defendant Erik Dussault, the Associate Director of SUA,[1] is responsible for the student activities office, which works with registered student groups at the University.  (Dussault Dep. at 10:1–16.)  Registered student groups receive certain benefits: they "can apply for funding through either the student service fees process or various grants on campus, and they can reserve space on campus for events."  (*Id.* at 13:1–5.)

There is no single, centralized process for reserving space for events at the University.  (*Id.* at 14:2–8.)  SUA provides information to registered student groups on various ways to reserve space.  (*Id.* at 14:9–15:5.)  For example, registered student groups can reserve student union space and outdoor space through SUA, and they can reserve classroom space through the Office for Classroom Management (OCM).  (*Id.* at 14:19–15:3.)  Other venues on campus have their own reservation processes.  (*Id.* at 15:3–5.)  When a registered student group reserves space from an office or venue other than SUA,

---

[1] At the time of the events alleged by Plaintiffs, Mr. Dussault was Assistant Director of SUA.  (Deposition of Erik Dussault, October 3, 2019 (Ryan Gallia Decl. Ex. B), at 10:18–24.)

SUA does not learn of the reservation unless the reservation is brought to its attention, either by the student group or by another party. (Towle Dep. at 50:11–51:8; Dussault Dep. at 20:5–16.)

In 2013, Mr. Dussault and his supervisor Denny Olsen, Senior Associate Director of SUA,[2] drafted a Student Group Large Scale Event Process (LSEP). (Olsen Dep. at 9:14–16, 24:10–16; Dussault Dep. at 37:25–38:5; Email from E. Dussault to T. Busse, Aug. 29, 2013 (Ryan Gallia Decl. Ex. D).) They developed the LSEP to help students plan events "that might require university resources," which would warrant review by the University's Large Scale Events Committee. (Olsen Dep. at 22:14–23:11.) The LSEP was designed to help students identify and present all of the information necessary for the Committee to review a proposal for an event. (Dussault Dep. at 38:21–39:11.) The LSEP is designed "to help events be successful." (Olsen Dep. 58:4–5.)

Given the University's decentralized systems for reserving event space, it is not mandatory that a registered student group follow the LSEP. (Olsen Dep. at 25:12–17.) Instead, registered student groups can inform SUA that they would like to follow the process, or SUA will contact a group and ask it to follow the process if a student group-planned large scale event is brought to SUA's attention by OCM or another venue. (Olsen Dep. at 25:12-21.) OCM,[3] for example, refers registered student groups to SUA if

---

[2] Mr. Olsen currently is Interim Director of SUA. (Deposition of Denny Olsen, October 25, 2019 (Ryan Gallia Decl. Ex. C), at 9:7–10.)

[3] OCM processes over 50,000 events a year, "25 percent of which are student union activities groups." (Deposition of Philip Hunter, Oct. 23, 2019 (Ryan Gallia Decl. Ex. E), at 9:21–24.)

a group indicates that it expects an audience of at least 100 people for an event involving a guest speaker.  (Hunter Dep. at 19:16–21 ("[W]e direct them to the student activities office to make sure that they work with the student activities office and their large group event policies and processes to help ensure that their event is successful.").)  Mr. Olsen is unaware of any instance in which a student group, having been referred to SUA, has declined to meet with SUA or to follow the LSEP.  (Olsen Dep. at 58:19–60:10.)

Where venue management or a student group states that an event raises security concerns, SUA will work with the group to review and address those concerns, sometimes through the LSEP.  (Olsen Dep. at 33:2–11.)  However, the "normal protocol" for an event where SUA becomes aware of a student group event that requires security or that may be protested is for someone from SUA and someone from the University of Minnesota Police Department (UMPD) to meet with the student group to identify security needs for the event.  (*Id.* at 45:15–46:20.)  Mr. Olsen is "not aware of any situations where student groups have not wanted to work with us when they . . . brought up security as a concern."  (*Id.* at 58:14–17.)

Several student groups follow the LSEP each year at the University.  (*Id.* at 25:9–12.)

## II.   The Lauren Southern Event

Plaintiff Students for a Conservative Voice (SCV) is a registered student organization at the University of Minnesota.  (Deposition of Madison Dibble, October 17, 2019 (Ryan Gallia Decl. Ex. F), at 28:3–7.)  In the fall of the 2017-18 academic year, SCV worked with another registered student organization, Collegians for a Constructive

Tomorrow (CFACT), to host Lauren Southern, a conservative YouTube personality and author, for an event at the University.  (Dibble Dep. at 87:19–21; Deposition of Michael Ziebarth, October 18, 2019 (Ryan Gallia Decl. Ex. G), at 54:15–25.)  The student groups did not prepare a large scale event proposal or otherwise engage with the LSEP in planning the event.  (*See* Dibble Dep. at 100:12–17.)

The student groups hosting Ms. Southern invited her to the University several weeks before her appearance on October 25, 2017.  (Ziebarth Dep. at 105:16–17.)  They submitted a request to OCM to hold the event in the West Bank Auditorium.  (Email from J. Todd to M. Berthelsen and L. Krueger, Oct. 23, 2017 (Ryan Gallia Decl. Ex. H at UM0003446).)  However, as of the morning of October 23, just two days before the event, they had not completed a use agreement for the space, as required by OCM, and so their room request was still pending.  (*Id.*)

As Ms. Southern's appearance approached, the student groups heard that a protest was being planned.  (Ziebarth Dep. at 55:17–25; Dibble Dep. at 91:22–92:15.)  On the afternoon of Friday, October 20, five days before the planned event, SCV's president contacted UMPD to share notice of the planned protest and stated, "[W]e think that we may need additional security.  Is this something you do?"  (Email from M. Dibble to police@umn.edu, Oct. 20, 2017 (Ryan Gallia Decl. Ex. H at UM0003453).)  At that point, neither student group had informed University staff about the Southern event, nor had they worked with anyone at the University to plan the event.  (Ziebarth Dep. at 56:6–8.)

