IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| YOUNG AMERICA'S FOUNDATION, a Tennessee nonprofit corporation; STUDENTS FOR A CONSERVATIVE VOICE, a registered student organization at University of Minnesota; and BEN SHAPIRO, <br><br> *Plaintiffs*, <br><br> v. <br><br> ERIC W. KALER, President of University of Minnesota, in his official and individual capacities; MICHAEL BERTHELSEN, Vice President of University Services of University of Minnesota, in his official and individual capacities; MATTHEW A. CLARK, Chief of Police of University Minnesota Police Department, in his official and individual capacities; TROY BUHTA, Lieutenant of University of Minnesota Police Department, in his official and individual capacities; ERIC DUSSAULT, Assistant Director of Student Unions & Activities of University of Minnesota, in his official and individual capacities, <br><br> *Defendants*. | Civil No. 18-cv-01864(SRN/HB) <br><br> THE HONORABLE SUSAN RICHARD NELSON |

PLAINTIFFS' AMENDED MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... iv

INTRODUCTION ......................................................................................................... 1

SUMMARY OF UNCONTROVERTED FACTS .................................................................. 2

    I.    University of Minnesota ................................................................... 2

    II.   Reservation Process & Venues ........................................................ 4

        A. Willey Hall ............................................................................... 4

        B. Mayo Auditorium ...................................................................... 5

        C. North Star Ballroom ................................................................. 5

        D. Large Scale Events Process ....................................................... 6

    III.  Past Campus Events Secured by University Police ........................... 6

    IV.  The Shapiro Lecture ...................................................................... 11

ARGUMENT .............................................................................................................. 17

    I.    Defendants' security rationale for excluding the ShapiroLecture from available venues was a mere pretext. ......................................... 17

    II.   By moving the Shapiro Lecture to a smaller, less desirable location, Defendants violated Plaintiffs' free speech rights ................ 20

        A. By denying available venues, Defendants discriminated based on viewpoint, which is unconstitutional in any forum .................. 21

            1. By moving the Shapiro Lecture from the middle of campus, Defendants discriminated based on viewpoint. ......................... 21

            2. By restricting the Shapiro Lecture because they deemed it controversial, Defendants discriminated due to viewpoint. ..... 22

            3. By enforcing an arcane, optional, and never-before-used policy, Defendants discriminated based on viewpoint. ............ 23

            4. By moving the Shapiro Lecture to the St. Paul campus, Defendants discriminated due to viewpoint by enforcing a heckler's veto. ........................................................................ 25

5. Defendants' actions show that they have no safeguards against viewpoint discrimination. ............................................... 26

B. By denying available venues, Defendants unconstitutionally excluded Plaintiffs from available designated public fora. ............ 27

1. The First Amendment protects Plaintiffs' speech. ................... 27

2. The venues Plaintiffs requested are designated public fora. ..... 27

a. Mayo Auditorium is a designated public forum. ................ 29

b. Willey Hall is a designated public forum. ........................... 29

3. By denying available venues, Defendants engaged in content discrimination. .............................................................. 30

a. Defendants considered the content of Plaintiffs' speech when imposing their restrictions. ......................................... 30

b. Defendants discriminated based on content when they exercised unbridled discretion in restricting Plaintiffs. ...... 32

4. Defendants' actions fail all possible levels of scrutiny. ............ 32

a. Defendants fail the scrutiny for limited public fora. ............ 32

b. Defendants fail the intermediate scrutiny reserved for content-neutral actions. .......................................................... 34

c. Defendants fail the strict scrutiny reserved for content- and viewpoint-based actions. ................................................ 35

CONCLUSION ....................................................................................... 36

CERTIFICATE OF COMPLIANCE ........................................................... 37

CERTIFICATE OF SERVICE ................................................................... 38

## TABLE OF AUTHORITIES

### CASES

*281 Care Committee v. Arneson,*
  766 F.3d 774 (8th Cir. 2014)....................................................... 36

*Apex Oil Company v. Jones Stephens Corporation,*
  881 F.3d 658 (8th Cir. 2018)....................................................... 17

*Arkansas Educational Television Commission v. Forbes,*
  523 U.S. 666 (1998)..................................................................... 29

*Ball v. City of Lincoln,*
  870 F.3d 822 (8th Cir. 2017) ...................................................... 28

*Board of Regents of University of Wisconsin System v. Southworth,*
  529 U.S. 217 (2000)..................................................................... 26

*Bowman v. White,*
  444 F.3d 967 (8th Cir. 2006)................................................28, 30, 32 - 34

*Burnham v. Ianni,*
  119 F.3d 668 (8th Cir. 1997).......................21, 24, 26, 31, 33, 34

*Child Evangelism Fellowship of Maryland, Inc. v. Montgomery
  County Public Schools,*
  457 F.3d 376 (4th Cir. 2006)....................................................... 26

*Child Evangelism Fellowship of New Jersey Inc. v. Stafford
  Township School District,*
  386 F.3d 514 (3d Cir. 2004) ....................................................... 23

*City of Lakewood v. Plain Dealer Publishing Company,*
  486 U.S. 750 (1988)...........................................................24, 31, 32

*Cornelius v. NAACP Legal Defense and Educational Fund,*
  473 U.S. 788 (1985).........................................................27, 29, 33

*DiLoreto v. Downey Unified School District Board of Education,*
  196 F.3d 958 (9th Cir.1999)....................................................... 33

*Douglas v. Brownell,*
  88 F.3d 1511 (8th Cir. 1996)...................................................... 32

*Forsyth County v. Nationalist Movement,*
  505 U.S. 123 (1992)..........................................................24, 31

*Frisby v. Schultz,*
    487 U.S. 474 (1988) ................................................................... 34

*Gay & Lesbian Student Association v. Gohn,*
    850 F.2d 361 (8th Cir. 1988) .......................................... 32, 35, 36

*Gerlich v. Leath,*
    861 F.3d 697 (8th Cir. 2017) ................................. 30, 31, 33, 34

*Healy v. James,*
    408 U.S. 169 (1972) ......................................................... 20, 33

*Krantz v. City of Fort Smith,*
    160 F.3d 1214 (8th Cir. 1998) ........................................... 34

*Lewis v. Wilson,*
    253 F.3d 1077 (8th Cir. 2001) ................................. 17, 24, 25

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ......................................................... 34

*Murdock v. Pennsylvania,*
    319 U.S. 105 (1943) ......................................................... 27

*Near v. Minnesota,*
    283 U.S. 697 (1931) ......................................................... 25

*Papish v. Board of Curators of University of Missouri*
    410 U.S. 667 (1973) ................................................... 20, 25

*Perry Educcation Association v. Perry Local Educators' Association,*
    460 U.S. 37 (1983) ........................................................... 33

*Phelps-Roper v. Ricketts,*
    867 F.3d 883 (8th Cir. 2017) ........................................... 30

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ............................................... 31, 35

*Regan v. Time, Inc.,*
    468 U.S. 641 (1984) ......................................................... 32

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ........................................... 21, 22, 30

*Schneider v. New Jersey,*
    308 U.S. 147 (1939) ......................................................... 27

*Seattle Mideast Awareness Campaign v. King County*,
    781 F.3d 489 (9th Cir. 2015)................................................................ 28, 29

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) ........................................................................... 24

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ........................................................................... 27

*Southworth v. Board of Regents of University of Wisconsin System*,
    307 F.3d 566 (7th Cir. 2002)............................................................ 24, 25

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949) .............................................................................. 20

*Texas v. Johnson*,
    491 U.S. 397 (1989) ........................................................................... 25

*United States v. Playboy Entertainment Group*,
    529 U.S. 803 (2000)......................................................................... 32, 36

*Victory Through Jesus Sports Ministry Found. v. Lee's Summit
    R-7 School District*,
    640 F.3d 329 (8th Cir. 2011)............................................................... 28

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989).......................................................................... 28

*Watson v. City of Memphis*,
    373 U.S. 526 (1963)........................................................................... 25

*Widmar v. Vincent*,
    454 U.S. 263 (1981)....................................................................... 20, 29

**INTRODUCTION**

On October 26, 2017, at 9:49 a.m., Defendant Kaler (University of Minnesota President) received an email from his Deputy Chief of Staff, Julie Christensen, alerting him that two conservative student groups had requested to reserve Mayo Auditorium, on the East Bank of the Minneapolis campus, for a lecture by well-known conservative commentator Ben Shapiro (the "Shapiro Lecture"). At 10:05 a.m., Defendant Kaler fired back a quick response: "So have they actually invited Ben Shapiro? *I do not want this in the middle of campus—West Bank is a better location.*" (emphasis added.) This was the first and only time he gave explicit orders about the location for any student group event.