Having learned of security concerns from both UMPD and OCM, Erik Dussault

reached out to the student groups on the morning of Monday, October 23.  (Email from

E. Dussault to M. Ziebarth and M. Dibble, Oct. 23, 2017 (Ryan Gallia Decl. Ex. I at YAF

000489).)  He copied Defendant UMPD Lieutenant Troy Buhta on the email and

suggested a meeting "to talk through planning for the event."  (*Id.*)

At the meeting later that morning, CFACT's president mentioned "that we were

looking into bringing [Plaintiff] Ben Shapiro the next semester for a speaking

engagement."  (Ziebarth Dep. at 71:9–13.)  Lieutenant Buhta responded that he wanted to

meet with the student groups "and plan extensively before that event, if that event was

happening."  (*Id.* at 72:17–19.)  The students also "mentioned . . . other people's

comparable speaking events, or . . . evidence that we would have issues at an event like

that or potential issues at an event like that."  (*Id.* at 73:18–74:1.)  They stated that they

wanted to "prepare for a . . . speaker that could produce some controversy . . . if brought

to campus," because they were concerned about the safety of Mr. Shapiro, attendees at

the event, and the larger campus community.  (*Id.* at 73:23–74:17.)[4]

---

[4] Plaintiffs admit that the security concerns for Mr. Shapiro's lecture were real and important. Mr. Shapiro is a prominent conservative speaker, and he is currently (and was in 2018) the most popular speaker for Young America's Foundation. (Deposition of Spencer Brown, October 24, 2019 (Ryan Gallia Decl. Ex. J), at 45:14–18, 46:1–3; Deposition of Patrick Coyle, October 24, 2019 (Ryan Gallia Decl. Ex. K), at 95:20–23.) Mr. Shapiro's events and lectures have a history of student protests and threats of protests. (Brown Dep. at 35:11–36:12, 38:17–39:17; Coyle Dep. at 37:2–23, 38:16–17; 41:10–12, 42:13–43.6, 44:3–10, 45:2–10, 45:11–46:5.)  For example, in late 2015 or early 2016, Mr. Shapiro spoke at California State University, Los Angeles, where protesters pulled the fire alarm and blocked the doors at the lecture venue.  (Brown Dep. at 39:9–14.)  In 2017, Mr. Shapiro spoke at the University of California, Berkeley, which "locked down" the campus due to anticipated protests, with University police ultimately arresting 10 protesters. (Brown Dep at 35:12, 35:20–23.)  Plaintiffs agree that safety and security are important values and that it is crucially important that Mr. Shapiro, event

Given the planned protests and attendant security concerns surrounding the Southern event, Lieutenant Buhta suggested a change of venue because of the challenges of securing Willey Hall, through which the West Bank Auditorium is accessed. (Email from T. Buhta to E. Dussault, Oct. 23, 2017 (Ryan Gallia Decl. Ex. H at UM0003449).) Lieutenant Buhta, who has been with UMPD for 22 years and has provided training on securing large-scale events, does not "like Willey Hall for any events," because "it's a huge building, there's seven different entrances," it is connected to both the skyway system and the tunnel system, and it is in "a central area where all tunnels meet." (Deposition of Troy Buhta, Oct. 4, 2019 (Ryan Gallia Decl. Ex. L), at 9:2–3, 14:7–15:13, 65:23–24, 66:6–25.) Lieutenant Buhta has never provided security for a student-hosted event in Willey Hall, and to his knowledge neither has UMPD. (*Id.* at 70:12–21.)

It is Lieutenant Buhta's practice to prepare for a scheduled event on campus with the "worst case scenario" in mind. (*Id.* at 18:4–8.) In developing a plan to secure a venue for an event, Lieutenant Buhta first considers whether there have been problems with the particular event in the past or at other venues, and then he develops a plan to secure the inside of the venue, its perimeter, and the exterior, ensuring he has enough officers present and has coordinated with other regional agencies. (*Id.* at 22:10–24:7.) The venue location is a "huge" consideration in Lieutenant Buhta's security assessment.

---

attendees, the larger campus community, and protesters all be safe at Mr. Shapiro's events. (Dibble Dep. at 117:19–118:17; Coyle Dep. at 61:5–13; Brown Dep. at 46:14–47:5.)

(*Id.* at 30:7–10.)

Once CFACT signed the required use agreement following the meeting with Mr. Dussault and Lieutenant Buhta, OCM confirmed that the Southern event would be held in Room 230 of Anderson Hall. (Email from P. Hunter to cfact@umn.edu and others, Oct. 3, 2017 (Ryan Gallia Decl. Ex. H at UM0003443); Email from E. Dussault to J. Todd, Oct. 24, 2017 (Ryan Gallia Decl. Ex. H at UM0003440).) Other than the use agreement, the students were not asked to fill out any forms. (Ziebarth Dep. at 62:21–63:22; Dibble Dep. at 98:12–15.)

About 250 people protested at the Southern event, which led to two arrests and "a curfew being issued on portions of campus." (Dibble Dep. at 84:8–13.) One protester occupied the room before Ms. Southern spoke but left when asked to do so by UMPD. (Ziebarth Dep. at 9–14.) There was no other protest presence in the room, and "the speaking event began and completed as planned." (Ziebarth Dep. at 61:18–21.) The student groups found it helpful to have UMPD and other law enforcement present at the event. (Dibble Dep. at 295:2–16.)

Later in the evening, following the event, SCV's president emailed Erik Dussault and Lieutenant Buhta, copying CFACT's president:

> We all made it through the event safely. We cannot thank you two (and your teams) enough for all of the preparation that went into the event. We all know that we could not have done this by ourselves, and I truly believe no other University has handled an event with as much professionalism and precision.

(Email from M. Dibble to E. Dussault, Oct. 25, 2017 (Ryan Gallia Decl. Ex. M).)

CFACT's president agrees that the student groups could not have done the event without

the support of Mr. Dussault and Lieutenant Buhta, both of whom treated the students with professionalism throughout the planning process.  (Ziebarth Dep. at 69:15–70:13; Dibble Dep. at 106:21–107:4.)  SCV's president found both Mr. Dussault and Lieutenant Buhta responsive and respectful, and she felt like she could express her opinion to them.  (Dibble Dep. at 107:22–108:11.)

Mr. Dussault responded to the email and asked the students to keep him informed about the Shapiro event planned for February 2018. (Email from E. Dussault to M. Dibble, Oct. 26, 2017 (Ryan Gallia Decl. Ex. M) ("If it works, let's set up a meeting in the next couple of weeks to talk preliminary planning.").)  Mr. Dussault understood SCV's president "to be willing and interested to work through this process moving forward."  (Email from E. Dussault to D. Olsen, Oct. 25, 2017 (Ryan Gallia Decl. Ex. N at UM0003715).)

## III.    Planning for the Shapiro Event

In fact, months before the Southern event, SCV had contacted Plaintiff Young America's Foundation (YAF) "to look at a date for Ben Shapiro in the spring semester" of the 2017-18 academic year.  (Email from M. Dibble to P. Coyle, Aug. 23, 2017 (Ryan Gallia Decl. Ex. O at YAF 000020).)  YAF offered one date of availability: February 26, 2018.  (Email from P. Coyle to M. Dibble, Oct. 5, 2017 (Ryan Gallia Decl. Ex. P at YAF 002778).)  SCV accepted the offered date without first checking on the availability of any venues on campus or asking about whether Mr. Shapiro had any flexibility in his schedule.  (Email from M. Dibble to P. Coyle, Oct. 6, 2017 (Ryan Gallia Decl. Ex. P at YAF 002777); Dibble Dep. at 74:5–22.)