Defendant Kaler's order, based on nothing but hearing that the speaker would share conservative views, was the first of many restrictions Defendants imposed. These restrictions slashed the size of the Shapiro Lecture and stymied Plaintiffs' ability to communicate their message to the intended audience. Plaintiffs desired to expose University of Minnesota students to a viewpoint different from those most people on campus hold and espouse. They intended to host the lecture on the Minneapolis campus in a venue large enough to accommodate as many students as desired to attend, and they tried to reserve multiple venues there, ranging in size from 455 to more than 5,000.

The University allows recognized student groups, University departments, and off-campus groups to reserve classrooms and other campus venues for events. Both student groups and off-campus groups host thousands of events there every year. Many draw thousands of attendees and involve speakers who have sparked protests elsewhere. Past events include musical performances from popular rock bands, lectures by Supreme Court justices,

1

presidential campaign rallies, large sporting events, and other speakers like Congresswoman Ilhan Omar and former Black Panther Angela Davis.

At least two venues Plaintiffs requested on the Minneapolis campus were available on the date of the Shapiro Lecture: Mayo Auditorium (seating 455) and Willey Hall (seating over 1,000). But Defendants refused to let Plaintiffs use these venues because they viewed Mr. Shapiro as conservative, alt-right, and controversial. Instead, they forced Plaintiffs to use the St. Paul campus, a less accessible, less desirable location. Also, they limited the audience size first to 500 and later to 450—while over one thousand remained on the wait list.

The uncontroverted facts show that Defendants violated Plaintiffs' First Amendment rights by restricting and quarantining their speech due to its content and viewpoint and by stopping them from delivering their message to hundreds of students, conservative and liberal, that desired to hear it. Thus, Plaintiffs request that this Court grant them summary judgment.

## SUMMARY OF UNCONTROVERTED FACTS

## I.   University of Minnesota

The University of Minnesota is the state's land-grant university with an enrollment of more than 47,000 students on five separate campuses.[1] The flagship is the Twin Cities campus, consisting of the Minneapolis campus (with its East Bank and West Bank sections) and the St. Paul campus.[2] The Twin Cities campus stretches over 1,150 acres and boasts over 200 buildings.[3] Gopher Way, a tunnel and skyway system, connects many buildings on the

---

[1]   Ex. 62 at 4, 7.
[2]   Ex. 65.
[3]   Ex. 67 at 1; Ex. 68 at 1.

Minneapolis and St. Paul campuses.[4] Most walkways are open weekdays, allowing students, faculty, staff, and visitors to navigate much of the campus without going outdoors.[5]

Most of the students reside on the Minneapolis campus, where twelve of the thirteen residence halls are located.[6] The Minneapolis campus enjoys access to light rail public transportation which connects the campus to the rest of the Minneapolis/St. Paul metro area.[7] The light rail does not run to the St. Paul campus.[8] The St. Paul Student Center is an approximately 15-minute drive, or a one hour and ten-minute walk, from the middle of the East Bank of the Minneapolis campus.[9]

The University is host to thousands of events on campus each year, including many large, high profile events.[10] Past events include musical performances from popular rock bands like U2; lectures by Supreme Court Justices Kagan, Sotomayor, and Ginsburg; presidential campaign rallies for Hillary Clinton and Bernie Sanders; appearances by former President Bill Clinton, Senator Al Franken, and former Black Panther Angela Davis; and large sporting events like Minnesota Vikings playoff games.[11] Most events are held on the Minneapolis campus where most of the large venues and students are located.[12]

---

[4] Ex. 74.
[5] *Id*.
[6] Exs. 58, 69, 77.
[7] Ex. 75.
[8] *Id*.
[9] Exs. 72–73.
[10] Ex. 7 at 10:2–6, 25:18–22.
[11] Ex. 3 at 61:12–22, 74:8–14, 75:13–25; Ex. 5 at 170:17–171:2; Ex. 8 at 76:2–12, 84:5–22; Ex. 9 at 28:23–29:7, 71:19–23, 89:1–90:23; Ex. 41.
[12] Ex. 6 at 117:11–25; Ex. 9 at 33:18–34:13.

## II.   Reservation Process & Venues

The University permits registered student organizations, University departments, and the general public to use both indoor and outdoor venues to host events.[13] They may reserve space in classroom buildings, the three student union buildings, the performance halls, or the other non-classroom campus buildings.[14]

Every year, the University processes requests for more than 50,000 events that take place in the 300 general purpose classrooms in 63 buildings. Student groups submit 25% of these requests.[15] Off-campus groups may reserve classroom space for events, including outside speakers.[16] Student organizations may request to reserve a campus venue, but it is not "reserved" until approved by the officials responsible for it.[17]

To reserve a health sciences classroom, an off-campus group must submit a request, complete a use agreement, provide evidence of insurance, and pay a use fee.[18] Departments and student groups must do the same, except for paying the use fee.[19] The University places no limits on the use of these classrooms or the type of speakers that may use the space.[20]

### A. Willey Hall

Willey Hall is a general-purpose classroom building on the Minneapolis campus' West Bank with two classrooms combining to seat over 1,000 people.[21]

---

[13]  Ex. 6 at 14:2–19:7; Ex. 7 at 23:17–25:5, 32:4–34:10; Ex. 93.
[14]  Ex. 6 at 14:2–19:7.
[15]  Ex. 7 at 10:2–6, 25:18–22.
[16]  Ex. 7 at 23:17–25:5.
[17]  Ex. 6 at 14:11–15:10; Ex. 7 at 18:12–22:15, 23:17–25:5.
[18]  Ex. 6 at 98:7–9; Ex. 93.
[19]  Ex. 7 at 32:4–34:10; Ex. 93.
[20]  Ex. 6 at 98:7–9; Ex. 93.
[21]  Ex. 5 at 169:4-20; Ex. 48.

Its classrooms serve mainly as venues for lecture and debate.[22] Otherwise, the University places no limits on the use of these or any other classrooms there.[23] In the past five years, Willey Hall's classrooms have hosted more than 150 events, including movie screenings, lectures, guest speakers, religious events, fraternity and sorority meetings, political debates, and forums.[24] University police has never conducted a security assessment of Willey Hall or provided security for an event there.[25]

### B. Mayo Auditorium

Mayo Auditorium, a health sciences classroom on the Minneapolis campus' East Bank, seats 455 people and is near light rail transportation.[26] Student and off-campus groups may request to use it and other facilities in that building using a similar process, except the use fee is waived for students.[27] Mayo Auditorium often hosts high-profile speakers, including Representative Omar, Senator Franken, former Senator Durenburger, and leftist commentator and professor Dr. Marc Lamont Hill.[28]

### C. North Star Ballroom

The North Star Ballroom in the St. Paul campus' Student Center can seat 555 people.[29] Student groups, University departments, and outside guests can reserve it using the same process as other student union spaces.[30] It shares the St. Paul Student Center with a bowling alley, a University bookstore, a café, a

---

[22] Ex. 6 at 23:13–24:21; Ex. 7 at 23:17–25:5, 40:10–41:6, 43:1–6; Ex. 39 at A-2.
[23] Ex. 7 at 23:17–25:5, 40:10-41:6, 43:1–6; Ex. 6 at 23:13–24:21; Ex. 39 at A-2.
[24] Ex. 3 at 132:7–20; Ex. 5 at 170:17–171:2; Ex. 25.
[25] Ex. 2 at 101:2–5; Ex. 13 at 103:1–4; Ex. 33.
[26] Ex. 8 at 25:1–6, 26:21–27:2, 30:17–31:10, 73:19-21; Ex. 52 at 2.
[27] Ex. 2 at 76:14–78:1; Ex. 8 at 25:1–4, 27:14–16, 31:18–21, 73:19–21.
[28] Ex. 117.
[29] Ex. 3 at 115:4–6; Ex. 104.
[30] Ex. 104.