Although YAF's vice-president knew nothing more about the University at the time SCV contacted him about booking the Shapiro event than that it is a public institution, he nonetheless felt that "most universities focus on liberal ideas," and "it's rare for conservative viewpoints to be accessed by students during the classrooms or through the college's official lecture series." (Coyle Dep. at 54:4–9, 57:8–15.) Unable to cite specific examples, YAF's spokesman similarly thought the University has "sort of a bias or a slant . . . [t]owards the left." (Brown Dep. at 48:1–6.)

YAF requires that student groups complete an event questionnaire in advance of a speaker visit to campus. (Coyle Dep. at 80:24–6.) The purpose of the event questionnaire is "[t]o ensure that your event runs smoothly." (Event Questionnaire (Ryan Gallia Decl. Ex. Q at YAF 000010).) The questionnaire asks for general information about the planned lecture, information about liberal speakers and activities on campus, and specific logistical information, including "the exact timetable of events for the speaker." (*Id.*) YAF thinks a detailed logistical plan "contributes to a successful event." (Coyle Dep. at 81:7–17.) YAF thought that the logistical plan SCV provided for the Shapiro event was "a good start." (*Id.* at 86:20–87:1.) YAF also expects student groups to coordinate with campus police in the planning of an appearance by Mr. Shapiro. (Coyle Dep. at 87:14–17; Brown Dep. at 201:11–19; *see also* Deposition of Ben Shapiro, Nov. 19, 2019 (Ryan Gallia Decl. Ex. R), at 73:19–74:6.)

On the evening of the Southern event, a student, on behalf of SCV, submitted a room reservation request to OCM. (Email from M. Kramer to issuesmgmt@umn.edu, Oct. 26, 2017 (Ryan Gallia Decl. Ex. S at UM0005512).) The request sought to reserve

the Mayo Auditorium for a "Ben Shapiro Speech," and the requester included the

following note:

> We will be hosting the event in Mayo Auditorium.  We understand there is a
> fee and insurance cost associated with it.  That is not an issue.  DO NOT
> relocate this event, and DO let us know the additional work we will be
> required to do ahead of time.  The event will likely require security.

(*Id.*)  The request listed the "estimated total attendance of the event" as 400.  (Ben

Shapiro – Request Number: 2017-22243 (Doc. 17-1).)

Defendant President Eric W. Kaler's deputy chief of staff forwarded the room

request to President Kaler, who responded, "I do not want this in the middle of campus –

West Bank is a better location."  (Email from E. Kaler to J. Christensen, Oct. 26, 2017

(Ryan Gallia Decl. Ex. S at UM0005513).)  President Kaler testified that he "did not want

[the Shapiro event] in Mayo because of the centrality to the medical school and the light

rail, and I thought West Bank was a better location for a safe event."  (Deposition of Eric

Kaler, Oct. 2, 2019 (Ryan Gallia Decl. Ex. T), at 73:17–22.)  That said, President Kaler

did not follow up on his email or give any additional input about the location of the

Shapiro event, and he did not "direct[] that it be on the St. Paul campus."  (*Id.* at 71:21–

72:15; *see also* Towle Dep. at 22:23–25; Buhta Dep. at 97:19–98:18; Dussault Dep. at

109:14–19; Deposition of Michael Berthelsen, Oct. 4, 2019 (Ryan Gallia Decl. Ex. U), at

43:11–44:1; Deposition of Matt Kramer, Oct. 23, 2019 (Ryan Gallia Decl. Ex V), at

47:13–48:2; Olsen Dep. at 70:9–25.)  About once a month, as the event approached,

President Kaler received a "two-sentence update" from Defendant Vice President

Michael Berthelsen or Interim Vice Provost Maggie Towle.[5]  (Kaler Dep. at 42:1–21, 83:20–24.)

Even before submitting the room reservation request, SCV notified YAF that it had "the ball rolling on reserving Mayo Auditorium," which "holds 450," for the Shapiro event.  (Email from M. Dibble to P. Coyle, Oct. 23, 2017 (Ryan Gallia Decl. Ex. W at YAF 000072).)  SCV's president then reached out to Mr. Dussault to ask for his assistance.  (Email from M. Dibble to E. Dussault, Dec. 4, 2017 (Ryan Gallia Decl. Ex. X at UM0004811).)  She explained that OCM had not allowed SCV "to book a room until they finalize the class schedule" for spring semester and that two other venues—Ted Mann Concert Hall[6] and Northrop Auditorium—had "said no" to SCV's reservation requests.  (*Id.*)  She hoped Mr. Dussault could "influence" the decision of Ted Mann Concert Hall to deny SCV's request "because it would be the safest location for the event."  (*Id.*)

Around the same time, a different student representative of SCV went to OCM to reserve Rooms 125 and 175 in Willey Hall on February 26, 2018, for a guest speaker,

---

[5] Shortly before the event, President Kaler grew concerned about "the ability for overflow audiences to see Mr. Shapiro's presentation," so he "made inquiry about what the provisions were for live streaming or other transmission."  (Kaler Dep. at 42:22–43:4.)  It was his opinion that, "if the room was full, they should be able to see him live streamed."  (*Id.* at 43:5–6.)

[6] Lieutenant Buhta considers Ted Mann Concert Hall to be an easily secured venue because it is "a building I like to call an island building, there's not a lot of entrances, easy to secure, not a lot of tunnel access, those are things that I like in a building when I'm trying to secure a building."  (Buhta Dep. at 66:17–25.)  He had hoped that Ted Mann Concert Hall would be available for the Shapiro event.  (*Id.* at 85:22–86:1.)

whom the student would not identify.  (Email from P. Hunter to J. Todd, Dec. 6, 2017 (Ryan Gallia Decl. Ex. Y at UM0000807).)  OCM listed the request as "tentative" because SCV had not signed a use agreement for 2018 and because Rooms 125 and 175 were classrooms not yet available to be reserved for events until after spring semester classes were finalized.  (*Id.*; Email from P. Hunter to N. Amundsen, Dec. 6, 2017 (Ryan Gallia Decl. Ex. Z at UM0005372).)  OCM also referred the request to SUA "because it is a guest speaker request and they are requesting both rooms in Willey Hall[7] (which UMPD does not suggest for security reasons)."  (Email from P. Hunter to J. Todd, Dec. 6, 2017 (Ryan Gallia Decl. Ex. Y at UM0000807).)