Subway restaurant, offices, conference rooms, and lounge areas.[31] Before Mr. Shapiro, the last notable person to speak there was First Lady Laura Bush over 10 years ago.[32]

### D. Large Scale Events Process

In August 2013, Defendants adopted a Large Scale Events Process (the "Policy") designed to govern certain student organization events.[33] Defendant Dussault primarily authored it.[34] Though the Policy states that it must "be followed by any registered student group proposing to host a large scale event," Defendants have required no student groups (besides Plaintiffs) to do so, even if they believe the event represents a large scale event.[35] Under the Policy, a student group must submit a Large Scale Events Proposal, which the Large Scale Events Committee must approve before the event will be approved.[36] But Defendant Dussault admitted that the Committee does not meet or even exist and no student group has ever submitted a proposal to this nonexistent Committee.[37]

## III. Past Campus Events Secured by University Police

The University of Minnesota Police Department is responsible for securing events on the Twin Cities campus.[38] Its staff includes 55 full-time officers, 120 part-time officers, and 80 non-sworn Campus Security personnel.[39] It also monitors 24 hours a day the 2,500 security cameras that

---

[31] Ex. 105.
[32] Ex. 6 at 114:19–24, 115:11–20.
[33] Ex. 10 at 23:6–11; Ex. 16.
[34] Ex. 6 at 40:9–25; Ex. 101.
[35] Ex. 6 at 43:25–44:16, 46:19–48:25; Ex. 16.
[36] Ex. 16.
[37] Ex. 6 at 46:19–48:25.
[38] Ex. 67.
[39] Ex. 3 at 25:1–2; 26:1–21; 73:23–74:4.

blanket the campus.[40] It regularly provides security for large events, including Golden Gophers football games in 58,000-seat TCF Bank Stadium where alcohol is served. It uses between 80 to 85 full- and part-time officers for these games.[41] It has no written guidelines for determining the number of officers needed to secure an event, except for the football games.[42] It regularly secures events involving high-profile speakers and protestors.[43]

For example, the President of Somalia, Hassan Sheikh Mohamud, spoke in Northrop Auditorium in 2014.[44] Northrop seats 2,700 people, is located on the Minneapolis campus' East Bank, and near the light rail.[45] Before this, President Mohamud faced assassination attempts and charges of supporting Somali terrorist groups.[46] Videos show suicide bombers attacking his palace. Defendant Buhta said it "was the biggest event we've ever hosted here where I felt like our safety and security was definitely going to have to be on point."[47] With only one week to prepare, he led 150 officers from University police and assisting agencies in securing the event while a crowd of 100 protested with signs calling President Mohamud a warlord guilty of genocide.[48] Despite the

---

[40]  Ex. 67.
[41]  Ex. 3 at 73:6–16, 74:8–11, 132:12–19.
[42]  Ex. 3 at 37:13–18.
[43]  Ex. 2 at 28:18–29:19, 78:20–79:22; Ex. 3 at 60:9–63:11, 60:9–63:11, 63:15–65:5, 65:9–68:18; Ex. 5 at 324:4–15; Ex. 8 at 77:18–78:17; Ex. 9 at 65:14–23, 66:7–18, 68:18–69:25, 15–74:1, 75:3–10, 78:21–79:21, 82:7–25, 83:15–21, 84:10–25, 86:4–87:5, 87:21–25, 88:15–90:14, 89:8–18, 92:3–18, 101:6–102:7; Ex. 11 at 60:22–61:3, 62:12–22, 74:7–17; Ex. 12 at 29:5–10; Ex. 13 at 102:6–103:8, 105:18–24; Ex. 25 at 5, 15–18, 24; Exs. 40–46; Ex. 51; Exs. 55–57; Exs. 59–61; Ex. 64; Ex. 83; Exs. 85–86; Exs. 97–100; Ex. 106; Ex. 110; Ex. 117; Ex. 119; Exs. 121–22; Def's Answer to Second Am. Compl. ¶ 60, ECF No. 59.
[44]  Ex. 2 at 28:18–29:1; Ex. 55; Ex. 61.
[45]  Ex. 115; Ex. 123; Ex. 124.
[46]  Ex. 56.
[47]  Ex. 2 at 28:18–29:1.
[48]  Ex. 2 at 29:11–19; Ex. 56; Ex. 57.

significant security concerns, Defendants did not limit the crowd size or move this event to a more isolated, less accessible venue on the St. Paul campus.

Other examples abound. In November 2016, Students for a Democratic Society, a student group known for its campus protests, including at the Shapiro Lecture, invited speaker Shaun King to speak in Willey Hall.[49] Mr. King has a history of controversy surrounding his Black Lives Matter activism.[50] University police did not provide any security, stop the group from using Willey Hall, or restrict the event's location or crowd size.[51]

In March 2017, the University hosted then-state-representative Ilhan Omar in Mayo Auditorium.[52] Defendants did not restrict or limit the event at all.[53]

That November, Queer Student Advocates and College Democrats hosted a gubernatorial forum in Willey Hall for 300 people.[54] University police provided no security and placed no restrictions on the event.[55]

In September 2018, University police secured an event for former Black Panther, Communist, and social justice activist Angela Davis who addressed a near capacity crowd in Northrop Auditorium.[56] Due to the crowds, the event was moved from Ted Mann Concert Hall to the larger Northrop one month before the event. Defendants did not restrict the crowd size.[57]

---

[49] Ex. 5 at 324:4–15; Ex. 9 at 84:10–25; Ex. 25 at 15; Ex. 122.
[50] Ex. 25 at 15; Ex. 122.
[51] *See supra* note 50.
[52] Ex. 9 at 88:15–89:4, Ex. 40.
[53] Ex. 9 at 66:7–18, 73:15–74:1, 86:4–87:5, 87:21–25, 88:15–90:14, 101:6–102:7; Exs. 41–46.
[54] Ex. 25.
[55] Ex. 2 at 70:12–21.
[56] Ex. 8 at 77:18–78:17; Ex. 12 at 29:5–10; Ex. 119.
[57] *See supra* note 56.

In August 2019, Ilhan Omar again spoke in Mayo Auditorium, this time as an elected member of the U.S. House of Representatives.[58] She appeared with Representative Ayana Pressley, a fellow member of "the Squad" of newly elected, progressive, female Democrat representatives.[59] Before this, Representative Omar's public appearances sparked large protests throughout the country from citizens incensed by her anti-Semitic comments.[60] Just three months earlier, protesters rallied against her in cities throughout the country, numbering up to 1,000 in at least one instance.[61] She reportedly received hundreds of death threats in the previous months, but University police secured her appearance in Mayo Auditorium without incident—on one day's notice.[62] There is no record of University police limiting Representative Omar's Mayo Auditorium event.

University police also regularly provides security for large protests on the Minneapolis campus. In November 2016, a protest titled "Stand Up to Trump's Fascism" occurred at the Humphrey Center on the campus' West Bank, just across the road from Willey Hall.[63] Fifteen on- and off-campus groups endorsed it, including Black Lives Matter St. Paul, Our Revolution Minnesota, Students for Justice in Palestine, and Students for a Democratic Society.[64] 1,700 people attended, 4,000 people were listed as interested in attending, and 20,000 people as sharing the event with others.[65] Defendants

---

[58] Ex. 9 at 89:12–90:14; Ex. 41.
[59] *See supra* note 58.
[60] Exs. 41–46.
[61] Ex. 9 at 92:3–18; Exs. 42–46.
[62] Ex. 2 at 78:20–79:22; Ex. 9 at 89:8–18; Ex. 41.
[63] Ex. 3 at 60:9–63:11; Ex. 97.
[64] *See supra* note 63.
[65] Ex. 3 at 60:19–61:9.

knew of the protest but took no steps to move it away from the middle of campus.[66]

In March 2017, six student groups sponsored a student protest entitled "Against Trump Student Day of Action on International Women's Day" at Coffman Memorial Union on the East Bank of the Minneapolis campus.[67] 661 people attended and the platform contained a long list of demands, including full reproductive rights and Medicare for all.[68] Despite the large number of protesters in the middle of campus, Defendants did not move the protest from the East Bank or limit the crowd size.[69]

University police have also allowed large events to change to larger venues on short notice. In November 2019, Socialist Senator and presidential candidate Bernie Sanders held a rally on campus with Representative Omar.[70] It was originally scheduled for the 2,700-seat Northrop Auditorium on the Minneapolis campus' East Bank. But less than a week beforehand, the University authorized the event to be moved to Williams Arena, also on the East Bank, because of the high demand.[71] More than 10,000 people attended.[72] University police secured the event even though (i) it had less than a week to prepare, (ii) Representative Omar had received hundreds of death threats, and (iii) the number of protesters that gathered was about the same number that gathered at the Shapiro Lecture.[73]

---

[66]  Ex. 3 at 62:14–21.
[67]  Ex. 3 at 65:9–68:18; Ex. 99.
[68]  Ex. 3 at 65:21–23; Ex. 99.
[69]  Ex. 3 at 66:9–17.
[70]  Ex. 51.
[71]  Exs. 59–60.
[72]  Ex. 51.
[73]  Ex. 9 at 65:14–23; Ex. 11 at 60:22–61:3, 62:12–22, 74:7–17; Ex. 60.