Mr. Dussault then reached out to the student groups "to meet with me and Troy Buhta in the next week to begin planning for this event."  (Email from E. Dussault to D. Olsen, Dec. 6, 2017 (Ryan Gallia Decl. Ex. Y at UM0000806).)  SCV's president met with Mr. Dussault and Lieutenant Buhta the following week.  (Email from E. Dussault to D. Olsen, Dec. 15, 2017 (Ryan Gallia Decl. Ex. AA).)  At the meeting, the student stated that SCV was "hoping for about 500 participants for their event."  (*Id.*)  Mr. Dussault, Lieutenant Buhta, and SCV's president planned "a walk through of the Mayo Auditorium space next week so that Troy can get a feel for the security concerns.  He actually thinks this might be a good location since it's fairly secluded."  (*Id.*)

SCV updated YAF on the planned walk-through of Mayo Auditorium, which it characterized as "the largest event space we were allowed to reserve."  (Email from M.

---

[7] Together, the two requested classrooms in Willey Hall seat over 900 people.  (Hunter Dep. at 28:15–24.)

Dibble to P. Coyle, Dec. 14, 2017 (Ryan Gallia Decl. Ex. BB at YAF 000024).)  SCV

explained that it was "hard to say how the event could go" with respect to protests, but

that SCV "ha[d] full trust in the University in allowing the event to go forward."  (*Id.* at

YAF 000025.)

At the walk-through, Lieutenant Buhta concluded that it would be difficult to

secure Mayo Auditorium.  (Buhta Dep. at 77:6–78:14.)  He had not visited the venue in

some time and was unaware of recent construction in the area that made the auditorium

"[d]irectly pretty much connected to the hospital over there."  (*Id.* at 77:14–21.)  The

proximity to the University of Minnesota Medical Center by way of an interconnected

"tunnel system or skyway system" led Lieutenant Buhta to change his mind about Mayo

Auditorium.  (*Id.*)

At that point, Mr. Dussault confirmed that rehearsals and performances were

scheduled for Ted Mann Concert Hall on the day of the Shapiro event; he noted that

"there is some availability before and after that date, but I don't know how much, if any,

flexibility you have for the date."  (Email from E. Dussault to M. Dibble, Dec. 20, 2017

(Ryan Gallia Decl. Ex. X at UM0004816).)  He also shared that Fergusen Hall, on the

West Bank portion of campus, had recital halls that could seat up to 150.[8]  (*Id.*)  Mr.

Dussault offered the North Star Ballroom in the St. Paul Student Center, which seats up

to 550 people, as another option for the event.  (*Id.*)  Lieutenant Buhta, observing that

"Willey [Hall] is not going to be a good option due to access from the skyway,"

---

[8] SCV preferred the North Star Ballroom to Fergusen Hall, given the relative size of the
venues.  (Dibble Dep. at 162:9–163:1.)

suggested that SCV consider the Continuing Education and Conference Center on the St. Paul portion of campus.[9]  (Email from T. Buhta to E. Dussault, Dec. 21, 2017 (Ryan Gallia Decl. Ex. X at UM0004817).)

At no point did SCV react negatively to the proffer of locations on the St. Paul portion of campus or expressly tell either Mr. Dussault or Lieutenant Buhta that it did not want to host the event there.  (Dibble Dep. at 167:7–169:16.)  Instead, SCV's president replied to the emails of Mr. Dussault and Lieutenant Buhta, "It looks like St. Paul will be our best option.  I am happy to walk through those two spaces with you."  (Email from M. Dibble to E. Dussault, Dec. 21, 2017 (Ryan Gallia Decl. Ex. EE at YAF000706).) Lieutenant Buhta offered SCV's president a ride to the North Star Ballroom for the scheduled walk-through.  (Email from T. Buhta to M. Dibble, Jan. 4, 2018 (Ryan Gallia Decl. Ex. FF at YAF 000551).)  SCV then entered into an agreement to hold the event at the North Star Ballroom.  (Confirmation (Ryan Gallia Decl. Ex. GG).)  Despite the fact

---

[9] After Lieutenant Buhta suggested the Continuing Education and Conference Center, Defendant UMPD Chief Matthew A. Clark emailed Ken Gay, the scheduler at the Center, to facilitate the scheduling of the event.  (Email from M. Clark to K. Gay, Dec. 21, 2017 (Ryan Gallia Decl. Ex. CC).)  He stated in the email that "[t]he admin has asked that we try to move this to the St. Paul campus."  (*Id.*)  He testified, however, that "nobody in the administration ever asked [him] to try to move the Shapiro lecture to the St. Paul campus."  (Deposition of Matt Clark, Oct. 3, 2019 (Ryan Gallia Decl. Ex. DD), at 96:9–13.)  He made this statement in his email to reflect his understanding that there was an agreement between Lieutenant Buhta, Mr. Dussault, and SCV to hold the event in St. Paul, that he had "already cleared that with people above me, as in the senior vice president and Mike Berthelsen," and that "they had not said that we couldn't do that." (*Id.* at 94:19–95:10.)

SCV excluded the Continuing Education and Conference Center because "there were fees associated with renting that particular building and it was smaller" than the North Star Ballroom.  (Dibble Dep. at 167:1–3.)

that the Ballroom can be configured to seat 555 people for a lecture-type event

(https://sua.umn.edu/reserve-space/all-spaces/north-star-ballroom; Email from E.

Dussault to M. Dibble, Dec. 20, 2017 (Ryan Gallia Decl. Ex. X at UM0004816)), SCV

chose a configuration for the room that sat 400 (Confirmation (Ryan Gallia Decl. Ex.

GG); Declaration of Beth Galatis ¶¶ 4–14).

Because SCV had not completed the required use agreement in connection with its

tentative reservation of Rooms 125 and 175 in Willey Hall, OCM followed up with SCV

on December 6, December 19, and December 22, 2017, and January 19, 2018.  (Emails

from P. Hunter to N. Amundsen, Dec. 6, 19, & 22, 2017, & Jan. 19, 2018 (Ryan Gallia

Decl. Ex. Z at UM0005372–73).)  On January 19, SCV finally informed OCM that it had

"settled on a different venue."  (Email from M. Dibble to P. Hunter, Jan. 19, 2018 (Ryan

Gallia Decl. Ex. Z at UM0005373).)