## IV.   The Shapiro Lecture

Conservative Voice is a student organization that promotes conservative views through its newspaper and campus events.[74] In the fall of 2017, it began planning to host a lecture from renowned author, speaker, and conservative political pundit Ben Shapiro.[75] Working with YAF, which schedules Mr. Shapiro's college lectures, Conservative Voice secured an agreement to bring him to campus on February 26, 2018, the only date he was available.[76] Plaintiffs intended to hold this lecture in the largest, most central venue available on the Minneapolis campus.[77]

On October 23rd, four months in advance, Conservative Voice informed Defendant Dussault of the Shapiro Lecture.[78] Though he knew nothing about the anticipated audience or anything else, he immediately ordered that Conservative Voice must (i) comply with the Policy, though it had never been applied to any student group event; (ii) work with the University to coordinate the Lecture; and (iii) coordinate with University police.[79] Defendants do not require all student groups hosting events on campus to coordinate with these entities.[80] They have no procedure or protocol to determine whether to notify University police or another department about a student event that may require security.[81]

---

[74]  Ex. 5 at 29:3–22.
[75]  Ex. 4 at 69:20–70:19; Ex. 5 at 65:1–67:12, 68:14–69:13.
[76]  Ex. 4 at 69:20–70:19; Ex. 5 at 65:1–67:12, 68:14–69:13; Ex. 11 at 72:16–23; Ex. 13 at 90:17–91:1.
[77]  Ex. 5 at 176:1–11; Ex. 11 at 72:16–23; Ex. 13 at 90:17–91:1.
[78]  Ex. 5 at 52:13; Ex. 6 at 91:21–92:16; Ex. 13 at 90:17–91:1; Ex. 38 at 2.
[79]  Ex. 5 at 96:10–16; Ex. 6 at 47:22–48:25; 96:3–20; Ex. 9 at 75:3–10; Ex. 13 at 71:4–72:19; Ex. 35.
[80]  Ex. 6 at 30:4–32:8; Ex. 9 at 75:3–10.
[81]  Ex. 6 at 30:4–32:8.

Conservative Voice requested to reserve multiple Minneapolis campus venues, including Mayo Auditorium (seating 455), Northrop Auditorium (seating 2,692), Ted Mann Concert Hall (seating 1,178), the Rarig Center (seating 460), the Maturi Pavilion (seating 5,500), the former Bell Museum, and Willey Hall classrooms 125 and 175 (seating 1,058).[82] As a venue is not reserved until the request is approved, Conservative Voice requested multiple venues to maximize its chances of securing the largest available Minneapolis campus venue.[83] Both Willey Hall and Mayo Auditorium were available the day of the Shapiro Lecture.[84] Willey Hall was the largest Minneapolis campus venue available that day.[85] But Defendants refused to allow Plaintiffs to use either one.[86]

On October 26th, just one day after Conservative Voice requested Mayo Auditorium, Defendant Kaler learned by email that Conservative Voice wanted to hold the Shapiro Lecture there. Less than 20 minutes later, he responded: "I do not want this in the middle of campus."[87] At the time, he knew little about Mr. Shapiro except that he was a conservative speaker and someone Defendant Kaler considered "controversial."[88] Yet within minutes of hearing about it, he ordered the Shapiro Lecture out of Mayo Auditorium and

---

[82]  Ex. 2 at 81:11–82:13; Ex. 6 at 108:1–20, 110:20–111:3; Ex. 13 at 75:16–76:9; Ex. 38 at 2–3.
[83]  Ex. 13 at 75:6–82:7; Ex. 38 at 3.
[84]  Ex. 5 at 39:4–7, 332:1–15; Ex. 6 at 112:18–24; Ex. 11 at 72:19–23; Ex. 12 at 30:6–19; Ex. 13 at 99:15–100:1.
[85]  Ex. 5 at 169:4–20; Ex. 48.
[86]  Ex. 5 at 39:4–7, 332:1–15; Ex. 6 at 112:18–24; Ex. 11 at 72:19–23; Ex. 12 at 30:6–19; Ex. 13 at 99:15–100:1.
[87]  Ex. 8 at 26:13–27:2; Ex. 18.
[88]  Ex. 8 at 28:19–29:3, 16–24; Exs. 18, 20.

away from the middle of campus.[89] He had never banned an event from being held in the middle of campus.[90]

On December 6th, Conservative Voice again requested both Willey Hall classrooms for the Shapiro Lecture.[91] Philip Hunter, the lead scheduler for the venue, routinely approved these requests, but this time, he forwarded it to his supervisors and Defendant Dussault.[92]

On December 19th, following Defendant Kaler's orders, Defendant Buhta rejected Conservative Voice's request for Mayo Auditorium, citing alleged security concerns given the building's walkway to a hospital.[93] At this point, two months before the event, Defendant Buhta had no specific information about any possible protests or threats.[94] And he did not restrict other events held in Mayo, even with speakers who had been previously protested.[95]

Shortly after learning of the request for Willey Hall, Defendants Clark and Berthelsen discussed moving the Shapiro Lecture to a St. Paul campus venue.[96] On December 21st, following this conversation, Defendant Clark e-mailed Ken Gay, who was responsible for booking the Continuing Education and Conference Center on the St. Paul campus, saying: "The admin has asked that we try to move this visit to the St. Paul campus[,]" and suggested that the

---

[89]  Ex. 8 at 26:13–27:2; Ex. 18.
[90]  Ex. 8 at 33:4–8.
[91]  Ex. 24.
[92]  Ex. 7 at 93:3–25.
[93]  Ex. 2 at 82:14–83:4; Ex. 5 at 137:8–15; Ex. 13 at 88:14–89:11.
[94]  Ex. 2 at 82:14–83:4.
[95]  Ex. 2 at 78:20–79:22; Ex. 9 at 66:7–18, 73:15–74:1, 86:4–87:5, 87:21–25, 88:15–90:14, 92:3–18, 101:6–102:7; Exs. 40–46; Ex. 117; *see supra* Facts III.
[96]  Ex. 3 at 94:9–95:8, 96:9–16.

Continuing Education and Conference Center should host the Shapiro Lecture.[97]

The same day, Defendant Dussault informed Defendant Buhta of the request for Willey Hall.[98] Defendant Buhta immediately rejected it: "Willey is not going to be a good option due to access from the skyway."[99] He rejected this request even though: (i) Defendants had allowed hundreds of other student and off-campus groups to host similar events there;[100] (ii) neither he nor anyone else at University police had ever conducted a walk-through or security assessment of Willey Hall;[101] (iii) skyways are not typically impacted by such events;[102] and (iv) it was more than two months before the Lecture.[103] Instead, he chose the Continuing Education and Conference Center on the St. Paul campus,[104] acknowledging that it was a less desirable location: "unfortunately it too is on the St. Paul campus."[105]

On December 22nd, Defendant Clark emailed Mr. Gay: "the crowd size needs to be limited to 500 and we will probably have protestors present."[106] Plaintiffs never agreed to limit the audience.[107] When Defendant Clark capped the audience more than two months in advance, he had no specific information on protesters or other security issues.[108]

---

[97] Ex. 3 at 85:6–19; Ex. 28.
[98] Ex. 2 at 101:2–5; Ex. 3 at 85:6–19; Ex. 13 at 103:1–4; Exs. 28, 33.
[99] Ex. 2 at 101:2–5; 102:21–24; Ex. 13 at 103:1–4; Ex. 33.
[100] Ex. 25.
[101] Ex. 2 at 100:20–101:5; Ex. 13 at 103:1–4; Ex. 33.
[102] Ex. 1 at 19:11–20.
[103] Ex. 3 at 108:17–109:22; Ex. 30.
[104] Ex. 2 at 101:2–5, 101:13–102:8; Ex. 13 at 103:1–4; Ex. 33.
[105] Ex. 2 at 101:13–102:8; Ex. 5 at 166:14–20; Ex. 33.
[106] Ex. 28.
[107] Ex. 5 at 176:1–11; Ex. 11 at 72:19–23; Ex. 13 at 90:17–91:1.
[108] Ex. 3 at 89:1–24; 108:17–109:25, 112:23–113:4; Ex. 28; Ex. 30 at 1, 2.