A few weeks later, Mr. Dussault contacted SCV for an update on the Shapiro

event.  (Email from E. Dussault to M. Dibble, Jan. 29, 2018 (Ryan Gallia Decl. Ex HH at

YAF 000470).)  SCV stated that tickets sold out within a few hours.  (Email from M.

Dibble to E. Dussault, Jan. 29, 2018 (Ryan Gallia Decl. Ex. II).)  SCV did not ask Mr.

Dussault—at that time or any time—whether the Shapiro event could be moved to a

different or larger venue.  (*Id.*; Dibble Dep. at 201:1–12; Dussault Dep. at 116:14–117:1.)

Nor did SCV approach Lieutenant Buhta with a request to secure a different or larger

venue upon learning the event had sold out.  (Dibble Dep. at 202:21–203:7.)  Instead,

SCV told YAF that it was "trying to force the University into giving us a larger venue"

and that it was waiting to see "if the University reaches out to us about the venue size."

(Email from M. Dibble to P. Coyle, Jan. 27, 2018 (Ryan Gallia Decl. Ex. JJ at YAF 000532); Email from M. Dibble to P. Coyle, Jan. 27, 2018 (Ryan Gallia Decl. Ex. KK at YAF 000069).)  Rather than asking anyone at the University about moving the event, SCV "hop[ed] that enough bad press for the University will get us a larger venue." (Email from M. Dibble to P. Coyle, Jan. 27, 2018 (Ryan Gallia Decl. Ex. JJ at YAF 000532).)

YAF advised SCV that it would "strengthen our argument . . . to make sure there aren't other venues available that haven't been requested."[10]  (Email from S. Brown to M. Dibble, Jan. 30, 2018 (Ryan Gallia Decl. Ex. LL at YAF 000250).)  YAF specifically asked SCV's president to "send an email to the person you've been working with to request venues and ask: 'Are there any venues available on the Minneapolis campus that hold approximately 1000 people on February 26?'" (*Id.*)  SCV's president has no recollection that she ever sent any such email or directly asked anyone at the University about moving the event to another venue.[11]  (Dibble Dep. at 223:12–225:20.)  Instead, she explained that SCV was trying to secure a different venue for the event "[w]ithout talking to the University."[12]  (Email from M. Dibble to S. Brown, Feb. 3, 2018 (Ryan

---

[10] YAF's spokesman thinks it is good for YAF events to get press and that he "like[s] it when the plight of our students gets national attention."  (Brown Dep. at 125:11–19.)

[11] In addition, SCV's president represented that she produced all emails in her possession related to this case.  (Dibble Dep. at 224:1–225:2.)

[12] Presumably to that end, a student representative of SCV placed a request to reserve Anderson Hall Room 210 on February 26, the date of the Shapiro event.  (Email from P. Hunter to N. Amundson, Jan. 30, 2018 (Ryan Gallia Decl. Ex. Y at UM0005374).)  OCM cancelled the request "guessing this was a miscommunication on your group's part

Gallia Decl. Ex. MM at YAF 000622).)

These efforts included trying to reserve Maturi Pavilion, which seats 5,500 people and had already been reserved by the University's volleyball team, despite YAF's exhortation that "Ben has preferred to speak in relatively smaller venues."  (Emails between M. Dibble and P. Coyle, Feb. 5, 2018 (Ryan Gallia Decl. Ex. NN at YAF 000265–66).)  SCV also attempted to secure Willey Hall.  (Email from P. Hunter to N. Amundson, Feb. 16, 2018 (Ryan Gallia Decl. Ex. OO).)  OCM cancelled this request because "the primary contact for your group . . . has told me they have found another venue for Ben Shapiro, and they will not need a general purpose classroom for this event."  (*Id.*)  OCM referred the student to Mr. Dussault for questions, but instead SCV's president—the "primary contact" referenced in the email—complained to YAF that "saying that I agreed to the St. Paul venue is completely irrelevant."  (Email from M. Dibble to P. Coyle, Feb. 16, 2018 (Ryan Gallia Decl. Ex. OO).)

SCV then issued a "Statement on Ben Shapiro's Speech at the University of Minnesota" via Twitter.  (Statement (Ryan Gallia Decl. Ex. PP at UM0000732).)  The statement asserts, "We know why we were unable to rent a large venue: The campus leftists and proto-terrorists who call themselves Anti-Fascists cannot bear to hear a different opinion without promising a violent, disruptive protest."  (*Id.*)  At the same time, SCV states that "the University of Minnesota Police Department is one of the finest

---

because [SCV's president] said you found a different venue."  (Email from P. Hunter to N. Amundson, Jan. 30, 2018 (Ryan Gallia Decl. Ex. Y at UM0005374).)

in the city and they are great to work with."[13]   (*Id.*)  Finally, SCV announced "a live

stream of the event."[14]   (*Id.*)  SCV issued this statement without consulting with YAF,

which "asked that [SCV] coordinate with them in the future."  (Dibble Dep. at

233:233:11–15; Email from P. Coyle to M. Dibble, Jan. 27, 2018 (Ryan Gallia Decl. Ex.

JJ at YAF 000531).)

On February 12, about two weeks before the Shapiro event, Mr. Dussault let

SCV's president know that it was possible to add an additional 49 seats to the North Star

Ballroom.  (Email from E. Dussault to M. Dibble, Feb. 12, 2018 (Ryan Gallia Decl. Ex.

QQ at YAF 000043–44).)

As the event approached, University officials finally learned of SCV's efforts to

secure a larger venue for the Shapiro event.  In response to a February 13 inquiry from a

member of the University's Board of Regents about the availability of Willey Hall, Chief

Clark explained that UMPD was "already past capacity for the event considering the

number of officers on UMPD" and that changing the location to Willey Hall "would

require more personnel to guard skyway access from other buildings and tunnels."

(Email from M. Clark to M. Berthelsen, Feb. 14, 2018 (Ryan Gallia Decl. Ex. RR at

UM0000154).)  Vice Provost Towle explained that SUA "wouldn't normally engage with

any student group re: their wait list.  The event will be live streamed and seems like the

---

[13] Despite voicing admiration for UMPD, SCV's president did not approach Lieutenant
Buhta or Chief Clark to ask for a larger venue for the Shapiro event.  (Dibble Dep. at
251:19–253:11.)

[14] There was no cap on the number of people able to access the live stream of the event.
(Dibble Dep. at 253:17–22.)

alternative for those who want to see the program." (Email from M. Towle to M. Berthelsen, Feb. 19, 2018 (Ryan Gallia Decl. Ex. SS).)