Since Defendants rejected their requests for the larger available venues on the Minneapolis campus and had only approved St. Paul campus venues, Plaintiffs faced the choice of canceling the Lecture or moving it off the main campus. So Conservative Voice reluctantly requested the Northstar Ballroom.[109] It is a less desirable location because of its limited seating capacity, its location on the St. Paul campus, and its distance from public transportation.[110] When Maggie Towle, Vice Provost for Student Affairs and Dean of Students, learned the Shapiro Lecture would be held there, she commented: "So happy St. Pa[u]l campus gets a little action for a change."[111]

In the two months before the Shapiro Lecture, University police prepared three different threat assessments. Each concluded there were no credible threats to the event, speaker, or attendees.[112] Instead, the best information Defendants possessed about potential protests predicted a little over a dozen protestors might show up.[113]

At first, Defendants only permitted Conservative Voice to issue 400 tickets for the Shapiro Lecture. On January 26, 2018, Conservative Voice made tickets available for the Lecture.[114] That day, they received 700 ticket requests.[115] Thus, Defendants authorized fifty additional tickets, but these seats had obstructed views because of the ballroom's layout.[116]

---

[109] Ex. 5 at 335:15–19.
[110] Ex. 5 at 169:4–20, 176:8–11, 201:3–12, 336:21–337:9; Ex. 6 at 117:11–118:8; Ex. 13 at 90:17–91:1.
[111] Ex. 12 at 40:18–21; Ex. 22.
[112] Ex. 3 at 108:17–109:25, 112:23–113:4; Ex. 30.
[113] Ex. 10 at 88:14–89:25.
[114] Ex. 1 at 56:8–19; Ex. 5 at 184:10–15.
[115] Ex. 13 at 82:1–7; Ex. 37.
[116] Ex. 1 at 56:8–19; Ex. 5 at 184:10–15.

A month before the Lecture, Conservative Voice again requested a larger venue so that they could accommodate the more than 1,000 students on the waiting list.[117] It also expressed its frustrations with the University publicly.[118] After not receiving a positive response, they again requested Willey Hall.[119] In response to public criticism, Defendant Kaler held a press conference in which he referred to Mr. Shapiro as "a controversial speaker" and claimed that University "officials chose the St. Paul campus location for safety reasons."[120] Despite the lack of any specific, credible security threats, Defendants Clark and Berthelsen rejected Plaintiffs' renewed request to use Willey Hall.[121]

On February 26th, Mr. Shapiro spoke in the North Star Ballroom to 450 people, 50 of whom had obstructed views.[122] University police deployed 100 to 120 officers to secure the Lecture: 58 of its officers and 65 to 75 officers from other agencies.[123] Ultimately, between 24 and 60 (at most) peaceful protesters attended the Shapiro Lecture.[124] University police did not actively use officers from the other agencies. These 65–75 officers—provided at no cost to the University—remained in the St. Paul Student Union cafeteria drinking coffee with nothing to do.[125]

---

[117] Ex. 7 at 109:12–110:2; Ex. 34.
[118] Ex. 4 at 98:4–24; Ex. 11 at 80:12–17; Exs. 36, 47.
[119] Ex. 3 at 109:23–25; Ex. 7 at 109:12–110:2; Exs. 30, 34.
[120] Ex. 19.
[121] Ex. 3 at 112:23–113:4; Ex. 5 at 47:6–8, 183:15–18, 201:3–5; Ex. 30.
[122] Ex. 5 at 184:10–185:6; Ex. 11 at 74:25–75:5; Ex. 89 at 99:21–100:4; Ex. 38 at 5.
[123] Ex. 2 at 110:8–111:4; Ex. 3 at 123:25–124:8; Ex. 32.
[124] Ex. 10 at 90:1–12; Ex. 88.
[125] Ex. 2 at 111:5–14; Ex. 3 at 119:19–120:8; Ex. 9 at 65:17–23; Ex. 11 at 60:22–61:3, 62:12–22, 74:7–17.

Because Defendants' restrictions kept the Lecture out of Willey Hall and away from the middle of campus, Plaintiffs could not communicate their message to over 500 students.[126] Because Defendants limited the Lecture's audience and location, YAF was deprived of the full benefit of the $6,617 it invested in this event through travel expenses.[127]

## ARGUMENT

"Summary judgment is warranted [because] there is no genuine issue of material fact for trial and [Plaintiffs are] entitled to judgment as a matter of law." *Apex Oil Co. v. Jones Stephens Corp.*, 881 F.3d 658, 660 (8th Cir. 2018). The undisputed facts show that Defendants disapproved of Plaintiffs' speech, treated them differently than the thousands of previous speakers, resurrected a never-before-enforced Policy, and used pretextual security concerns to move them to a smaller, less desirable location.

## I.   Defendants' security rationale for excluding the Shapiro Lecture from available venues was a mere pretext.

Defendants claim they were motivated not by Shapiro's views, but by the potential reaction (however unlikely) to those views from others. Defendants' own "evidence" belies their claims. Plus, "the mere possibility of a violent reaction to [Mr. Shapiro's] speech is simply not a constitutional basis on which to restrict [his] right to speak." *Lewis v. Wilson*, 253 F.3d 1077, 1081 (8th Cir. 2001).

The uncontroverted evidence demonstrates that Defendants' security concerns were pretext. First, Defendant Kaler ordered the Lecture moved based only on the conservative views of Plaintiffs, prior to gathering any

---

[126] Ex. 5 at 211:12–15; Ex. 13 at 81:7–82:7; Ex. 89 at 92:3–6.
[127] Ex. 4 at 138:22–139:4.

information. Second, even when they did their own security assessments, they concluded that no threats were present.[128]

They also admit they could have secured the Shapiro Lecture in Willey Hall or Mayo Auditorium.[129] Their belated reasons for not allowing it in Mayo Auditorium did not prevent other speakers with much greater concerns from speaking there.[130] Representative Omar recently twice spoke there along with other leftist speakers like Keith Ellison.[131] Other prominent leaders have done the same.[132] Concern for light rail access also did not cause Defendants to cancel or move a large, anti-Trump protest outside the nearby Humphrey Center in 2016.[133] Nor did it cause Defendants to cancel or move another massive leftist protest outside Coffman Memorial Union on the East Bank, just across the street from Mayo Auditorium.[134]

Similarly, Defendants' excuses for denying Willey Hall did not apply to other groups. The skyway's proximity to Willey Hall's classrooms did not prevent over 150 external and student group events from meeting there in the past five years.[135] Many featured controversial leftist groups and speakers like Shaun King and Students for a Democratic Society, the group that protested the Shapiro Lecture.[136]

---

[128] *See supra* notes 112–13.
[129] Ex. 2 at 67:17–22; Ex. 3 at 131:21–132:6; *see supra* Facts III.
[130] *See supra* Facts III.
[131] Ex. 86; *see supra* Facts III.
[132] *See supra* Facts II.B.
[133] *See supra* Facts III.
[134] *See supra* Facts III.
[135] *See supra* note 24.
[136] *See supra* Facts II.A, III.

Along with giving leftist speakers preferential treatment, Defendants revealed their real reason for restricting the Shapiro Lecture in their communications—Plaintiffs' viewpoints. Defendants and other University officials referred to Mr. Shapiro as "conservative" at least twice.[137] They labeled him "controversial" at least five times.[138] A University official even referred to him as "alt-right," though he is Jewish and the frequent target of alt-right attacks.[139]

Plaintiffs' security expert, G. Michael Verden, assessed the security requirements for various relevant campus venues.[140] A former Secret Service Agent assigned to the Presidential Protective Detail, he provided security for the President of the United States, the First Lady, and foreign dignitaries. He also served as the National Basketball Association's Director of Security and provided security for the highest profile sporting events in the United States, including the Super Bowl and the Final Four.[141]

Mr. Verden prepared a detailed security analysis of Willey Hall, Mayo Auditorium, and other campus venues.[142] He concludes Defendants could have secured any venue for the Shapiro Lecture with the same resources used to secure the North Star Ballroom.[143] Defendants failed to rebut his report, revealing that their security concerns were mere pretext.