Vice President Berthelsen then decided that "[w]e are not moving the event." (Email from M. Berthelsen to M. Towle, Feb. 21, 2018 (Ryan Gallia Decl. Ex. SS).) He explained that he made the decision independently without consulting with others, and he based his decision on the fact that "[w]e were too far down the road in planning. We had the site, we had transportation plans, we had public safety people arranged. . . . [W]e could not have successfully moved it and held it." (Berthelsen Dep. at 59:12–24.) He also explained that it would have been challenging to move the event from St. Paul to Minneapolis because the public safety resources (such as law enforcement support from other agencies) would not have been the same.[15] (*Id.* at 62:4–21.)

As the event approached, some protests of the event were announced. (Email from M. Dibble to P. Coyle, Feb. 19, 2018 (Ryan Gallia Decl. Ex. TT).) SCV's president shared information about the planned protest from the group that "kick started the protest for our Lauren Southern event" with YAF (*id.*), but she does not recall sharing it with UMPD (Dibble Dep. at 302:2–6).

UMPD prepared an incident action plan for the event, which indicated a detailed operational timeline for the event, described the protest presence at past Shapiro events,

---

[15] He compared this with the Southern event, which was held in Anderson Hall, a different location from the venue tentatively reserved for the event: the West Bank Auditorium. (Berthelsen Dep. at 61:8–62:9.) To the extent it was considered a "move," Vice President Berthelsen explained that "many of the resources would have been the same" at either West Bank venue. (*Id.*)

highlighted any planned protests for the event at the University and described a

responsive plan, and listed coordination with more than 60 officers from other agencies.

(UMPD Incident Action Plan (Ryan Gallia Decl. Ex. UU).)

## IV.    The Shapiro Event

Ben Shapiro appeared at the North Star Ballroom on February 26, 2018.  (Shapiro

Dep. at 61:5–7; Ziebarth Dep. at 128:19–20.)  The event was "really well attended."

(Ziebarth Dep. at 128:21–22.)  The event was also live streamed to an unlimited

audience.  (Dibble Dep. at 253:17–22; Coyle Dep. at 101:9–103:4.)  Mr. Shapiro was

able to speak without disruption.  (Shapiro Dep. at 95:1–97:20; Ziebarth Dep. at 130:1–

8.)

Although Plaintiffs contend that they were treated differently by the University

based on their viewpoint, SCV is not "aware of other student groups that were planning

activities that required security that weren't asked to meet with University officials."

(Dibble Dep. at 148:10–16.)  The University did not pass any costs related to security

through to SCV, YAF, or Mr. Shapiro.  (*Id.* at 153:7–9.)

## ARGUMENT

It is important to view Plaintiffs' claim through the applicable First Amendment

standard.  The Court found that the venues SCV explored as options for the Shapiro event

were "limited public forums."  *Young Am.'s Found.*, 370 F. Supp. 3d at 984.  In a limited

public forum, the University may place restrictions on speech that are "reasonable in light

of the purpose served by the forum" and that do not "discriminate against speech on the

basis of its viewpoint."  *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819,

829 (1995).  To establish viewpoint discrimination, Plaintiffs must show that "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Id.*

A university is not obligated to "grant free access to all of its grounds or buildings," *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981), and the University is unaware of any authority for the proposition that the First Amendment confers on a student group the right to reserve any available venue for an event.  For this reason alone, Plaintiffs' claim fails.

## I.  Standard of Review

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's claim, and on which that party will bear the burden of proof at trial," the court must grant summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must make "justifiable inferences" in favor of the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II.  Plaintiffs' Claim Is Barred by the Doctrine of Qualified Immunity.

A threshold issue when a plaintiff asserts a § 1983 claim for damages[16] is the doctrine of qualified immunity.  Here, Plaintiffs seek to impose personal liability on each

---

[16] Plaintiffs seek "[c]ompensatory and nominal damages for the violation of Plaintiffs' First Amendment rights."  (2d Am. Verified Compl. (Doc. 58) at 32.)

of the defendants.  The qualified immunity doctrine provides government officials with

an affirmative defense to damages claims "insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would

have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  For a right to be "clearly

established," "[t]he contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right."  *Anderson v.

Creighton*, 483 U.S. 635, 640 (1987).  Qualified immunity protects "all but the plainly

incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224,

229 (1991).  Therefore, Plaintiffs must satisfy two inquiries with respect to their claim to

overcome qualified immunity: they must show (1) facts as to each individual showing a

violation of their rights and (2) that "the right was clearly established at the time such that

a reasonable person would have known that his conduct violated the law."  *Monroe v.

Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).

   Although Defendants asserted their qualified immunity in connection with their

motion to dismiss, the Court reserved the issue "until at least summary judgment, when a

proper factual record has been developed." *Young Am.'s Found.*, 370 F. Supp. 3d at 992.

As discussed herein, Plaintiffs cannot show facts to establish that any defendant

discriminated against them on the basis of viewpoint in violation of the First Amendment,

and they certainly cannot overcome qualified immunity.

III.    **Plaintiffs Cannot Show That President Kaler Violated Their First Amendment Rights.**

Plaintiffs allege that President Kaler "denied them the opportunity to hold the Shapiro event in the largest and most central portion of the Minneapolis campus." (2d Am. Verified Compl. ¶ 94.)  As support, they rely on the email President Kaler sent upon learning of the planned Shapiro event, wherein he stated that he did not want the event to be held in the Mayo Auditorium and that he thought the West Bank portion of campus was a better location.  (*Id.* ¶ 95.)  Plaintiffs, however, cannot show that President Kaler took any action to in any way restrict their speech, let alone that he did so in violation of the First Amendment.

President Kaler's testimony in this regard is uncontroverted.  He stated unequivocally that he took no steps to follow up on the email he sent, that he gave no advice or guidance about the planning of the Shapiro event, and that he did not direct that the event be located on the St. Paul portion of campus.  (Kaler Dep. at 71:21–72:15.)  Not a single University employee contradicted this testimony; instead, to a person they testified that they received no input whatsoever from President Kaler.  (Towle Dep. at 22:23–25; Buhta Dep. at 97:19–98:18; Dussault Dep. at 109:14–19; Berthelsen Dep. at 43:11–44:1; Kramer Dep. at 47:13–48:2; Olsen Dep. at 70:9–25.)  Moreover, Plaintiffs testified that they did not interact with President Kaler in any regard.  (Dibble Dep. at 282:6–15; Brown Dep. at 60:11–63:13; Coyle Dep. at 51:1–4; Ziebarth Dep. at 44:20–22; Shapiro Dep. at 76:4–6.)  In short, Plaintiffs can offer no evidence that President Kaler restricted their speech in any way.