---

[137] Ex. 3 at 111:4–7; *see supra* Facts IV.
[138] Ex. 3 at 76:16–77:1; Ex. 12 at 43:14–44:1; Exs. 27, 114; *see supra* Facts IV.
[139] Ex. 12 at 16:13–16.
[140] Ex. 14 at 3.
[141] Ex. 14 at 4.
[142] Ex. 14 at 10.
[143] Ex. 14 at 10–12, 20–23.

It is clearly unreasonable to claim there were security concerns, when no such evidence existed and when events containing other views with actual security concerns were allowed in the same or similar venues.

## II. By moving the Shapiro Lecture to a smaller, less desirable location, Defendants violated Plaintiffs' free speech rights.

Freedom of expression must be jealously guarded, particularly when it involves messages some find controversial. *See, e.g.*, *Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949) (noting free speech "best serve[s] its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger"). This principle extends with equal force to public universities. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."). This includes speech that may offend. *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("[M]ere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'").

It has been clear for decades that the First Amendment protects students on campus to the same degree it protects citizens off campus. *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room of the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large."). Yet Defendants ignored these clearly applicable principles when they denied Plaintiffs use of larger available venues and moved them to a smaller, less accessible one.

### A. By denying available venues, Defendants discriminated based on viewpoint, which is unconstitutional in any forum.

In any forum, the government cannot discriminate based on viewpoint. *See, e.g.*, *Burnham v. Ianni*, 119 F.3d 668, 675–76 (8th Cir. 1997). Because Defendants discriminated due to viewpoint when they denied available venues and moved the Lecture, Plaintiffs should receive summary judgment.

### 1. By moving the Shapiro Lecture from the middle of campus, Defendants discriminated based on viewpoint.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "In the realm of private speech or expression, government regulation *may not favor one speaker over another.*" *Id.* (emphasis added). Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject"—that is, "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.

Yet Defendants pegged Mr. Shapiro for disfavored treatment from the moment they heard his name. When Defendant Kaler first saw Shapiro's name on October 26, 2017, he knew little, but he knew Shapiro was conservative and he did not want him to speak in Mayo Auditorium.[144] Within twenty minutes, he told his Deputy Chief of Staff, "I do not want this in the middle of campus," and she promised to pass along his instructions.[145]

Defendant Kaler had then been President for six years.[146] Every year, student organizations host thousands of events on campus.[147] In all that time,

---

[144] Ex. 8 at 33:14–34:4; *see supra* Facts IV.
[145] *See supra* notes 87-90.
[146] Ex. 8 at 6:8–10.
[147] *See supra* note 10.

with all those events, he personally intervened in only two—both conservative events.[148] When a congresswoman, who received death threats and who often attracts hundreds of protestors, came to campus, he did nothing.[149] When national leaders—like President Clinton, Senator Franken, Supreme Court justices, and presidential candidate Hillary Clinton—visited, he remained unconcerned.[150] When protests involving from 100 to 1,700 people erupted on campus, he did nothing.[151] The only times Defendant Kaler intervened were when Conservative Voice hosted events featuring conservative speakers.[152] And the only speaker he ever banned from the middle of campus was Mr. Shapiro.[153]

Thus, he—and the other Defendants who followed his orders—violated the First Amendment's "axiomatic" command. *Rosenberger*, 515 U.S. at 828.

### 2. By restricting the Shapiro Lecture because they deemed it controversial, Defendants discriminated due to viewpoint.

Defendant Kaler knew little about the Shapiro Lecture, but he knew that some people consider Mr. Shapiro "controversial."[154] He labeled him as such.[155] The other Defendants did too, using monikers like "conservative," "controversial," and "alt-right."[156] So they prevented him from speaking in Willey Hall and Mayo Auditorium, banned him from the middle of campus, and limited the audience to 450.[157]

---

[148] Ex. 8 at 20:8–21, 41:3–7.
[149] *See supra* Facts III.
[150] *See supra* Facts I, II.A, IV.
[151] *See supra* Facts III.
[152] *See supra* Facts III–IV.
[153] *See supra* note 90.
[154] Ex. 3 at 76:16–77:1; Ex. 12 at 43:14–44:1; Ex. 114; *see supra* Facts IV.
[155] *See supra* note 88; Facts IV.
[156] Ex. 3 at 111:4–7; Ex. 12 at 16:13–16; *see supra* Facts IV.
[157] *See supra* Facts IV.

Restricting a speaker because he is controversial is textbook viewpoint discrimination. "To exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint." *C.E.F. of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) (Alito, J.).

But Defendants carried out Defendant Kaler's orders to keep Mr. Shapiro out of the "middle of campus."[158] Once Defendants Dussault and Buhta learned of the Lecture, they decided that it would require security,[159] though they had no basis for their "security assessment."[160] They only knew that Shapiro was conservative, or at least that he was a Fox News commentator.[161] To them, he was "controversial," and so they subjected Plaintiffs to unique scrutiny. That is viewpoint discrimination.

### 3. By enforcing an arcane, optional, and never-before-used policy, Defendants discriminated based on viewpoint.

Defendant Dussault carried out Defendant Kaler's orders using the Policy he drafted in 2013, knowing that it had never been applied to a student group event before.[162] Yet, he emailed Conservative Voice's President, Ms. Dibble, paperwork for her to follow from the Policy and told her she would have to submit it before receiving approval for a venue.[163] He also knew that the Policy was not mandatory, but he told her that it was.[164] He also knew that the Large Scale Events Committee, which supposedly reviews and approves

---

[158] *See supra* Facts IV.
[159] *See supra* note 79.
[160] *See supra* note 112.
[161] Ex. 3 at 111:4–7; *see supra* Facts IV.
[162] *See supra* note 35 and accompanying text.
[163] *See supra* note 79.
[164] Ex. 6 at 47:22–48:25; *see supra* Facts IV.

events, had never met.[165] But he gave Ms. Dibble the format to follow anyway, erecting another major hurdle Conservative Voice would need to overcome. As expected, the nonexistent committee never approved, and Plaintiffs were denied the two centrally located venues they requested.[166]

In short, Defendants chose to apply a policy that was entirely optional. They have unfettered discretion to apply it or not. But they did so here—for the first time—because they disliked the viewpoint of Plaintiffs' speech, thus violating the First Amendment.

The Supreme Court "consistently condemn[s]" speech regulations that "vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969). Given vague or non-existent criteria, officials "may decide who may speak and who may not based upon the . . . viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988). Thus, speech restrictions must "contain narrow, objective, and definite standards to guide" officials, *Shuttlesworth*, 394 U.S. at 150–51, and cannot involve the "appraisal of facts, the exercise of judgement, and the formation of an opinion." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). This doctrine applies with the same force in a limited public forum because viewpoint discrimination is unconstitutional anywhere. *Burnham*, 119 F.3d at 675–76; *Lewis*, 253 F.3d at 1079 ("[W]e need not determine precisely what kind of forum" is at issue where regulation "delegate[s] unbridled discretion to the government officials entrusted to

---

[165] *See supra* note 37.
[166] Ex. 2 at 100:20–101:5, 102:21–24; *accord supra* Facts II.D, III, IV.

enforce the regulation."); *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 574–95 (7th Cir. 2002) (holding "that the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement" in a limited public forum on campus).

An optional policy that applies or not based on an official's whim confers unbridled discretion, rendering it viewpoint-based and illegal in any forum.

### 4. By moving the Shapiro Lecture to the St. Paul campus, Defendants discriminated due to viewpoint by enforcing a heckler's veto.

The Supreme Court has long and often ruled that the First Amendment "knows no heckler's veto." *Lewis*, 253 F.3d at 1082; *Near v. Minnesota*, 283 U.S. 697, 722 (1931). It has repeatedly reaffirmed that "constitutional rights may not be denied simply because of [public] hostility to their assertion or exercise." *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963). These principles apply fully to a university because "mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. This is all part of that "bedrock principle" of the First Amendment: the government may not prohibit "the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

But Defendants ignored all this. They refused to let Plaintiffs use Willey Hall or Mayo Auditorium and relegated them to the St. Paul campus, citing mere "possibility" of protests at Mr. Shapiro's lecture.[167] Defendants made these decisions months before the Lecture with no specific information about

---

[167] *See supra* Facts IV.

security concerns.[168] Defendant Kaler admitted that University "*officials chose the St. Paul campus*" because they were "mindful of the fact that [Mr. Shapiro] is a controversial speaker and that at several places where he's spoken, protests have objected[.]"[169] Yet Defendants did not impose the same restrictions on other speakers with different viewpoints who had drawn larger protests in the past.[170] Defendants' own threat assessments concluded "there was no credible threat" to the Lecture.[171]

Restricting speech because of the mere *possibility* of public hostility is a textbook heckler's veto, and heckler's vetoes are inherently viewpoint-based. Thus, they are illegal in any forum. *Burnham*, 119 F.3d at 675–76.