At most, Plaintiffs can prove that President Kaler voiced an opinion about the Shapiro event and received brief, periodic updates from his staff about it, but they can point to no authority for the proposition that voicing an opinion or receiving updates constitutes a violation of the First Amendment. To the contrary, opinion—even the opinion of a university official—"is absolutely protected under the First Amendment." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)).

To the extent Plaintiffs ask the Court to infer from President Kaler's statement that his opinion about the Shapiro event must have been acted on, such an inference is not "justifiable." *Liberty Lobby*, 477 U.S. at 255. First, Plaintiffs cannot adduce evidence to support such an inference. Second, the evidence supports the contrary inference: that President Kaler's opinion was neither shared nor acted upon. Third, had President Kaler's opinion been heeded, the Shapiro event would have taken place on the West Bank—the very location Plaintiffs assert they were entitled to hold the event. Plaintiffs can point to no evidence even suggesting that President Kaler had any role whatsoever in the selection of the North Star Ballroom as the venue for the event.

In sum, because Plaintiffs cannot show that President Kaler engaged in viewpoint discrimination or a restriction of their speech, their claim against him fails as a matter of law.

IV.   **Plaintiffs Cannot Show That Vice President Berthelsen Violated Their First Amendment Rights.**

Plaintiffs allege, on information and belief, that Vice President "Berthelsen participated in the University administration's decision that the event must be moved to the St. Paul campus based on the controversial nature of the speech and allegedly based on concerns about protests at other University campuses."  (2d Am. Verified Compl. ¶ 113.)  They cannot show facts to support this allegation.

Vice President Berthelsen testified that he is "[n]ot normally" involved in the planning of student group-hosted events.  (Berthelsen Dep. at 16:12–16.)  He was notified about the Shapiro event when SCV first submitted a request to OCM, because the request stated that "the event will likely require security."  (*Id.* at 37:8–21.)  He then forwarded the room request

> to a few people I thought would want to know[, b]ecause the Lauren Southern
> event [which had occurred the same night the room request was submitted]
> had been very contentious and had significant count protestors and it required
> a lot of security, and it was the same group scheduling, and I had just been
> told that it was going to require security, so I was sensitive to that topic.

(*Id.* at 41:2–8.)  He did not take any action beyond forwarding SCV's room request, and he understood that the student group, OSA, and UMPD "talked about a range of possible sites, and the first one everyone agreed on was North Star Ballroom."  (*Id.* at 49:70–50:6.)  In short, Plaintiffs cannot show that Vice President Berthelsen had any involvement in "moving" the Shapiro event to the St. Paul portion of campus.

No evidence demonstrates otherwise.  Plaintiffs base their allegation of Vice President Berthelsen's involvement on a December 21, 2017, email Chief Clark sent to

the Continuing Education and Conference Center in which he stated, "The admin has asked that we try to move this visit to the St. Paul campus.  It's going to be a security issue with past lectures at other universities." (Email from M. Clark to K. Gay, Dec. 21, 2017 (Ryan Gallia Decl. Ex. CC at UM0004921).)  Chief Clark offered uncontroverted testimony that no one in administration had made such a request at the time he sent the email.  (Clark Dep. at 96:9–13 ("Q: And you're telling me that nobody in the administration ever asked you to try to move the Shapiro lecture to the St. Paul campus? A: Absolutely not, that is what I'm telling you.").)  Chief Clark explained that he made the statement in his email to signal to the venue that agreement had been reached between SCV, Lieutenant Buhta, and Mr. Dussault about holding the event on the St. Paul portion of campus and that he had briefed his supervisors (including Vice President Berthelsen) on the agreement and "they had not said that we couldn't do that." (Clark Dep. at 95:1–10.)  And he clarified that he updated Vice President Berthelsen on the agreement because "[h]e's my direct report."  (*Id.* at 96:14–23.)  There is no evidence that Vice President Berthelsen gave any direction with respect to the scheduling of the event, only that he received information that evinced an agreement among all parties involved.

In fact, the only action Vice President Berthelsen took in connection with the Shapiro event was the decision not to move the event to a different venue after tickets had sold out.  Although SCV did not ask any of the defendants about whether a different venue could be secured for the Shapiro event, Vice President Berthelsen ultimately learned that SCV wanted to move the event to Willey Hall.  (Email from B. Steeves to M. Berthelsen, Feb. 14, 2018 (Ryan Gallia Decl. Ex. RR at UM0000155).)  Vice Provost

Towle shared that OSA does not "engage with any student group re: their wait list" and that the live stream would ensure that interested parties could see the program.  (Email from M. Towle to M. Berthelsen, Feb. 19, 2018 (Ryan Gallia Decl. Ex. SS).)  Vice President Berthelsen then decided that the University would not move the event because "[w]e were too far down the road in planning."  (Email from M. Berthelsen to M. Towle, Feb. 21, 2018 (Ryan Gallia Decl. Ex. SS); Berthelsen Dep. at 59:12–24.)

Defendants are unaware of any authority for the proposition that a student group (or any host, for that matter) has a right under the First Amendment to a change in venue when an event sells out, particularly when extensive logistical planning and resource deployment has already taken place.  At the very least, Vice President Berthelsen qualifies for qualified immunity for his decision not to move the event, because his decision did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818.

> "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "'reasonably . . . anticipate when their conduct may give rise to liability for damages.'"

*Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal citations omitted).  Plaintiffs can point to no First Amendment right, let alone a clearly established right that places the question beyond debate, that entitles them to a change in venue.

Notably, it is undisputed that the University did not pass on security or other extra costs to Plaintiffs in connection with the Shapiro event.  Given that the University bears

the burden of marshalling its limited (and public) resources, it is reasonable for the University to decide to marshal those resources responsibly by declining to move a large-scale event involving a prominent speaker less than two weeks before the event so as to necessitate a new security plan involving different law enforcement partners.  Even if the Court views such a decision as a restriction of Plaintiffs' speech, it is a reasonable, viewpoint neutral restriction that is permitted in a limited public forum.  *Rosenberger*, 515 U.S. at 829.

Because Plaintiffs cannot show that Vice President Berthelsen violated their clearly established First Amendment rights when he declined to relocate the Shapiro event, summary judgment is warranted on Plaintiffs' claim against him.

## V.   Plaintiffs Cannot Show That Chief Clark Violated Their First Amendment Rights.

Plaintiffs' allegations with respect to Chief Clark center on the email he sent to the Continuing Education and Conference Center, and Plaintiffs also allege that Chief Clark "conclude[d] that Willey Hall was not a suitable venue for the Shapiro lecture."  (2d Verified Am. Compl. ¶ 116.)  Plaintiffs cannot show facts in support of these allegations that demonstrate unreasonable viewpoint discrimination in violation of the First Amendment.