### 5. Defendants' actions show that they have no safeguards against viewpoint discrimination.

For Defendants' policies and actions to be viewpoint neutral, they must have affirmative "protection . . . for viewpoint neutrality." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). "[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *C.E.F. of Md., Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006).

Yet the Policy lacks any such protections, as Defendants' actions attest. The Policy is optional.[172] They have never applied it to any other student group, and the committee it references never meets.[173] Yet they applied it to Mr.

---

[168] *See supra* note 108.
[169] *See supra* note 120.
[170] *See supra* Facts III–IV; Argument I.
[171] *See supra* note 112.
[172] *See supra* note 35.
[173] *See supra* note 37.

Shapiro's lecture. Why? Because they did not like his views, and because there were no safeguards preventing them from doing so. Defendants' actions are viewpoint-based and illegal in any forum.

### B. By denying available venues, Defendants unconstitutionally excluded Plaintiffs from available designated public fora.

In evaluating Defendants' decisions to move the Shapiro Lecture, the Court must (1) determine whether Plaintiffs' speech is protected, (2) "identify the nature of the forum," and (3) assess whether the restrictions "satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Under this analysis, Defendants violated the First Amendment, and Plaintiffs are entitled to judgment as a matter of law.

### 1. The First Amendment protects Plaintiffs' speech.

Plaintiffs desired to engage in a time-honored form of expression that the First Amendment clearly protects: a public lecture. These classic forms of speech lie at the very "foundation of free government by free men." *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939); *Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943) (discussing protections for preaching).

At the Shapiro Lecture, Plaintiffs sought to express their views on public issues, like capitalism and the First Amendment.[174] Such speech "occupies the highest rung on the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

### 2. The venues Plaintiffs requested are designated public fora.

"[T]he extent to which [Defendants] may limit access depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797. The

---

[174] Ex. 11 at 64:1–13, 65:14–25; 66:20–67:18; Ex. 13 at 31:2–15, 50:12–51:19; *see supra* Facts IV.

Eighth Circuit recognizes traditional, designated, and nonpublic fora. *Bowman v. White*, 444 F.3d 967, 975–76 (8th Cir. 2006).[175] Designated public fora can be "of a limited or unlimited character." *Id.* at 976. "An 'unlimited' designated public forum is a forum designated for expressive conduct . . . but not limited to a particular type of speech or speaker." *Id.* "[A] university concert hall might be considered a 'limited public forum,'" but only if it were "designated for particular speech by university-supported musicians." *Id*. But "both University Entities and Non-University Entities [can] speak" in a location, there is little evidence "that [the University] intended to limit the use of [those] University space[s] to a particular type of speech or speaker," creating a designated public forum. Op. at 21, Doc. 33 (quoting *Bowman*, 444 F.3d at 979).

Before discovery, this Court held that Mayo Auditorium and Willey Hall were limited public fora, saying that the University opened its property "limited to use by certain groups" or "dedicated solely to the discussion of certain subjects." Op. at 20, Doc. 33. Discovery has refuted both assumptions. The uncontroverted facts reveal Defendants allows University departments, registered student groups, and off-campus groups to use Mayo Auditorium and Willey Hall for a wide variety of speakers and events.[176] This "general access" for on- and off-campus groups creates unlimited designated public fora. *Seattle*

---

[175] In a traditional public forum or an unlimited designated public forum, strict scrutiny applies to all content-based restrictions on speech. Op. at 21, Doc. 33 (citing *Ball v. City of Lincoln*, 870 F.3d 822, 830 (8th Cir. 2017)); *Bowman*, 444 F.3d at 975. Content-neutral restrictions must be "narrowly tailored to serve a significant governmental interest, and . . . leaves open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Elsewhere, restrictions must be "reasonable and viewpoint neutral." *Bowman* 444 F.3d at 976; *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334–35 (8th Cir. 2011).

[176] *See supra* Facts II.A–B.

28

*Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 497 (9th Cir. 2015) (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998)); *Widmar*, 454 U.S. at 267–68 (finding classrooms represented designated public fora for student groups).

### a. Mayo Auditorium is a designated public forum.

Mayo Auditorium is a classroom on the Minneapolis campus' East Bank that Defendants permit student groups, departments, and off-campus groups to reserve. It is often used for high-profile speakers, including Representative Omar, Senator Franken, former Senator Durenburger, and leftist commentator and professor Dr. Marc Lamont Hill.[177]

### b. Willey Hall is a designated public forum.

Willey Hall is a general-purpose classroom on the Minneapolis campus' West Bank with two classrooms combining to seat over 1,000 people. They serve as venues for lecture and debate, not for performance events or events serving food or drink. Over the past six years, they have hosted more than 150 events, including lectures, guest speakers, religious events, political debates, and forums.[178]

Thus, discovery shows that Defendants do not grant "selective access" to Mayo Auditorium or Willey Hall via speaker-based or subject-matter limits. *Forbes*, 523 U.S. at 679; *Cornelius,* 473 U.S. at 806; *Seattle Mideast*, 781 F.3d at 497. When hundreds of different groups—even from off-campus—have used these venues for countless different topics, these are designated public fora.

---

[177] *See supra* Facts II.B; *accord* Ex. 117.
[178] *See supra* Facts II.A; *accord* Ex. 25.

### 3. By denying available venues, Defendants engaged in content discrimination.

To be a reasonable time, place, and manner restriction, Defendants' policies and decisions denying Plaintiffs access to available venues and capping their audience must be content neutral. *Bowman*, 444 F.3d at 980; *Phelps-Roper v. Ricketts*, 867 F.3d 883, 891 (8th Cir. 2017). The flaws that render them viewpoint-based make them content-based because viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.

### a. Defendants considered the content of Plaintiffs' speech when imposing their restrictions.

The uncontroverted facts show Defendants considered only the content of Plaintiffs' speech when they restricted the Shapiro Lecture. Defendant Kaler banned it from the middle of campus within 20 minutes of learning about it based on his understanding that Shapiro was conservative and "controversial."[179] Defendants and other officials followed his example, repeatedly calling Mr. Shapiro "conservative," "controversial," and (falsely) "alt-right."[180] As they disapproved of his views, they excluded Plaintiffs from multiple venues and capped their audience.

The Eighth Circuit recently struck down restrictions another university imposed after uniquely scrutinizing a student group due to its views. *Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017). There, a pro-marijuana group initially obtained several trademark licenses for cannabis-related design. *Id.* at 697. But after public backlash, the university revoked its permission. *Id.* at 700–02. The Court found the university imposed unique scrutiny because its "official could not recall ever placing another student group's order request on hold"

---

[179] *See supra* Facts IV.
[180] *See supra* Argument II.A.2.

and "the group was required to obtain approval from [university officials] for any future designs." The Court held that "Defendants' actions and statements show that the unique scrutiny they imposed on [the student group] was motivated by viewpoint [and thus also content] discrimination." *Id.* at 705.

That is exactly what happened here. Defendant Kaler had never banned a student group from the middle of campus before.[181]  Defendants also required Plaintiffs to get permission from University police and other officials before approving any venues, requirements they did not impose on other groups.[182] Defendants' unique scrutiny highlights their content (and viewpoint) discrimination.

Defendants cannot absolve themselves by simply invoking "security concerns" because "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty.*, 505 U.S. at 134. Defendants say that they moved Plaintiffs to the St. Paul campus because they felt that Mr. Shapiro "is a controversial speaker and that at several places where he's spoken, protests have objected[.]"[183] Thus, they considered audience reaction. The Supreme Court and the Eighth Circuit have consistently condemned this kind of heckler's veto. *See, e.g.*, *Burnham*, 119 F.3d at 676 (restricting speech because "other persons on [ ] campus objected to his viewpoint" was viewpoint (and thus also content) discrimination); *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (finding content discrimination despite "innocuous justification").

---

[181] *See supra* note 90.
[182] *See supra* notes 79–80; Argument II.A.3; IV.
[183] Ex. 19 at 2; *accord supra* Argument II.A.2, 4.