First, there is no evidence that Chief Clark had any role in concluding that Willey Hall was not a suitable venue for the event.  He testified that he does not recall being through Willey Hall and that the decision "was based on the assessment that came from

Troy Buhta." (Clark Dep. at 102:16–19.) Lieutenant Buhta concurs. (Buhta Dep. at 104:17–106:24.)

To the extent Plaintiffs rely on the email as evidence that Chief Clark impermissibly mandated that the event be scheduled in St. Paul or limited to an audience of 500, this too is not supported by evidence. First, there is no mention of the speaker's viewpoint in the email, and it is undisputed that the security concerns referenced by Chief Clark were first raised by the students both orally and in writing. For Chief Clark, or anyone else at the University, to simply disregard these raised concerns would be unreasonable. Moreover, Chief Clark offered uncontested testimony that he had not received direction from any of his superiors regarding the location of the event; his statement in the email that the event should take place in St. Paul was based on his understanding of the agreement reached between SCV, OSA, and UMPD. With respect to audience size, Lieutenant Buhta testified that he briefed Chief Clark on the event:

> Our original meeting with [the student organizers] was they wanted 450 to 500 people to attend this event. So that's kind of where we came up with these different venues as to where we could host these events. That's where the buildings came up, looking at what venues could hold that many people. Because that was the number that they wanted.

(Buhta Dep. at 87:5–11.) Lieutenant Buhta also mentioned to Chief Clark that he was considering the North Star Ballroom as an option, and Chief Clark then suggested the Continuing Education and Conference Center. (*Id.* at 87:12–16.)

In sum, the facts do not establish impermissible viewpoint discrimination. They establish reasonable operational planning between a police chief and his lieutenant, reacting to information from the student group with which the lieutenant was working, to

find the ideal, most securable venue for a large-scale event featuring a prominent speaker. As such, summary judgment is appropriate on Plaintiffs' claim against Chief Clark.

## VI.   Plaintiffs Cannot Show That Erik Dussault or Lieutenant Buhta Violated Their First Amendment Rights.

Finally, Plaintiffs allege that Mr. Dussault and Lieutenant Buhta discriminated against them based on their viewpoint in violation of the First Amendment. The facts, however, show that Mr. Dussault and Lieutenant Buhta worked collaboratively and reasonably with SCV in the planning of the Shapiro event.[17]

To prevail on their claim, Plaintiffs would have to ask the Court to ignore the role of SCV in the planning of the event. SCV originally indicated that it expected an audience of 400 in its room reservation request to OCM. (Doc. 17-1.) It reiterated this number in conversation with Mr. Dussault and Lieutenant Buhta. (Dussault Dep. at 124:22–24; Buhta Dep. at 87:5–7.) And when the North Star Ballroom offered SCV a larger capacity of 550, SCV declined and stated that it "did not want more seating because they intended to keep attendance to student group members and have very limited general public attendance." (Galatis Decl. ¶ 13.) Plaintiffs can identify no evidence that Mr. Dussault or Lieutenant Buhta were motivated by the viewpoint of Plaintiffs with respect to the size of the audience for the event.

Nor can they identify evidence that Mr. Dussault or Lieutenant Buhta were motivated by viewpoint with respect to the location of the event. This is not a case where

---

[17] There are no facts that show that either Mr. Dussault or Lieutenant Buhta interacted at all with YAF or Mr. Shapiro in the planning of the event.

University officials cited security concerns "as a mere pretext for suppressing expression because [they] oppose the speaker's point of view" or that "the asserted fears of a hostile audience reaction are speculative and lack substance." *Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502–03 (9th Cir. 2015).  Instead, SCV indicated its desired audience size.  SCV signaled a lack of flexibility with the date of the Shapiro event.  SCV (and CFACT, its partner in planning,) stated that the event could draw protests and that it raised security concerns, and some of SCV's past events—as well as some of Mr. Shapiro's appearances on other college campuses—had in fact drawn protests.  SCV defined the parameters of the event it was planning by raising security concerns from its very first communications about the event, and Mr. Dussault and Lieutenant Buhta worked with SCV within those parameters to plan a safe and successful event.

Notably, SCV was offered a larger venue on the West Bank portion of campus: Ted Mann Concert Hall, which seats 1,126 with additional standing room.  *See* https://cla.umn.edu/music/about/location-facilities/ted-mann-concert-hall.  In December 2017, Mr. Dussault notified SCV that there was "some availability before and after" the February 26, 2018, date when the Ted Mann Concert Hall would have been available for the Shapiro lecture.  (Email from E. Dussault to M. Dibble, Dec. 20, 2017 (Ryan Gallia Decl. Ex. X at UM0004816).)  Lieutenant Buhta had hoped that Ted Mann Concert Hall would be available for the event.  (Buhta Dep. at 85:22–86:1.)  Instead, in response to this offer and Lieutenant Buhta's decision that Willey Hall was not a good option for the event, SCV replied that St. Paul looked like the best option.  (Email from M. Dibble to E.

Dussault, Dec. 21, 2017 (Ryan Gallia Decl. Ex. EE at YAF000706).)  At no point did SCV complain to any defendant about the location of the event or ask that the event be moved.

Plaintiffs have no evidence that Mr. Dussault or Lieutenant Buhta violated their First Amendment rights, let alone any clearly defined rights.  The First Amendment did not somehow mandate that Mr. Dussault or Lieutenant Buhta offer to move the event, and nor did it give Plaintiffs the right to reserve a specific, preferred venue.  *Powell v. Noble*, 798 F.3d 690, 701 (8th Cir. 2015) ("[T]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message.").  In no instance did Mr. Dussault or Lieutenant Buhta violate any clearly defined rights of any of the plaintiffs, and therefore the Court should enter summary judgment in favor of Defendants.

## CONCLUSION

For the foregoing reasons, Defendants respectfully ask the Court to grant in its entirety their motion for summary judgment.

Dated: February 25, 2020                    DOUGLAS R. PETERSON
                                            General Counsel
                                            University of Minnesota


                                            By:  s/ Carrie Ryan Gallia
                                            Brian J. Slovut (#236846)
                                            Deputy General Counsel
                                            Dan Herber (#0386408)
                                            Senior Associate General Counsel
                                            Carrie Ryan Gallia (#0390479)
                                            Associate General Counsel
                                            Office of the General Counsel
                                            360 McNamara Alumni Center
                                            200 Oak Street SE
                                            Minneapolis MN 55455-2006
                                            (612) 624-4100

                                            Attorneys for Defendants