### b. Defendants discriminated based on content when they exercised unbridled discretion in restricting Plaintiffs.

Also, Defendants discriminated based on content by exercising unbridled discretion when they imposed these restrictions. *Lakewood*, 486 U.S. at 763 (noting that given discretion, officials "may decide who may speak and who may not based upon the content of the speech"). Thus, even a facially content-neutral policy cannot "delegate overly broad licensing discretion to a government official." *Bowman*, 444 F.3d at 980; *Douglas v. Brownell*, 88 F.3d 1511, 1521 (8th Cir. 1996). The undisputed facts show Defendants applied an entirely optional policy, one they had complete discretion to apply or not.[184] Exercising that discretion is inherently content-based.

Plus, "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984). Policies lacking protections against viewpoint discrimination lack any against content discrimination.[185] Thus, they must face strict scrutiny. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818 (2000) ("It is rare that a regulation restricting speech because of its content will ever be permissible."); *Gay & Lesbian Student Ass'n v. Gohn*, 850 F.2d 361, 366 (8th Cir. 1988) (it "is an extremely difficult standard for government to meet").

### 4. Defendants' actions fail all possible levels of scrutiny.
### a. Defendants fail the scrutiny for limited public fora.

While Mayo Auditorium and Willey Hall are designated public fora, Defendants' restrictions do not even pass the reasonable and viewpoint neutral

---

[184] *See supra* Argument II.A.3.
[185] *See supra* Argument II.A.5.

scrutiny reserved for limited public fora. *Bowman*, 444 F.3d at 976. Because Defendants' actions are not viewpoint neutral,[186] this Court need not address whether they are reasonable. After all, they must be both reasonable and viewpoint neutral. One is not enough.

But Defendants cannot even show that their restrictions are "reasonable in light of the purpose served by the forum," *Cornelius*, 473 U.S. at 806—here, the vaunted "marketplace of ideas," *Healy*, 408 U.S. at 180, and the "stage for societal debate," *Bowman*, 444 F.3d at 979. This focuses on whether the exclusion is consistent with "limiting [the] forum to activities compatible with the intended purpose of the property." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983); *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 967 (9th Cir.1999).

Defendants allow hundreds of speakers to use Mayo Auditorium and Willey Hall, including many that pose far greater security concerns than Mr. Shapiro.[187] They have secured events featuring a foreign president who was the target of terrorist attacks and accused of being a genocidal warlord.[188] It is unreasonable for officials who can secure events with such high profile figures with such monumental security threats to say that Mr. Shapiro's lecture must be moved from those same venues, especially when their own threat assessments said there was no threat.[189]

Once Defendants opened these venues to on- and off-campus speakers, they were "prevented from unreasonably distinguishing among the types of

---

[186] *See supra* Argument II.A.
[187] *See supra* Facts II.A–B.
[188] *See supra* Facts III; Argument I.
[189] *See supra* note 112.

speech [they] would allow within the forum." *Burnham*, 119 F.3d at 676; *Gerlich*, 861 F.3d at 714 ("Participants in a [limited public] forum, declared open to speech *ex ante*, may not be censored *ex post* when the sponsor decides that particular speech is unwelcome.") (Kelly, J., concurring).

Using pretextual security concerns to restrict a conservative speaker while allowing speech from other perspectives implicating far greater security concerns is, by definition, unreasonable.[190]

### b. Defendants fail the intermediate scrutiny reserved for content-neutral actions.

Defendants' Policy and actions fail even the intermediate scrutiny for content-neutral rules, where Defendants must show that they are "narrowly drawn." *Bowman*, 444 F.3d at 976. That is, they must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). And there must be a "reasonable fit" between Defendants' means and ends. *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1221 (8th Cir. 1998). Too often "silencing speech is . . . the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted).

Defendants' pretextual security concerns cannot pass this test. After all, they could secure events featuring government leaders, including foreign leaders who were subject of terrorist attacks and federal officials whose remarks often spark vehement protests.[191] They even let organizers move to a larger venue when the expected audience swells. *Id*. But they refused to let

---

[190] *See supra* Facts III; Argument I.
[191] *See supra* Facts III.

Plaintiffs do so when the Lecture sold out overnight and 1,000 people were on the waiting list.[192] Even their own assessments showed only a handful of people at most might protest the Shapiro Lecture and posed no threat to it.[193] So their restrictions—moving Plaintiffs' event, banning it from the middle of campus, and limiting the crowd size—had no "reasonable fit" with genuine security concerns.

### c. Defendants fail the strict scrutiny reserved for content- and viewpoint-based actions.

Being content-based,[194] Defendants' actions must satisfy strict scrutiny—an "extremely difficult standard . . . to meet," *Gohn*, 850 F.2d at 366—by "further[ing] a compelling interest and [being] narrowly tailored to [it]." *Reed*, 135 S. Ct. at 2231.

Any security interests Defendants possibly had are not compelling because they left "appreciable damage to [their] supposedly vital interest[s] unprohibited." *Id.* at 2232. They opened their venues to thousands of events on a wide range of topics.[195]

They allowed speakers who regularly spark protests (and even terrorist attacks) to speak on campus without exiling them to the St. Paul campus or capping their audience.[196] Restricting Plaintiffs, whose speech posed by their own admission no threat, did not serve an "interest of the highest order." *Reed*, 135 S. Ct. at 2232.

---

[192] Exs. 34, 37.
[193] *See supra* note 113.
[194] *See supra* Argument II.B.3.
[195] *See supra* Facts III.
[196] *See supra* Facts II.A–B, III.

Also, Defendants must use "the least restrictive means" (*i.e.*, show that its restrictions are "necessary," "not underinclusive," and "could be replaced by no other regulation). *281 Care Comm. v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014). But allowing events with far greater security risks while restricting Plaintiffs is the definition of "underinclusive." And as Defendants could have easily secured the Shapiro Lecture in Mayo Auditorium or Willey Hall,[197] their restrictions were not "necessary."

"It is rare that a regulation restricting speech because of its content will ever be permissible," and Defendants' Policy and actions are no exception. *Playboy*, 529 U.S. at 818; *Gohn*, 850 F.2d at 366.

## CONCLUSION

For these reasons, Plaintiffs request that the Court grant this Motion for Summary Judgment.

Respectfully submitted this the 17th day of March 2020,

<table>
<tr><td></td><td>*s/ Tyson Langhofer*</td></tr>
<tr><td>DAVID A. CORTMAN<br>Georgia Bar No. 188810<br>TRAVIS C. BARHAM<br>Arizona Bar No. 024867<br>ALLIANCE DEFENDING FREEDOM<br>1000 Hurricane Shoals Rd. NE,<br>Suite D-1100<br>Lawrenceville, Georgia 30043<br>Telephone: (770) 339–0774<br>Facsimile: (770) 339–6744<br>dcortman@ADFlegal.org<br>tbarham@ADFlegal.org</td><td>TYSON LANGHOFER<br>AZ Bar No. 32589<br>JONATHAN M. LARCOMB<br>VA Bar No. 47274<br>ALLIANCE DEFENDING FREEDOM<br>20116 Ashbrook Place, Suite 600<br>Ashburn, VA 20147<br>Telephone: (202) 393–8690<br>Facsimile: (202) 347–3622<br>tlanghofer@ADFlegal.org<br>jlarcomb@ADFlegal.org</td></tr>
</table>

*Attorneys for Plaintiffs*

---

[197] *See supra* Argument I.A.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document as been prepared in Century Schoolbook, 13-point font and fully complies with D. Minn. LR 7.1(h).

I also certify that this Memorandum of Law contains 9,728words, which fully complies with D. Minn. LR 7.1(f) and was prepared using Microsoft Word 365.

Respectfully submitted on this the 17th day of March, 2020.

*s/ Tyson Langhofer*

TYSON LANGHOFER*
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of March, 2020, I electronically filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to the following attorneys of record:

> BRIAN J. SLOVUT
> Deputy General Counsel
> DAN HERBER
> Senior Associate General Counsel
> CARRIE RYAN GALLIA
> Associate General Counsel
> Office of the General Counsel
> 360 McNamara Alumni Center
> 20 Oak Street SE
> Minneapolis, Minnesota 55455-2006
> Telephone:  (612) 624–4100
>
> *Attorneys for Defendants*

Respectfully submitted on this the 17th day of March, 2020.

*s/ Tyson C. Langhofer*

Tyson C. Langhofer
*Attorney for Plaintiffs*