# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Young America's Foundation, *a Tennessee nonprofit corporation*, Students for a Conservative Voice, *a Registered Student Organization at the University of Minnesota*, and Ben Shapiro,<br><br>Plaintiffs,<br><br>v.<br><br>Eric W. Kaler, *President of the University of Minnesota, in his individual capacity*, Michael Berthelsen, *Vice President of University Services of University of Minnesota, in his official and individual capacities*, Matthew A. Clark, *Chief of Police of University of Minnesota, in his official and individual capacities*, Troy Buhta, *Lieutenant of University of Minnesota Police Department, in his official and individual capacities*, and Erik Dussault, *Assistant Director of Student Unions & Activities of University of Minnesota, in his official and individual capacities*,<br><br>Defendants. | Case No. 18-cv-1864 (SRN/HB)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

David A Cortman and Travis Christopher Barham, Alliance Defending Freedom, 1000 Hurricane Shoals Road NE, Suite D-1100, Lawrenceville, GA 30043; Jonathan Caleb Dalton, Alliance Defending Freedom – Center for Academic Freedom, 440 First Street NW, Suite 600, Washington D.C. 20001; Theodore C. Landwehr, Landwehr Law Offices, 4034 NE 7th Street, Columbia Heights, MN 55421; and Tyson Charles Langhofer, Alliance Defending Freedom, 20116 Ashbrook Place, Suite 250, Ashburn, VA 20147, for Plaintiffs.

Brian J. Slovut, Carrie Ryan Gallia, and Daniel J. Herber, University of Minnesota – Office of the General Counsel, 200 Oak Street SE, Suite 360, Minneapolis, MN 55455, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the parties' cross motions for summary judgment. Plaintiffs Young America's Foundation, Students for a Conservative Voice, and Ben Shapiro argue that judgment should be entered in their favor because Defendants President Eric Kaler, Vice President Michael Berthelsen, Chief of Police Matthew A. Clark, Lieutenant Troy Buhta, and Assistant Director of Student Activities Erik Dussault—all employed by the University of Minnesota during the relevant time period—violated their First Amendment rights by engaging in impermissible viewpoint discrimination in the implementation of the University's policy for handling large scale events (Doc. No. 68). Defendants, in turn, argue that judgment should be entered in their favor because there is no genuine issue of material fact in dispute and Plaintiff's claims fail as a matter of law (Doc. No. 62).

Having considered the briefing and voluminous record submitted by the parties, and for the following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. No. 62) and **DENIES** Plaintiffs' Motion for Summary Judgment (Doc. No. 68).

## I.      BACKGROUND

### A.      The Parties

There are three Plaintiffs in this case. Plaintiff Young America's Foundation ("YAF") is a nonprofit organization that was founded by the late conservative thinker William F. Buckley in the 1960s. (2d. Am. Compl. [Doc. No. 58] ¶¶ 24, 79.) YAF hosts and co-sponsors conferences and lectures around the country, with the expressed goal of introducing young people and university students to conservative viewpoints. (*Id.*; *see also* Dep. Tr. of Patrick Coyle ("Coyle Dep.") [Doc. No. 73-4] at 24 (noting YAF hosts

2

approximately 150 lectures annually on college campuses).)  The organization also has approximately 500 high school and college chapter organizations, called Young Americans for Freedom, to promote conservative ideas in the academic community.  (Coyle Dep. at 16–18.)

Plaintiff Students for a Conservative Voice ("SCV") is a registered student group at the University of Minnesota.  (2d. Am. Compl. ¶ 25.)  SCV seeks to introduce their classmates to "alternative," conservative, viewpoints by way of "flyers, signs, peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students."  (*Id.* ¶¶ 25–27.)  According to SCV, their mission is important because "[c]onservative viewpoints are notably absent from educational instruction at the University of Minnesota."  (*Id.* ¶¶ 25–27, 72.)  During the relevant time period for this case, a University of Minnesota student, Madison Dibble, served as the President of SCV on the University of Minnesota's Twin Cities campus.  (*See* Dep. Tr. of Madison Dibble ("Dibble Dep.") [Doc. No. 73-5] at 28.)

Plaintiff Ben Shapiro is an "American political commentator, nationally syndicated columnist, author, radio talk show host, and attorney."  (2d. Am. Compl. ¶ 28.)  He holds a bachelor's degree in political science from the University of California – Los Angeles, and a juris doctorate from Harvard Law School.  (*See* Dep. Tr. of Ben Shapiro ("Shapiro Dep. Tr.") [Doc. No. 73-11] at 13.)  He is the prior editor-in-chief for the Daily Wire, and the host of a podcast and radio show.  (*Id.*)  He also writes a syndicated column for Creators Syndicate, and works with YAF to schedule speaking opportunities on college campuses

3

around the country.  (*Id.* at 15–16.)  While he does not currently practice law, Shapiro is a licensed attorney in California.  (*Id.*)

There are five Defendants in this case.  Defendant Eric W. Kaler was, at all times relevant to this case, the President of the University of Minnesota.  (2d Am. Compl. ¶ 29.) He became President Emeritus in July 2019.  (*Id.*)  While serving as President, Defendant Kaler's responsibilities included "overall administration of the institution, fundraising, representing the institution to the legislative bodies and the governor, representing and providing a . . . strategic vision for the institution . . . and [] the mechanical aspects of actually managing a 25,000-employee organization . . . ."  (Dep. Tr. of Eric W. Kaler ("Kaler Dep.") [Doc. No. 73-8] at 15.)  Kaler was also "involved in the construction of policies," and possessed the authority to "give directives" on policy matters, and to "implement new policies."  (*Id.* at 15, 18–19.)  Kaler is being sued only in his individual capacity.  (*See* 2d Am. Compl. ¶ 37.)

Defendant Michael Berthelsen is the Vice President of University Services at the University of Minnesota.  (2d Am. Compl. ¶ 38.)  In that role, Defendant Berthelsen is responsible for facility management, "public safety, which includes the police department and [the University's] public safety communications emergency center," certain auxiliary services such as "parking, dining, housing, residential life, bookstore [services], [and] printing," among others, and the "finance and support and IT support services that cross all those business lines."  (Dep. Tr. of Michael Berthelsen ("Berthelsen Dep.") [Doc. No. 73-1] at 10–11.)  Berthelsen is being sued in both his official and individual capacities.  (2d Am. Compl. ¶ 41.)

4

Defendant Matthew Clark is the Chief of Police at the University of Minnesota.  (2d Am. Compl. ¶ 42; *see also* Dep. Tr. of Matthew Clark ("Clark Dep.") [Doc. No. 73-3] at 8.)  Clark is being sued in both his official and individual capacities.  (2d Am. Compl. ¶ 45.)

Defendant Troy Buhta is a Lieutenant in the University of Minnesota Police Department (the "UMPD").  (*Id.* ¶ 46.)  Lieutenant Buhta is the commander of the University of Minnesota Police Department's investigative unit.  (Dep. Tr. of Troy Buhta ("Buhta Dep.") [Doc. No. 73-2] at 8.)  Buhta is being sued in both his official and individual capacities.  (2d Am. Compl. ¶ 49.)

Finally, Defendant Eric Dussault is the Associate Director for Student Unions & Activities (SUA) at the University of Minnesota.  (2d. Am. Compl. ¶ 50; *see also* Dep. Tr. of Eric Dussault ("Dussault Dep.") [Doc. No. 73-6] at 8.)   Defendant Dussault is responsible for managing the SUA office staff, and works with students on organizing activities on campus.  (Dussault Dep. at 10.)  He is being sued in both his official and individual capacities.  (2d Am. Compl. ¶ 52.)

### B.    The University of Minnesota's Twin Cities Campus: Layout, Venue Reservations, and the Large Scale Events Process

This case involves a scheduled speech by Plaintiff Ben Shapiro that took place on February 26, 2018 on the Twin Cities campus of the University of Minnesota.  Relevant to that event is the layout of the Twin Cities campus, the process of reserving venues for such events, and certain event policies.

### 1.      The University of Minnesota's Twin Cities Campus

The University's Twin Cities campus—the flagship of the University's five campuses throughout the state—serves roughly 47,000 students and is home to over 900 student organizations.  (*See* Pls. Ex. 62 [Doc. No. 72-1] at 46.)  The campus is sectioned into three areas:  East Bank and West Bank (both in Minneapolis) and St. Paul.  (Pls. Ex. 65 [Doc. No. 72-1] at 67.)  Of the three sections, the Minneapolis portions (East and West Bank) are home to more students; only one of the University's thirteen residence halls is located on the St. Paul portion of the campus, and that residence hall holds only 500 of the 7,564 total residence hall capacity.  (*See* Pls. Ex. 77 [Doc. No. 72-1] at 119; *see also* Gallia Ex. 3 [Doc. No. 79-1] at 12 (illustrating three non-university housing options near the St. Paul campus).)

The Minneapolis and St. Paul portions of the campus, while separate, are not far from each other.  By car, it takes approximately fifteen minutes to get from the West Bank to the St. Paul portion of the campus.  (*See* Pls. Ex. 70 [Doc. No. 72-1] at 97.)  The University also offers a bus service called the Campus Connector—free for students— which takes approximately five minutes to travel from East Bank to West Bank, fifteen minutes from East Bank to St. Paul, and twenty minutes from West Bank to St. Paul.  (*See* Gallia Ex. 4 [Doc. No. 79-1] at 15; *see also* Pls. Ex. 76 [Doc. No. 72-1] at 116.)  Moreover, the Minneapolis portion of the campus is home to three Metro Transit Green Line Light Rail stations that connect that portion of the campus to the full Metro Transit light rail network threading throughout the Twin Cities.  (*See* Pls. Ex. 75 [Doc. No. 72-1] at 111.)  Although the St. Paul portion of the campus is not connected to the Green Line, several

6

Metro Transit bus lines service both the Minneapolis and St. Paul portions of the campus, and the University offers a discounted cost U-Pass that provides unlimited Metro Transit rides to its students. (*See* Gallia Ex. 5 [Doc. No. 79-1] at 20–25.)

There are several large venues available for student group activities on the Twin Cities campus. The Court's discussion of these venues is limited primarily to locations relevant to this case based on the parties' course of conduct surrounding Shapiro's speech. In St. Paul, there is the North Star Ballroom, which is located inside the St. Paul Student Center and has adjustable seating layouts capable of holding up to 555 people. (*See* Pls. Ex. 104 [Doc. No. 72-2] at 67; *see also* Gallia Ex. 11 [Doc. No. 79-1].) The North Star Ballroom was ultimately the location where Shapiro spoke on February 26, 2018. (*See* 2d. Am. Compl. ¶ 12.)

Beyond St. Paul, there are several venues available on both the East and West Bank in Minneapolis. Relevant here, the West Bank is home to Anderson Hall, the Ted Mann Concert Hall, and Willey Hall. Anderson Hall contains several classrooms available for use, with the largest holding 246 people. (*See* Pls. Ex. 96 [Doc. No. 72-2] at 37.) The Ted Mann Concert Hall contains auditorium-style seating and can hold 1178 people when extra seating is added. (Pls. Ex. 110 [Doc. No. 72-2] at 93, 101.) Willey Hall, on the other hand, consists of two auditorium-style classrooms separated by a divider that can be moved to merge both classrooms into one larger room with a capacity for 1058 people. (*See* Pls. Ex. 48 [Doc. No. 73-18] at 7–8.)

The East Bank is home to the Mayo Auditorium and the Northrop Memorial Auditorium. The Mayo Auditorium contains auditorium-style seating and can hold up to

455 people. (*See* Pls. Ex. 52 [Doc. No. 72-1] at 6–7.) The Northrop Memorial Auditorium—more specifically the Carlson Family Stage within the auditorium—also contains auditorium-style seating and can hold up to 2,692 people at full capacity. (Pls. Ex. 108, 115 [Doc. No. 72-2] at 85, 142.)

### 2.   Reserving A Venue On The Twin Cities Campus & the Large Scale Events Process

Registered student groups—like Plaintiff SCV—can apply for funding and reserve on-campus venues for their events. (Dussault Dep. at 13.) There is no centralized site or process for reserving space as a student group on campus. (*Id.* at 14, 19.) Generally, however, student groups—and more specifically, the officers of the student group—submit requests to reserve classroom University spaces to the University's Office of Classroom Management (OCM or "Classroom Management"). (Dep. Tr. of Philip Hunter ("Hunter Dep." [Doc. No. 73-7] at 18–19.) Once a request is submitted, Classroom Management verifies that that group is a registered student group, and typically approves the request if the venue holds less than 100 people. (*Id.*) If the request is for a larger event—typically 100 or more people—the process is different. (*Id.* at 19–20.) For those events, Classroom Management would typically place a "pending" status on the reservation request and would then email the student group a "Use Agreement" which sets forth various policies the student group must abide by in its use of the venue. (*Id.* at 20.) Whenever an event involves a guest speaker, Classroom Management typically requests that the student group work with the University's Student Unions and Activities office (SUA). (*Id.* at 21–22.)

The University also has a student affairs policy known as the "Large-Scale Events Process" (LSEP).[1] (*See* Pls. Ex. 112 ("LSEP") [Doc. No. 72-2] at 109–112; Defs. Ex. D [Doc. No. 65-1] at 70–73.) The LSEP sets forth a process to be followed by registered student groups seeking to host a large scale event on the University of Minnesota campus. (LSEP at 109.) Groups seeking to host such an event must generally complete the process prior to entering into any agreements with outside guests related to such events. (*See id.*; Defs. Ex. D at 70.) The process was created in 2013 to help students plan events that "might require university resources" which, in turn, would warrant review by the University's Large Scale Events Committee. (*See* Dussault Dep. 37–38; Dep Tr. of Denny Olsen ("Olsen Dep.") [Doc. No. 73-10] at 9, 24.) It is not mandatory to follow the LSEP; rather, student groups can either inform SUA that they wish to follow the process, or SUA will contact the group and ask it to follow the process. (Olsen Dep. at 25.)

By its terms, the LSEP defines "large scale event[s]" as "student group sponsored events taking place in a large campus venue or outdoor space that will draw a significant amount of the campus population, a large off-campus crowd, or represents a significant security concern (i.e. public figure, celebrity, etc.)." (LSEP at 109.) The LSEP then states that, although a student group has a right to reserve a "large campus venue" for such an event, "the reservation will only be confirmed upon approval by the Large Scale Events Committee." (*Id.*) The Large Scale Events Committee consists of "members from the

---

[1] Several versions of the LSEP were provided to the Court as summary judgment exhibits. While the versions have some variations, they are generally similar. (*Compare* Pls. Ex. 112 (LSEP) *with* Defs. Ex. D.) Accordingly, unless otherwise noted, the Court will cite to Plaintiff's version of the document. (*See* Pls. Ex. 112.)

UMPD, University Services, Parking and Transportation, Student Unions and Activities, and other campus departments impacted by large scale events on campus[.]"  (*Id.*)

Student groups following the LSEP must put together a "Large Scale Events Proposal" that includes an event description setting forth "all pertinent event logistics" and a timeline that "includes all details from set up to event takedown[.]"  (*Id.* at 110.)  The group must provide "detailed information" about the "public figure" being invited to campus, including information about any groups used to contact that public figure, information "on the general 'act' performed by the [public figure] . . . at the proposed event[,]" and an explanation of the public figure's prior appearances elsewhere, including any "issues or concerns at other [events], or reasons for security concerns."  (*Id.*)  The student group must also provide a "plan for any security concerns caused by hosting [the] event on campus" which should include estimates on "impact to traffic, parking, and safety on campus" as well as any "concerns for resources need[ed] to secure or transport artists or event performers/speakers."  (*Id.*)  Finally, the student group must provide details about what marketing will be done for the event, what ticketing plan (if any) will be used, the projected event budget, and the group's financial commitment to make the event happen. (*Id.* at 111–12.)  Ultimately, this information is required for the Large Scale Events Committee to make a "determination of whether the campus can support the event."  (*Id.* at 109.)

Several student groups follow the LSEP each year at the University.  (Olsen Dep. at 25.)  Where either venue management or a student group indicates that an event raises security concerns, the SUA will work with the group to review and address those concerns.

10

(*Id.* at 33.)  In general, however, the "normal protocol" for events that require security, or that may involve protests, is for someone at the SUA and someone from the UMPD to meet with the student group to discuss security needs for the event.  (*Id.* at 45–46.).

### C.      Ben Shapiro and His Speech at the University of Minnesota

### 1.      Ben Shapiro's Past Appearances At Other Campuses

Ben Shapiro's appearances on college campuses often draw large audiences and occasionally generate significant protest activity.  In preparation for Shapiro's on-campus speech, the UMPD compiled a brief history of relevant security concerns surrounding his speeches.  (*See* Pls. Ex. 30 [Doc. No. 73-16] at 41–43.)  In February of 2016, for example, when Shapiro spoke at a California university, protestors blocked the entrance to the building in which he was speaking.  Students attending the event were eventually able to enter the venue, but Shapiro had to be escorted out by law enforcement after his speech was over.  (*Id.* at 43.)  Two months later, Shapiro spoke at Penn State University to an audience of around 300 people, while protestors attempted to shut down the speech by yelling and pounding on the venue's closed doors.  (*Id.*)  Later that year, while speaking to a University of Wisconsin audience, Shapiro was interrupted when twenty protestors climbed on to the speaker's platform with him.  (*Id.* at 43.)

In some cases, protest activity had a significant impact on the hosting college's resources and campus.  In September 2017, for example, Shapiro gave two such speeches. The first was at UC Berkeley, where approximately 1000 protestors appeared, the University incurred a $600,000 security bill, and nine arrests were made.  ((*Id.* at 42–43; *see also* Pls. Ex. 31 [Doc. No. 73-16] at 50.)  The second was at the University of Utah,

where approximately 300 protestors gathered outside, multiple fights between protestors and counter-protestors occurred, and two people were arrested.  (*Id.* at 42–43.)

Not all of Shapiro's speeches result in protest activity.  In February 2017, for example, Shapiro spoke at Marquette University to an audience of over 400 students, with no reported incidents.  (*Id.* at 43.)  Similarly, on January 24, 2018—about a month before Shapiro's scheduled speech at the University of Minnesota—Shapiro spoke at the University of Connecticut to approximately 500 students.   There were no reported incidents.  (Pls. Ex. 31 at 50.)  In Shapiro's own words, about "half to two-thirds" of his campus events "have peaceful protestors, [while] the remainder have no protestors at all." (Shapiro Dep. at 55–56.)  Of those events where protestors are present, Shapiro estimates that a "very small percentage have rowdy protestors," which he described as protest activity resulting in arrests, interfering with the event, or interfering with students trying to attend his speech.  (*Id.*)  Shapiro also testified that his popularity has risen over time, and that from 2017 to 2019, he had not "spoken at a venue smaller than a thousand that was not packed."  (*Id.* at 43–44.)  When he speaks at smaller venues, universities often set up overflow rooms so other students can watch his speech via video streaming.  (*Id.* at 44.)

### 2. The SCV's Lauren Southern Event and the Start of Planning for Ben Shapiro's Speech

In the fall of the 2017-2018 academic year, Plaintiff SCV worked with another registered student organization, Collegians for a Constructive Tomorrow (CFACT) and its president, Michael Ziebarth, to host a conservative YouTube personality and author, Lauren Southern, at the University.  (*See* Dibble Dep. at 87; Dep. Tr. of Michael Ziebarth

("Ziebarth Dep.") [Doc. No. 73-13] at 54–55.)  In preparing for the event, the student groups did not create a Large Scale Event Proposal.  (Dibble Dep. at 100.)

On October 20, 2017—five days before the Southern Speech—SCV and CFACT informed the UMPD that they were aware of "a group of students" planning a protest at the Southern speech, and that the event "may need additional security."  (Pls. Ex. 80 [Doc. No. 72-1] at 156.)  The next day, following this notice, Defendant Clark informed Defendant Berthelsen, among others, that he had learned of planned protests for the Southern event, and that he was going to be working with the student groups to plan for any such events.  (*See id.* at 153–54.)  Defendants Buhta and Dussault then became involved in planning for the Southern event.  (*Id.* at 155.)

Following the notice of potential protest activity, several changes were made to the plans for the Southern event.  The event was originally to be located in Willey Hall, on the West Bank.  (*See id.* at 152, 156.)  Upon being notified of the security needs related to the protest activity, however, Defendant Clark sought to change the location to a different building with "less seating and fewer access points[.]"  (*Id.* at 153.)  He also requested that SCV use a ticketing system for the event, that the venue implement a "no bags" policy, and that the building be "lock[ed] []down" to keep any protestors outside.  (*Id.*)  Buhta echoed those concerns, noting that Willey Hall is "too hard to lock down and secure" and that a "change of venue" was their biggest priority.  (*Id.* at 152.)  On October 24—one day before the event, and after speaking to SCV and CFACT—the event was moved to a different West Bank location, Anderson Hall.  (*Id.* at 142; *see also* Pls. Ex. 35 [Doc. No. 73-16] at

68–69.)  The University also moved at least one scheduled class out of Anderson Hall in order to accommodate the Southern event.  (Defs. Ex. N. [Doc. No. 65-3] at 103–104.)

While meeting with Buhta, Dussault, and Dibble to plan for security concerns at the Southern event, CFACT President Ziebarth told Buhta and Dussault that both SCV and CFACT were looking to bring Ben Shapiro to campus the following spring for a speaking engagement, and that it would be a "large speaking event."  (Ziebarth Dep. at 71–72.) Buhta responded that "he really wanted to meet" with the student groups in order to "plan extensively" before the Shapiro speech.  (*Id.* at 72.)  The group also discussed other similarly large speaking events at other universities in order to anticipate how large the Shapiro event might be, and in order to "prepare for a . . . speaker that could," in Ziebarth's words, "produce some controversy . . . if brought to campus to hold an event like that." (*Id.* at 73–74.)  Shortly after that, Dussault informed SCV that they "will need to go through the Student Group Large Event protocol due to the size of the planned event."  (Pls. Ex. 35 at 69.)

After planning for security, the Lauren Southern event took place on October 25, 2017.  (*Id.* at 55.)  Approximately 250 people protested the event, which led to two arrests, and to the issuance of a curfew on portions of the campus.  (Dibble Dep. at 84; *see also* Pls. Ex. 26 [Doc. No. 73-16] at 26–27.)  Temporary fencing was put in place to keep protestors back from Anderson Hall, and 25 University police officers were present, assisted by the Minneapolis Police Department, Minnesota State Patrol, Hennepin County Sheriff's Office and Metro Transit Police.  (Pls. Ex. 26 at 26–27.)  There were several fights between protestors and counter-protestors, and officers used chemical spray to break up

14

fights and disperse crowds.  (*Id.* at 27.)  Although one protestor managed to get into the venue where Southern was going to speak, that protestor left when asked to leave by University Police.  (Ziebarth Dep. at 60.)  Ultimately, Ziebarth testified that the Southern event "began and [was] completed as planned[,]" with no harm to Southern.  (*Id.* at 61–62.)  After the event was over, Dibble, on behalf of SCV, emailed both Dussault and Buhta the following message:

> We all made it through the event safely.  We cannot thank you two (and your teams) enough for all the preparation that went into the event.  We all know that we could not have done this by ourselves, but I truly believe no other University has handled an event with as much professionalism and precision.

(Defs. Ex. M. [Doc. No. 65-3] at 96.)  Both Ziebarth and Dibble agreed that Dussault and Buhta were respectful, responsive, and professional throughout the entire process.  (*See* Ziebarth Dep. at 70; Dibble Dep. at 106–108.)

### 3.    The Planning Process

By the time that SCV first notified the University of the Shapiro speech, the group had already agreed to host Shapiro.  (*See* Defs. Ex. O [Doc. No. 65-3] at 106–107 (noting SCV reached out to YAF seeking a date for Shapiro on August 23, 2017); Defs. Ex. P [Doc. No. 65-3] at 109–110 (noting, on October 6, that SCV accepted the YAF's proposed date of February 26, 2018 for the Shapiro speech).)  Dibble, the SCV President, agreed that SCV would host Shapiro on February 26, 2018—the only date offered by YAF—without first checking to see whether any venues on the East or the West Bank were available, and without asking about Shapiro's availability on any other dates.  (Dibble Dep. at 75.)

As part of booking Shapiro as a speaker, YAF sent a questionnaire to SCV to obtain general information about the planned lecture, information about activities on campus, and other logistical information.[2]  (*See* Defs. Ex. Q [Doc. No. 65-3] at 112–116.)  The questionnaire was completed by Dibble on January 11, 2018.  (*Id.* at 115–16.)  Dibble told YAF that Shapiro's speech would be held in the North Star Ballroom on the St. Paul portion of the Twin Cities campus, and informed Shapiro that SCV had been "working closely [with the] University of Minnesota Police to secure this event[.]"  (*Id.* at 113–114.)  With respect to any such security concerns, Dibble also explained that the Southern event that SCV had previously hosted had resulted in approximately 250 protestors, several arrests, and a curfew, but noted that the protests were "peaceful, for the most part."  (*Id.* at 2.)

The process of planning for Shapiro's speech took place through "multiple conversations" between the University and the student groups "over a long period of time." (Ziebarth Dep. at 75.)  Aside from the initial conversations between SCV, Buhta, and Dussault while preparing for the Southern event, the process began when SCV submitted a room reservation request to OCM seeking to reserve the Mayo Auditorium—on the East Bank—for Shapiro's speech.  (*See* Defs. Ex. S [Doc. No. 65-3] at 134.)  Included with the request was the following message:

> We will be holding the event in Mayo Auditorium.  We understand there is
> a fee and insurance cost associated with it.  That is not an issue.  DO NOT

---

[2]     The questionnaire was designed to provide Shapiro with a better idea of what to expect during his visit and was important to YAF in order to ensure it was a successful event.  (Coyle Dep. at 81.)  Notably, YAF generally seeks a detailed plan for Shapiro's speeches precisely because of his "prominence" as a speaker.  (*Id.* at 87.)  Moreover, YAF generally expects that student groups will coordinate with University police in advance of Shapiro's speaking events.  (*Id.*)

relocate this event, and DO let us know the additional work we will be required to do ahead of time.  The event will likely require security.

(*Id.*)  The request also indicated that the estimated total attendance of the event would be approximately 400 people.  (*See* Shapiro Event Request [Doc. No. 17-1] at 1.)

The request was forwarded by President Kaler's Deputy Chief of Staff, Julie Christensen, to President Kaler, who responded by saying: "I do not want this in the middle of campus – West Bank is a better location."  (Defs. Ex. S at 135.)  Christensen acknowledged his message, informed him that the University would be "heavily engaged in making sure there's a safe location" for the event, and indicated that she would "share [his] sentiments."  (*Id.* at 136.)  President Kaler testified that he sent this email because the Mayo Auditorium is "in the middle of the medical school[,]" is "very close to the green line[,]" and if "there were disruptions, they could easily spill and interfere with that transportation."  (Kaler Dep. at 27.)  He explained that for him, it made more sense to have the event "in a place that was a little more distant from the center of campus so that if there was a disruption it would have minimal effect on the thousands of people who come to the [U]niversity for reasons besides protesting."  (*Id.* at 27–28.)

President Kaler further explained that he was aware that Shapiro had visited other college campuses and that there was a possibility of protest activity, which presented a safety concern that led him to think that "West Bank would be a better location" than the center of campus.  (*Id.* at 28–29.)  While he did not believe there would be particularly strong "anti-Ben Shapiro sentiment" on campus, he felt the University "needed to exercise caution" in the interest of safety.  (*Id.* at 33–34.)  Beyond that email, President Kaler had

no other involvement with the Shapiro speech planning process, and at no point did he tell anybody that it would better if the event were held on the St. Paul portion of the Twin Cities campus. (*Id.* at 35, 72 ("I never directed that it be on the St. Paul Campus[.]").) President Kaler's email was not disseminated to the primary University officials working on the Shapiro event—such as Buhta, Dussault, and Berthelsen.[3] (*See, e.g.*, Buhta Dep. at 97–98 (noting he never received Kaler's email, or any other communication from Kaler related to the Shapiro event); Dussault Dep. at 109 (indicating he was unaware of Kaler's email); Berthelsen Dep. at 43–44 (noting that he did not see Kaler's email, and did not communicate with Kaler at all about the Shapiro event).)

On December 4, 2017, Dibble reached out to Dussault to discuss the process of deciding on a final venue for the Shapiro speech. (*See* Defs. Ex. X [Doc. No. 65-4] at 5.) She noted that she was having difficulty reserving a room because OCM was waiting until the spring semester class schedule was finalized. (*Id.*) She also noted that the Ted Mann Concert Hall and Northrop Auditorium had already said "no to holding the event." (*Id.*) Neither Northrop Memorial Auditorium nor Ted Mann Hall were available for February 26, which Dussault communicated to Dibble at a later date. (*Id.* at 10; Dussault Dep. at 108.) Around the same time that Dibble reached out to Dussault, another student affiliated with SCV attempted to reserve Willey Hall for an unidentified guest speaker event on February 26. The request was placed into "tentative" status because Mayo Auditorium was

---

[3]     The only other action taken by President Kaler with respect to the Shapiro event was an inquiry he made about whether the lecture would be live-streamed, because he believed that if the room in which Shapiro spoke was full, other students should still have the opportunity to hear the lecture. (Kaler Dep. at 42–43.)

already being held for a guest speaker event for SCV pending further discussions with Dussault and Buhta.  (*See* Defs. Ex. Y [Doc. No. 65-4] at 13–15.)  The new request was also referred to SUA because "it is a guest speaker request and they are requesting both rooms in Willey Hall (which UMPD does not suggest for security reasons)."  (*Id.* at 14.)

It appears from the record that Dibble, Buhta, and Dussault then met on December 14 to discuss venue options.  (Defs. Ex. X at 6–7; *see also* Defs. Ex. AA [Doc. No. 65-4] at 22.)  At that meeting, SCV indicated that they were "hoping for about 500 participants for their event" and that planning was progressing under the assumption that "this will obviously be much bigger in terms of crowd and reaction" than, for example, the earlier Lauren Southern event.  (Defs. Ex. AA at 22.)  The group planned a walkthrough of the Mayo Auditorium on December 19.  (*Id.*)  Notably, Buhta thought that the Mayo Auditorium "might be a good location since its fairly secluded" but the purpose of the walkthrough was to provide him with "a feel for the security concerns" that may be present with the venue.  (*Id.*)  Additionally, Dussault noted (in an email to Interim SUA Direction Denny Olsen) that Dibble was "very willing to work with" the University on venue.[4]  (*Id.*)

---

[4]     Following the meeting, Dibble sent an email to YAF updating the organization that SCV, Buhta, and Dussault were planning a walk-through of Mayo Auditorium, which Dibble characterized as "the largest event space" that SCV had been allowed to reserve because "University Police cannot secure" a larger space.  (Defs. Ex. BB [Doc. No. 65-4] at 27–28.)  She also noted that she believed Shapiro's event would draw no protestors, although she acknowledged that "it is hard to say how the event could go" and that she had "full trust in the University allowing the event to go on."  (*Id.* at 28.)  Finally, Dibble stated that SCV was going to utilize a ticket registration system for the Shapiro speech—the tickets would still be free—and that the University Police were interested in reaching out to Shapiro's security detail to ensure that they could develop an extraction plan for use if necessary.  (*Id.*)

On December 19, Buhta, Dibble, and Ziebarth met to walk through the Mayo Auditorium to consider the venue for the Shapiro speech.  (Dussault Dep. at 108–109; Buhta Dep. at 76–77; Dibble Dep. at 124–25, 137; Ziebarth Dep. at 88–89; *see also* Defs. Ex. AA at 23–24.)  Following the walkthrough, Buhta changed his mind and concluded that it would be difficult to secure the Mayo Auditorium.  (Buhta Dep. at 77.)  He had not been to the Mayo Auditorium in some time and was unaware that recent construction had connected the venue "[d]irectly . . . to the [University's] hospital[,]" which posed an interference risk for medical classes and presented a "tunnel . . . or skyway system" scenario where security would have to "decipher [whether] someone belongs in [the] building or not."  (*Id.* at 77–78.)  Ultimately, Buhta acknowledged that his initial preference for the Mayo Auditorium was misplaced, and that he considered it his "fault for not walking through there before suggesting it . . . ."  (*Id.* at 77.)

After Buhta determined that the Mayo Auditorium was not a viable venue due to security concerns, Dussault informed Dibble that Ferguson Hall—located on the West Bank—had some recital halls that could seat up to 150 people.  (Defs. Ex. X at 10.)  Dibble rejected that option because a 150-person venue was significantly smaller than the venue SCV was seeking for Shapiro, and even if it had been available, she would not have selected it.  (Dibble Dep. at 162–63.)  Dussault then suggested the North Star Ballroom in the St. Paul Student Center, noting that "[d]epending on the set up for the event, the capacity for that space can be as much as 550."  (Defs. Ex. X at 10.)  Dibble responded later saying that it "[s]ounds like it will be a decision between the North Star Ballroom or Willey Hall then." (*Id.*)  Buhta intervened, noting that "Willey is not going to be a good option due to access

from the skyway" and suggested (as an alternative to the North Star Ballroom) the Continuing Education and Conference Center, also located on the St. Paul campus. (*Id.* at 11.) Dibble, on behalf of SCV, responded saying "[it] looks like St. Paul will be our best option. I am happy to walk through those two spaces with you," and requested that a "hold" be placed on both the North Star Ballroom and the Continuing Education and Conference Center venues. (Defs. Ex. EE [Doc. No. 65-4] at 46.) Dibble did not—either at that time or any other time—inform Dussault or Buhta that SCV did not want to host the event in St. Paul. (Dibble Dep. at 167–69.)

On January 4, SCV and Buhta visited the St. Paul portion of campus for venue walkthroughs. (Defs. Ex. FF [Doc. No. 65-4] at 50–53.) By that time, SCV had excluded the Continuing Education and Conference Center from their venue preferences because the "fees associated with renting that particular building" were higher "and it was smaller" than the North Star Ballroom.[5] (Dibble Dep. at 167; *see also* Defs. Ex. FF at 52–53.)

---

[5]     Following Buhta's suggestion that SCV book the Continuing Education and Conference Center, Defendant Clark contacted the Center's scheduler. (*See* Defs. Ex. CC [Doc. No. 65-4] at 31.) Clark noted that "[t]he admin has asked that we try to move this visit to the St. Paul campus" because it was "going to be a security issue with past lectures at other universities." (*Id.*) He also stated that the crowd size needed to be limited to 500 people and that protestors would probably be present. (*Id.* at 30.)

Clark testified that his comment about the crowd size limit was based on his understanding, from Buhta, that SCV had agreed that the anticipated crowd for the Shapiro event would be approximately 500 people. (Clark Dep. at 87–88.) As to his comment about the likelihood of protestors, Clark explained that there was "no reason for [him] not to expect" that some members of the campus community might protest Shapiro's event when they had just protested Southern and another SCV-hosted speaker event. (*Id.* at 91–92.) He also explained that no one in the administration had asked him to move the event to St. Paul, and that the statement reflected his "understanding" that there was "an agreement made between Troy Buhta, Erik Dussault, and the student group on where this was going to be, and the choice was between the . . . [Continuing Education and

Accordingly, Buhta and Dibble walked through the North Star Ballroom.  (Defs. Ex. FF at 50–51.)  Following the walkthrough, SCV reserved the North Star Ballroom for their event.[6]  (Defs. Ex. GG [Doc. No. 65-4] at 55–57; *see also* Defs. Ex. HH [Doc. No. 65-4] at 66–67.)

On January 11, 2018, Dibble met with Beth Galatis—an event manager responsible for the North Star Ballroom—to discuss planning details for Shapiro's speech.  (*See* Decl. of Beth Galatis in Supp. of Defs.' Mot. for Summ. J. ("Galatis Decl.") [Doc. No. 66] at ¶¶ 1, 7.)  In that meeting, Galatis asked whether the total attendance would be 400, to which Dibble responded, "Yes."  (*Id.* ¶ 12.)  Galatis also presented Dibble with an "illustration of a 400 seat configuration" of the North Star Ballroom, and informed her that the space could technically accommodate 550 seated people, but some of the seats would have an obstructed view.  (*Id.* ¶ 13.)  Dibble responded by "adamantly elect[ing] to move forward with the configuration for 400 seated attendees" and stated that "she did not want more seating because they intended to keep attendance to student group members and have a very limited general public attendance."  (*Id.* ¶¶ 13–14.)  At no point did Dibble ever

---

Conference Center] or [the] North Star Ballroom."  (*Id.* at 94–95.)  He further stated that he had "cleared that with people above [him], as in the senior vice president and Mike Berthelsen[.]"  (*Id.* at 95.)

[6]     When informed that the Shapiro speech had been scheduled at the North Star Ballroom, Vice Provost Maggie Towle stated in a January 13 email: "So happy St. Pa[u]l gets a little action for a change :)[.]"  (Pls. Ex. 22 [Doc. No. 73-15] at 30.)  She testified that she made this statement because she was "really excited that we had a big event over there for the students that live over there.  I thought it was great.  The staff loved it."  (Towle Dep. at 40.)

express to Galatis any concern with holding the event in the North Star Ballroom.  (*Id.* ¶¶ 16, 21.)

A few weeks later, after SCV implemented its ticket system for the Shapiro speech, Dussault reached out to Dibble and SCV, asking for an update.  (Defs. Ex. HH at 60.)  On January 29, 2018, Dibble informed Dussault that tickets for the event had "sold out in a few hours."  (*Id.* at 59–60.)  At no point did Dibble, on behalf of SCV, ever ask Dussault or Buhta to move the event to a different or larger venue after tickets to the speech sold out.  (*See id.*; Dibble Dep. at 200–203; Dussault Dep. at 116–17; Buhta Dep. at 141.)  Instead, as stated in an email from Dibble to YAF, SCV began "trying to force the University into giving" the student group "a larger venue" for Shapiro's speech, and apparently was waiting for the University to "reach[] out . . . about the venue size."  (Defs. Ex. JJ [Doc. No. 65-4] at 76.)  Dibble also told YAF that SCV had reached out to "some members of the [Minnesota] state legislature" to see if they would support pushing "for a larger venue."  (*Id.*)  She also stated that SCV had released a statement on the Shapiro event page online, with the hope that "enough bad press for the University will get [the group] a larger venue . . . ."  (*Id.*)  Dibble informed YAF of these efforts on January 27.  (*Id.*)

### 4.     SCV's and YAF's Press Activity Prior to Shapiro's Speech and the University's Response

YAF and SCV began a "press push" in order to garner public attention regarding the venue for Shapiro's speech.  (*See* Dep. Tr. of Spencer Brown ("Brown Dep.") [Doc. No. 65-2] at 124–125 (noting that YAF started a "press push" regarding Shapiro's lecture so that the "plight of our students gets national attention").)  To that end, on January 30,

23

YAF encouraged Dibble to strengthen SCV's position by "mak[ing] sure there aren't other venues available that haven't been requested." (Defs. Ex. LL [Doc. No. 65-4] at 81.) YAF asked Dibble to contact the University and ask: "Are there any venues available on the Minneapolis campus that hold approximately 1000 people on February 26?" (*Id.*) YAF stated that "[t]he school's answer to that question will allow us to definitively say whether they're trying to block you from the main campus, which would be a bad decision on their part, but one we can pressure them on." (*Id.*) Nonetheless, the record contains no evidence that Dibble ever sent any such email, or directly asked anyone at the University about moving the event to another venue. (*See* Dibble Dep. at 223–26.)

In early February 2018, YAF published a blog post criticizing the University for allegedly moving Shapiro to a smaller venue on a "secondary campus" and accusing the University of "viewpoint discrimination." (*See* Defs. Ex. MM [Doc. No. 65-4] at 88–89.) It claimed that the University was treating SCV and its members as "second-class citizens[,]" but noted that "[t]here's no reason to doubt the sincerity of the U of M's concerns about security . . . ." (*Id.* at 87.) Dibble assisted in drafting this post, and informed YAF that "[a]ll the reasoning given for why we could not have one venue or another was related to safety or public disruption" and that the University's alleged "micromanagement began after [SCV's] Lauren Southern event in October." (*Id.* at 83–84.) She also noted that "[w]ithout talking to the [U]niversity, [SCV] has been trying to find availability at the [Maturi] Sports Pavilion and Williams Arena[,]" which are other venues on campus. (*Id.* at 84.) Ultimately, neither location was available.

At that point, YAF began "encouraging the public to contact [the University or specific administrators] about giving [SCV] a larger room and [to] complain about the location[.]" (Defs. Ex. NN [Doc. No. 65-4] at 95.)  To make that campaign more effective, YAF asked Dibble to provide the contact information for the "person who would be able to change the decision the school made about venue size and location," or the people "who would be pressured by public outcry." (*Id.* at 92.)  Dibble provided YAF with contact information for Denny Olsen (Director of the SUA), Berthelsen, Philip Hunter (Lead Event Scheduler at OCM), and Karen Hanson (Executive Vice President and Provost of the University), as well as a few other general University contact points. (*Id.* at 91.)  Notably, however, Dibble did not provide any contact information for Dussault, Clark, or Buhta, the primary people she had been working with to plan Shapiro's speech. (*Id.*)

On February 12, Dussault informed Dibble that the North Star Ballroom could add an additional 49 seats for Shapiro's speech, although due to the layout of the room, the added seats would likely have a partially obstructed view. (Defs. Ex. QQ [Doc. No. 65-4] at 102–103.)  After checking with YAF, Dibble agreed to the expansion. (*Id.* at 102; *see also* Dibble Dep. at 298.)

On February 13, a member of the University Board of Regents contacted University officials expressing concern about the planning process surrounding the Shapiro event. (Defs. Ex. RR [Doc. No. 65-4] at 111–12.)  The Regent specifically asked why Willey Hall was not available to SCV, and noted that, in his opinion, the North Star Ballroom was not the "easiest security site (to the extent that should be the final determining factor) compared to Willey Hall." (*Id.* at 112.)  He also stated that he had "great faith" in the University

25

Police's ability to secure "virtually any site" on campus, and that he did not feel that the University should "yield to the heckler's veto[.]" (*Id.*) The message was forwarded to both Clark and Berthelsen. (*Id.* at 111.) Clark responded by noting that the University Police were "already past capacity for this event considering the number of officers on UMPD"[7] and that "[a]dding additional seats and guarding a growing protest crowd creates greater safety risk[s] and concern[s]." (*Id.* at 110.) Clark also noted that "[c]hanging the venue to Willey would require more personnel to guard the skyway access from other building and tunnels[,]" and that "[i]f this grows to a larger protest and counter protest crowd," the University might "need to cancel the event for safety reason[s], or request many more officers from other agencies." (*Id.*) Ultimately, Clark noted, "[t]he location of this event was established and agreed upon (by [SCV]) based on the limited personnel within DPS." (*Id.*)

On February 16, without contacting Buhta, Dussault, or Clark, a student again submitted (on behalf of SCV) a reservation request for Willey Hall for the Shapiro Speech. (Defs. Ex. OO [Doc. No. 65-4] at 97.) Philip Hunter, who works for OCM, emailed that student, explaining that he had cancelled the request because Dibble, on behalf of SCV, had previously informed OCM that SCV had found another venue for the event—the North Star Ballroom. (*Id.*) Hunter later testified that he had assumed it was a "duplicate request" that often occurs when student group officers "aren't communicating with each other and

---

[7]    The UMPD employs 55 full-time sworn police officers, 120 part-time officers, and approximately 80 non-sworn campus security officers. (Clark Dep. at 23, 26, 73.) The 120 part-time officers are utilized only for football games at the University's football stadium. (*Id.* at 74.)

they'll make different requests, or other members of the group that aren't even officers will make requests." (Hunter Dep. at 110.) There is nothing in the record showing that the student who submitted the request, SCV, or Dibble ever responded to Hunter's cancellation message. However, the same day Hunter cancelled the request, Dibble forwarded Hunter's email to YAF, asserting that SCV's "reservation [was] being blocked" and claimed that the fact that she "agreed to the St. Paul venue is completely irrelevant." (Defs. Ex. OO at 97.)

SCV then issued a formal "Statement on Ben Shapiro's Speech at the University of Minnesota" on Twitter. (Defs. Ex. PP [Doc. No. 65-4] at 100.) In relevant part, SCV claimed that the Shapiro speech had resulted in approximately 725 requests for tickets—far beyond the capacity of the North Star Ballroom—and that SCV could easily sell thousands of tickets for the speech if it had a larger venue. (*Id.*) It then claimed that SCV had "attempted to reserve every large capacity building on this campus" but had been unable to do so because, in its opinion, "[t]he campus leftists and proto-terrorists who call themselves Anti-Fascists cannot hear a different opinion without promising a violent, disruptive protest." (*Id.*) The University, SCV claimed, was "unwilling to risk protestors shutting roads, blocking trains, or forcing hospitals into lockdown so that students would have the opportunity to hear Ben Shapiro speak[,]" and as a result had "caved to th[e] heckler's veto and decided that the smaller venue on the St. Paul satellite campus would be the only site made available . . . ." (*Id.*) SCV also noted, however, that one of the reasons it sought to have Shapiro speak on campus was because the UMPD was, in its opinion, "one of the finest in the city and they are great to work with." (*Id.*) The statement

27

was signed by Dibble, Ziebarth, and Kal Randa, who was then President of the Minnesota Students for Liberty.  (*Id.*)

On February 19, Matt Kramer—Vice President of University Relations—asked Dussault to ask SCV about the number of people it had on its waitlist for the Shapiro event. Before Dussault did so, Vice Provost Maggie Towle intervened, explaining that SUA does not "normally engage with any student group [regarding] their wait list.  [For the Shapiro event,] [t]he event will be live streamed [which] seems like the alternative for those who want to see the program."  (Defs. Ex. SS [Doc. No. 65-4] at 114.)  To that end, she noted that "[u]nless the U plans to move this to a larger venue (which I do not recommend) I see no purpose in asking about the wait list."  (*Id.*)  Berthelsen responded that "[w]e are not moving the event."  (*Id.*)  He made that decision, he said, because the student group and the University "were too far down the road in planning.  We had the site, we had transportation plans, we had public safety people arranged.  It was too far down, and we . . . could not have successfully moved it and held it."  (Berthelsen Dep. at 59.)  He also noted that moving an event from a St. Paul venue to a Minneapolis venue is difficult because it changes the law enforcement agencies that the University works with, primarily because "different police jurisdictions are engaged" for the two venues.  (*Id.* at 62.)

Just before Shapiro's visit to the University, Defendant Kaler spoke at a press conference, explaining that the University holds no bias toward conservative views, and that the St. Paul campus was chosen for Shapiro's speech for purely safety reasons.  (Pls. Ex. 19 [Doc. No. 73-15] at 22.)  Kaler further stated that the University was "mindful of the fact that [Shapiro] is a controversial speaker and that at several places where he's

spoken, protests (sic) have objected, and we intend to ensure the event is safe for all who attend." (*Id.*)

### 5.      Ben Shapiro's Speech

As the date for Shapiro's speech approached, at least one protest was planned by another student group, Students for a Democratic Society (SDS). (*See, e.g.*, Defs. Ex. TT [Doc. No. 65-4] at 118–19.) SDS was the same group that had "kick started the protest for [SCV's] Lauren Southern event." (Dibble Dep. at 301–302.) Dibble testified that she does not recall ever sharing any information she had about this planned protest with either the UMPD or Buhta. (*Id.* at 302.)

The UMPD prepared an incident action plan for the event and updated it as more information became available. (Defs. Ex. UU [Doc. No. 65-4] at 121.) The plan contained a detailed timeline of events, background information on Shapiro, and some general information about past protest history at Shapiro's prior speeches. (*Id.* at 121–122.) The plan also contained detailed information on the use of chemical deployment (should it become necessary), and coordination involving numerous police officers from at least six different agencies, including the UMPD. (*Id.* at 124–125.) The University's most up-to-date security assessment for the event indicated that while "[t]here is no credible information indicating a threat to the venue, speaker, or guests[,] . . . activist groups . . . and individuals who were unable to obtain tickets are likely to protest outside the St. Paul Student Center before and during the event." (Pls. Ex. 30 at 47.) The security assessment also indicated that there was "a potential for violence between opposing groups, as seen at the Lauren Southern event in October, where disturbances were disrupted via chemical

spray[,]" and that because of YAF's and SCV's accusations of viewpoint discrimination against the University, the event had received heightened national attention and at least one scheduled protest. (*Id.* at 47–48.)

Ultimately, Shapiro did visit the University on February 26, 2018, and spoke in the North Star Ballroom. The venue was full, with an audience of approximately 450 people. (Dibble Dep. at 313–14, 320–21; *see also* Ziebarth Dep. at 128–29 (noting the event was "really well attended").) Shapiro himself brought a four-person security detail with him for the event. (*Id.* at 317–18.) His speech "went smoothly as far as he was able to speak and . . . there weren't any major disruptions during the speech itself." (Dibble Dep. at 320; *see also* Shapiro Dep. at 95 (agreeing that the speech "went off as planned . . . insofar as it was not disturbed").) He also agreed that he was able to "share [his] views on political issues and answer the questions of the students who show[ed] up" all without any violence. (Shapiro Dep. at 96–97.) The speech was livestreamed, and Dibble received positive feedback from students who attended the event. (Dibble Dep. at 322.)

The University spent approximately $15,000 on security and incidental expenses securing the Shapiro speech, and had approximately 104 to 114 officers available at the venue.[8] (Pls. Ex. 32 [Doc. No. 73-16] at 52.) The University also used concrete and steel barricades to limit access to two streets near the venue. (Clark Dep. at 127–28.) Approximately 40 people protested outside the event. (Olsen Dep. at 91.) None of the

---

[8]     Notably, the number of officers present was higher than normal due to a slight variation in how standby officers were used. Normally, standby officers are not present at any event, but would "report to the scene when requested." (Pls. Ex. 32 at 52.) At the Shapiro event, the officers remained nearby because it was convenient to do so. (*Id.*)

security costs for the event were passed on to YAF, SCV, or Shapiro.  (Dibble Dep. at 171–72.)

### D.      Procedural History

On July 3, 2018, Plaintiffs filed a complaint alleging that the University's LSEP and its implementation, in connection with the Shapiro speech, violated their First Amendment free speech rights and Fourteenth Amendment rights to due process and equal protection. (*See generally* Compl. [Doc. No. 1].)  More specifically, Plaintiffs assert three claims, each under 42 U.S.C. § 1983 (2018).  Count One asserts that the LSEP violated—both on its face and as applied—Plaintiffs' right to freedom of speech under the First Amendment. (*Id.* ¶¶ 132–60.)   Count Two asserts that the LSEP violated Plaintiffs' Fourteenth Amendment right to due process of law because the LSEP is impermissibly vague and ambiguous, and lacked meaningful guidance to Defendants in determining whether to impose restrictions on Plaintiffs and other student organizations.  (*Id.* ¶¶ 161–72.)  Finally, Count Three asserts that the LSEP violated Plaintiffs' Fourteenth Amendment right to equal protection because Defendants enforced the LSEP against them based on the content and viewpoint of Plaintiffs' speech.  (*Id.* ¶¶ 173–88.)

On August 22, 2018, Defendants moved to dismiss the complaint in its entirety, arguing that (1) YAF and Shapiro lacked standing; (2) Plaintiffs' complaint failed to plausibly allege any violation by Kaler, Berthelsen, or Clark; (3) Plaintiffs failed to state a claim for either First or Fourteenth Amendment violations; and (4) in any event, Defendants were entitled to qualified immunity.  (*See* Defs. Mem. in Supp. of Mot. to Dismiss [Doc. No. 16].)  On February 26, 2019, this Court issued its order on Defendants'

Motion to Dismiss. *See Young America's Found. v. Kaler*, 370 F. Supp. 3d 967 (D. Minn. 2019).

The Court held that, while both YAF and Shapiro lacked standing to sue for prospective injunctive relief, they had standing to sue for retrospective relief. *Id.* at 979–80. The Court dismissed Plaintiffs' claims against Defendant Kaler—but not Defendants Clark or Berthelsen—without prejudice because, at the time, there were insufficient facts pleaded in the complaint that Kaler was aware of the implementation of the LSEP to Shapiro's speech. *Id.* at 981–82. Further, the Court held that the venues at issue for Shapiro's speech were "limited public forums" under the law, because the University permitted only limited use of those forums by certain groups under certain circumstances. *Id.* at 983. Accordingly, the Court noted, the University is permitted to "place restrictions on First Amendment-protected speech" in those limited public forums "so long as those 'restrictions are reasonable in light of the purpose served by the forum,' and do not 'discriminate against speech on the basis of its viewpoint.' " *Id.* at 983 (citations omitted).[9]

The Court also held that Plaintiffs had failed to state a claim that the LSEP violated their First Amendment rights, on its face, because the LSEP was (1) facially reasonable; (2) facially viewpoint neutral; and (3) did not provide Defendants with the "unbridled discretion" to approve or decline any event, based on the detailed criteria set forth in the

---

[9]     The Court rejected Plaintiffs' assertion that the venues at issue were "designated public forums" because there was no evidence that the University had intentionally opened up the venues for expressive conduct that was not limited to a particular type of speech or speaker, much less for indiscriminate use by the general public. *Young America's Found.*, 370 F. Supp. 3d at 983–84.

policy. *Id*. at 986–89. The Court did not dismiss Plaintiffs' claim that the LSEP violated their First Amendment rights, as-applied, because the allegations in Plaintiffs' complaint plausibly alleged such a claim. *Id.* at 990. Moreover, the Court reserved ruling on whether Defendants were entitled to qualified immunity on Plaintiffs' as-applied First Amendment claim until the record was more fully developed. *Id.* at 992.

With respect to Plaintiffs' Fourteenth Amendment Due Process claim, which rested on the assertion that the LSEP was impermissibly vague, the Court held that the policy was, as a matter of law, not impermissibly vague, and accordingly dismissed the claim. *Id*. at 993. As to Plaintiffs' Fourteenth Amendment Equal Protection claim, the Court held that qualified immunity "plainly protects Defendants from an Equal Protection claim" because there was no " 'robust consensus of cases of persuasive authority,' much less 'controlling authority,' applying the Equal Protection clause to a limited public forum, as-applied student free speech claim like this one." *Id.* at 994 (citation omitted). Accordingly, the Court dismissed Counts Two and Three in their entirety. *Id.* at 995.

On August 26, 2019, after discovery had ensued, Plaintiffs moved to amend their complaint and rejoin President Kaler based on new allegations purportedly showing his involvement in the decision making regarding the Shapiro speech. (*See* Pls.' Mot. to Alter/Amend/Supplement Pleadings [Doc. No. 48].) On August 30, 2019, Magistrate Judge Hildy Bowbeer granted Plaintiffs' motion. (*See* Minute Entry Granting Pls.' Mot. to Alter/Amend/Supplement Pleadings [Doc. No. 57].) Plaintiffs subsequently filed their Second Amended Complaint on September 13, 2019, asserting only an as-applied First Amendment claim against each Defendant. (*See* 2d Am. Compl.)

33

On February 25, 2020, Plaintiffs and Defendants each filed the present motions for summary judgment.  (*See* Defs. Mot. for Summ. J. [Doc. No. 62]; Pls. Mot. for Summ. J. [Doc. No. 68].)  Both motions have been fully briefed, and the Court entertained oral argument on each motion on May 11, 2020.[10]

## II.   DISCUSSION

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' " if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016).  Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of establishing a lack of any genuine issue of material fact in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Here, Plaintiffs and Defendants have both moved for summary judgment.  Therefore, each party "concedes and affirms that there is no issue of fact only for purposes of [their]

---

[10]      *See* Defs. Mem. in Supp. of Summ. J. ("Defs. SJ Mem.") [Doc. No. 64]; Pls. Mem. in Opp'n to Summ. J. ("Pls. Opp'n Mem.") [Doc. No. 85]; Defs. Reply Mem. in Supp. of Summ. J. ("Defs. Reply") [Doc. No. 88]; Pls. Mem. in Supp. of Summ. J. ("Pls. SJ Mem.") [Doc. No. 77]; Defs. Mem. in Opp'n to Summ. J. ("Defs. Opp'n Mem.") [Doc. No. 78]; Pls. Reply Mem. in Supp. of Summ. J. ("Pls. Reply") [Doc. No. 87]; Minute Entry re: Oral Argument [Doc. No. 92].

own motion." *Allied Mut. Ins. Co. v. Lysne*, 324 F.2d 290, 292 (8th Cir. 1963) (citation omitted) (internal quotation marks omitted).  However, " 'the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.' " *Zurich Am. Ins. Co. v. Ins. Co. of N. Am.*, 392 F. Supp. 3d 992, 996 (E.D. Mo. 2019) (quoting *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)).  Rather, "each summary judgment motion must be evaluated separately on its own merits to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." *Id.* (citing *Husinga v. Federal-Mogul Ignition Co.*, 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007)).

## A.    Legal Standard

The First Amendment, applicable to the states through the Fourteenth Amendment, *see Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019), provides in relevant part that state actors "shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002) (citation omitted) (internal quotation marks omitted).  Virtually all non-violent political speech is protected by the First Amendment, even when "hurtful," "offensive," or "disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (citing *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

Still, the First Amendment's protections are not limitless.  The government, " no less than a private owner of property, has the power to preserve the property under its control for

the use to which it is lawfully dedicated." *Ball v. City of Lincoln*, 870 F.3d 722, 730 (8th Cir. 2017) (quoting *United States v. Grace*, 461 U.S. 171, 178 (1983)). Accordingly, it is well settled that "government need not permit all forms of speech on property it owns and controls." *Id.* (citation omitted) (internal quotation marks omitted). Indeed, "[n]othing in the Constitution requires the [g]overnment freely to grant access to all who wish to exercise their right to free speech on every type of [g]overnment property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* (quoting *Cornelius v. NAACP legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985)).

### 1.     The First Amendment & Public University Venues

"[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." *Bowman v. White*, 444 F.3d 967, 974 (8th Cir. 2006) (quoting *Healy v. James*, 408 U.S. 169, 180 (1972)). Indeed, "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (citations omitted). Accordingly, "students enjoy First Amendment rights of speech and association on the campus, and [] the 'denial [to particular groups] of use of campus facilities for meetings and other appropriate purposes' must be subjected to the level of scrutiny appropriate to any form of prior restraint." *Id.* (quoting *Healy*, 408 U.S. at 181, 184). Nonetheless, any claim of First Amendment rights on a public university's campus "must be analyzed 'in light of the special characteristics of the school environment.' " *Id.* (quoting *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969)). "A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and [the Supreme Court] h[as] never denied a

36

university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Moreover, the Supreme Court has never held that "a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." *Id.*

Where First Amendment rights are asserted in a public university context, particularly where it relates to the use of a forum on campus, the Supreme Court instructs us to use a "forum analysis" as a means of determining "when [a public university's] interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Ball*, 870 F.3d at 729–30 (quoting *Cornelius*, 473 U.S. at 800). Courts conducting this "forum analysis" follow a two-step process. First, the court must "determine whether a property is a traditional public forum, a designated public forum, or a non-public forum[.]" *Bowman*, 444 F.3d at 974 (citing *Families Achieving Independence & Respect v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1418 (8th Cir. 1997)). Second, the Court must apply "the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster." *Id.* (citations omitted).

As noted above, the Court previously held that the venues at issue for Shapiro's speech are "limited public forums."[11] *See Young America's Found.*, 370 F. Supp. 3d at 984–85. In

---

[11]     Plaintiffs urge the Court to reconsider its prior ruling and find that the North Star Ballroom, the Mayo Auditorium, and Willey Hall qualify as designated public fora because they have been utilized by numerous groups for a wide variety of speakers and events. (Pls. SJ Mem. at 27–29.) The Court reaffirms its prior holding. "The defining characteristic of a designated public forum is that it's open to the same indiscriminate use, and almost unfettered access that exists in a traditional public forum." *Young America's Found. v. Napolitano*, No. 17-cv-02255-MMC, 2018 WL 1947766, at *3 (N.D. Cal. Apr. 25, 2018). The "quintessential" examples of traditional public fora, in turn, are "streets, sidewalks,

a limited public forum, the state may place restrictions on First Amendment-protected speech so long as those restrictions are "reasonable in light of the purpose served by the forum" and do not "discriminate against speech on the basis of viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Gerlich v. Leath*, 861 F.3d 697, 704–705 (8th Cir. 2017) (same).   A state engages in viewpoint discrimination "when the rationale for its regulation of speech is 'the specific motivating ideology or the opinion or perspective of the speaker' " at issue.  *Gerlich*, 861 F.3d at 705 (quoting *Rosenberger*, 515 U.S. at 829).

## 2.   Official and Personal Capacity Claims and Relevant Defenses

Plaintiffs have asserted an as-applied First Amendment claim against Defendants Berthelsen, Clark, Dussault, and Buhta in both their official and personal capacities, and Defendant Kaler in his personal capacity.  (*See* 2d Am. Compl. ¶¶ 37, 41, 45, 49, 52, 176–77.)  This distinction is important.  As the Eighth Circuit explained in *Gorman v. Bartch*,

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available.  *See Hafer v. Melo,* 502 U.S. 21 (1991).   Claims against individuals in their official capacities are

---

and public parks" which all contain the "physical characteristics of a public thoroughfare . . . [that has] the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct . . . ." *Ball*, 870 F.3d at 730 (citations omitted) (internal quotation marks omitted).

Here, unlike streets, sidewalks, and public parks, the undisputed facts show that Willey Hall, the Mayo Auditorium, and the North Star Ballroom are not open for "unfettered access" by the public.  Indeed, each venue must be reserved through the University, and any such reservations are subject to several restrictions including, importantly, that the spaces are "intended primarily for meetings, lectures and discussion groups."  (Pls. Ex. 93 [Doc. No. 72-2] at 25.)  Live bands, dance performances, or any other event or performance that involves amplified music or may produce noise disturbances, for instance, are not permitted.  (*Id.*)

equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* at 24–27. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* at 25–27.

152 F.3d 907, 914 (8th Cir. 1998).

With respect to Plaintiffs' claim against Berthelsen, Clark, Dussault, and Buhta in their *official* capacities, Plaintiffs' claim "is actually 'against the governmental entity itself[,]' " i.e., the University of Minnesota. *Carter v. Hillsboro Treatment Ctr.*, No. 4:19-cv-01323-NAB, 2020 WL 4260742, at *4 (E.D. Mo. July 24, 2020) (quoting *White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017)). Accordingly, Plaintiffs' request for damages (*see* 2d Am. Compl. ¶ 200) cannot be based on their claims against Berthelsen, Clark, Dussault, or Buhta in their official capacities because 42 U.S.C. § 1983 permits claims for money damages only against "persons," and neither a state—nor its officials acting in their official capacity— qualify as "persons" under 42 U.S.C. § 1983. *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016). Plaintiffs' claim for injunctive relief, however, is cognizable against those four Defendants in their official capacity. *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("[S]tate officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment . . . ."). Moreover, the defense of qualified immunity is not available to Berthelsen, Clark, Dussault, and Buhta with respect to Plaintiffs' claims against them in their official capacity. *See Tripp v. Cook*, No. 4:20-cv-04021-KES, 2020 WL 3469733, at *5 (D.S.D. June 25, 2020) ("[W]hen an official capacity claim is

asserted for injunctive relief against a state officer, the defense of qualified immunity does not apply." (citation omitted)).

With respect to Plaintiffs' claim for money damages against all Defendants in their *personal* capacities, each Defendant may raise qualified immunity as a defense. *See Gorman*, 152 F.3d at 914.  Qualified immunity "shields government actors from legal liability unless the actor's conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Kohorst v. Smith*, ___ F.3d ___, 2020 WL 4515294, at *3 (8th Cir. 2020) (quoting *McGuire v. Cooper*, 952 F.3d 918, 922 (8th Cir. 2020)).  Its purpose is to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lyons v. Vaught*, 875 F.3d 1168, 1171 (8th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  It protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 308 (2015) (quotation omitted)).

For a constitutional right to be clearly established for purposes of qualified immunity, "the contours of the right must be clear enough that a reasonable [government actor] would understand that the act in question violates the right." *Id.* (citing *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017)).  While "[e]xisting law need not be directly on point to clearly establish a right," it must nevertheless "put the question beyond debate." *Id.* (citing *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019)).  To be beyond debate, "the clearly established law must be 'particularized' to the facts of the [present] case." *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 552 (2017) (per curium) (citation omitted).

Notably, in a public school or university setting, "educators are rarely denied immunity from liability arising out of First-Amendment disputes.  The rare exceptions involve scenarios in which a factually analogous precedent clearly established the disputed conduct as unconstitutional."  *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014) (citation omitted); *see also Wilson v. Layne*, 526 U.S. 603, 618 (1999) (noting that public officials cannot be expected "to predict the future course of constitutional law"); *Keefe v. Adams*, 840 F.3d 523, 541 (8th Cir. 2016) (Kelly, J., concurring) (noting that a "dearth of prior decisions" analogous to the case before the court "precludes a finding that [officials] violated clearly established . . . rights"), *cert. denied*, ___ U.S. ___, 137 S. Ct. 1448 (2017).

### B.    Defendants' Qualified Immunity

#### 1.    President Kaler

The Court first considers whether President Kaler is entitled to qualified immunity. Plaintiffs argue that Kaler personally discriminated against them because, when he first heard about Shapiro's invitation to speak on campus, he told his Deputy Chief of Staff that he did "not want this in the middle of campus."  (Pls. Opp'n Mem. at 25.)  According to Plaintiffs, Kaler based this "decision" on Shapiro's conservative views, and his belief that Shapiro was controversial.  (*Id.*)  Plaintiffs also contend that Kaler had the authority to ban an event from a campus venue, and he did so for Shapiro's speech because of Shapiro's conservative views. (*Id.* at 26.)  Finally, Plaintiffs argue that Kaler's viewpoint discrimination was evident at a later press conference at which he stated that the decision to host Shapiro on the St. Paul portion of the campus was made because the University was "mindful of the fact that

[Shapiro] is a controversial speaker and that several places where he's spoken, protests (sic) have objected[.]" (*Id.* at 26–27.)

Defendants argue that the undisputed facts show that Kaler did not take any action in any way to restrict Plaintiffs' speech, let alone in violation of the First Amendment. (Defs. SJ Mem. at 25.) Defendants assert that the record is clear that Kaler was not involved in any planning of the Shapiro event, nor did he direct that the event be located on the St. Paul portion of the campus. (*Id.*) Moreover, Defendants note that it is undisputed that every person involved in the planning process was unaware of Kaler's earlier statement, and Plaintiffs themselves never interacted with Kaler during the planning process. (*Id.*)

The Court finds that President Kaler is entitled to qualified immunity. The undisputed evidence shows that Kaler did not violate Plaintiffs' First Amendment rights. While Kaler told his Deputy Chief of Staff that he did "not want this in the middle of campus – West Bank is a better location" (Defs. Ex. S at 135), he testified that his concern was based on his knowledge that Shapiro "had spoken at other campuses and there were protests at those campuses" related to his speech. (Kaler Dep. at 29.) Moreover, Kaler explained that he was aware that the initial venue requested by SCV was the Mayo Auditorium—in the center of the East Bank—and because "[SCV] indicated that security would likely be required" for Shapiro's event, the possibility of a disruption occurring led him to believe that having the event "in a place that was a little more distant from the center of campus" would be preferable. (*Id.* at 28.) He noted that he believed such a move would be appropriate "so that if there was disruption it would have a minimal effect on the thousands of people who come to the university for reasons besides protesting." (*Id.* at 27–28.) He

42

expressly denied that his comments were in anyway based on the fact that Shapiro was a conservative speaker. Indeed, he noted his concerns related strictly to safety and would apply to the potential for protest activity for both left- and right-leaning speakers. (*Id.* at 29.)

Moreover, the undisputed facts show that Kaler's views were simply not considered during the planning process for the Shapiro speech. (*Id.* at 35, 72.) There is simply no evidence that Kaler decreed that Shapiro could not speak on the Minneapolis portion of campus. In fact, in his email, Kaler himself suggested that the speech be venued on the West Bank—a location SCV desired. Further, Kaler noted that he would not issue such an order "without the process of consultation with student affairs and our police and facilities people[,]" and there is no evidence indicating any such process occurred. (*Id.* at 27.)

In addition, the three University officials that were primarily involved in working with SCV to plan Shapiro's visit to the University—Buhta, Dussault, and Berthelsen—were entirely unaware of Kaler's email, and never communicated with him about Shapiro's speech. (Buhta Dep. at 97–98; Dussault Dep. at 109; Berthelsen Dep. at 43–44.) Ultimately, it is undisputed that Kaler took no steps to follow up on the email he sent, gave no advice or guidance about the planning of the Shapiro speech, and never directed that it be located on the St. Paul portion of campus.[12] (Kaler Dep. at 71–72.)

---

[12]    As explained in detail above, officials worked *with* SCV on venue selection. *See supra* § I(C)(3). There is no evidence that officials unilaterally selected the North Star Ballroom without any input from, or involvement by, SCV.

In sum, there is no genuine dispute of material fact that Kaler did not engage in viewpoint discrimination against Plaintiffs, nor did he restrict Plaintiffs' speech in violation of clearly established First Amendment rights. As such, Kaler is entitled to qualified immunity from Plaintiffs' as-applied First Amendment claim, and the Court grants Defendants' motion for summary judgment on that issue.

### 2. Defendant Berthelsen

The Court now turns to whether Berthelsen is entitled to qualified immunity. Plaintiffs argue that Berthelsen engaged in viewpoint discrimination by: (1) providing Kaler with periodic updates about the planning process for Shapiro's speech after Kaler was notified about the event; and (2) participating in the decision to "move[] [Shapiro's] [l]ecture to the St. Paul campus[.]" (Pls. Opp'n Mem. at 28, 31–32.) Plaintiffs also claim that Clark's email to the St. Paul Continuing Education and Conference Center, in which he stated that "[t]he admin has asked that we try to move this visit to the St. Paul campus[,]" implicates Berthelsen because Clark discussed moving the Shapiro speech to St. Paul with Berthelsen, who was his immediate supervisor. (*Id.* at 7.) Finally, Plaintiffs argue that Berthelsen engaged in viewpoint discrimination by refusing to move Shapiro's lecture to a larger venue after tickets for the event in the North Star Ballroom sold out. (*Id.* at 42.)

Defendants argue that there is no evidence in the record that Berthelsen did anything to violate Plaintiffs' First Amendment rights. They note that Berthelsen is not normally involved in planning student group-hosted events, and was only notified about Shapiro's event because, as SCV confirmed, the event required security. (Defs. SJ Mem. at 27.) Moreover, Defendants argue that beyond forwarding SCV's room request for the Mayo

Auditorium to those who needed to know about Shapiro's visit—given SCV's prior history with protestors at the Lauren Southern event—Berthelsen did nothing else to "move" the Shapiro lecture anywhere. (*Id.*) In fact, the only action Berthelsen took, related to the Shapiro event, was refusing to move the event to a different venue, at the last minute, after tickets for the North Star Ballroom had sold out. (*Id.* at 28.) The record is undisputed, Defendants argue, that decision was based strictly on the fact that security planning for the event at the North Star Ballroom was already in place and could not be changed in time for the Shapiro event. (*Id.* at 29.)

The Court finds that Berthelsen is entitled to qualified immunity. It is undisputed that Berthelsen's involvement in planning for Shapiro's visit to campus was, at best, minimal. He is not normally involved with planning student-group-hosted events, and typically is only brought in where "select student events . . . require[] [] larger logistics planning" such as "extra transportation or scheduling . . . or use [of] public safety resources." (Berthelsen Dep. at 16.) Berthelsen explained that SCV was asked to work with SUA on the Shapiro event primarily because SCV itself had made clear—in its reservation request for the Mayo Auditorium—that the event would likely require security. (*Id.* at 37.) When events require security, Berthelsen testified, the University "want[s] to make sure that the larger group of [University] organizations are [] engaged and . . . doing the proper pre-work to support and host the event." (*Id.*) Further, Berthelsen's uncontroverted testimony established that he only became involved with the Shapiro planning process because SCV was the same group that had hosted Lauren Southern on campus. That event had been a "very contentious [event] and had significant [numbers of] protestors and [] required a lot of security[,]" so he "was

sensitive to that topic." (*Id.* at 41.)  Beyond forwarding the email to those who needed to know about the planned event, the record is undisputed that he took no further action on venue planning for Shapiro's speech.  (*Id.* at 49–50.)

Plaintiffs' argument in reliance on Clark's email ignores the uncontroverted testimony in the record.  Clark clearly explained that, in fact, no one at the administration had asked him to move the event to St. Paul.  Rather, the statement reflected his "understanding" that there was "an agreement made between Troy Buhta, Erik Dussault, and the student group on where this was going to be, and the choice was between the . . . [Continuing Education and Conference Center] or [the] North Star Ballroom." (Clark Dep. at 94–95.)  Clark further stated that he had "cleared that with people above [him], as in the senior vice president and Mike Berthelsen" because Clark reported directly to Berthelsen.  (*Id.* at 95–96.)

Further, there is no evidence that Berthelsen's decision not to move, for security reasons, Shapiro's lecture to a larger venue after tickets sold out, at the last minute, demonstrates viewpoint discrimination against Plaintiffs.  In fact, there is no evidence in the record that SCV even asked that the event be moved after tickets sold out.  (*See* Defs. Ex. HH at 60; Dibble Dep. at 200–203; Dussault Dep. at 116–17; Buhta Dep. at 141.)  To the contrary, SCV simply waited to see if the University would "reach[] out . . . about the venue size."  (Defs. Ex. JJ at 76.)

Berthelsen's uncontroverted testimony established that the University was "not moving the event" (Defs. Ex. SS at 114), because both SCV and the University "were too far down the road in planning" and had already prepared the "site, . . . transportation

plans, . . . [and] public safety people [were already] arranged." (Berthelsen Dep. at 59.)

Because such extensive planning had already occurred, Berthelsen determined that the

University "could not have successfully moved it and held it." (Berthelsen Dep. at 59.)

He also noted that moving the event from the St. Paul portion of campus to an East or West

Bank location would have been particularly difficult because, unlike moving the Lauren

Southern event—which was moved from a West Bank venue to a different West Bank

venue—moving Shapiro's speech would have required a change in which "police

jurisdictions are engaged" for the two venues. (*Id.* at 62.)

Plaintiffs argue that Berthelsen's explanation for not moving the event is mere

pretext for viewpoint discrimination because the University has moved other high-profile

non-conservative speaker events where demand exceeded the venue's size. (*See* Pls. Opp'n

Mem. at 1, 21–22, 42.) Specifically, Plaintiffs cite to two events, each of which occurred

*after* Shapiro's speech:

1) A September 2018 event hosted by the University's Office of Multicultural Student Engagement, featuring former Black Panther and social justice activist, Angela Davis. The event was moved from the Ted Mann Concert Hall to Northrop Auditorium one month before the event; and

2) A November 2019 political rally for then-Democratic Presidential Candidate Bernie Sanders, accompanied by Democratic U.S. Representative Ilhan Omar, which was moved from Northrop Auditorium to the Williams Arena due to the high demand for seats.

(*Id.* at 21–22; Pls. Ex. 119 [Doc. No. 72-2] at 152; Pls. Exs. 51, 59, 60 [Doc. No. 72-1].)

To establish pretext, Plaintiffs must provide evidence showing that Defendants

treated other groups that are similarly situated to Plaintiffs differently, or in a disparate

manner.  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).  The test for whether a comparator is similarly situated, for purposes of pretext, is rigorous: the comparator must be "similarly situated in all relevant respects[.]"  *Rinchuso v. Brookshire Grocery Co.*, 944 F.3d 725, 730 (8th Cir. 2019).  Further, Plaintiffs need to show that Defendants' proffered explanation for their actions lacked any basis in fact, or that Defendants' explanation for their decision changed over time.  *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008).

No such evidence was offered.  Each of the events cited by Plaintiffs occurred after Shapiro's speech in February of 2018.  Importantly, the groups involved these events are not similarly situated to SCV, both legally and factually.  Unlike SCV and the Shapiro speech, the Angela Davis event was hosted by the University itself, and did not present any significant security concerns.  *See* Decl. of Kari Schloner in Opp'n to Pls.' Mot. for Summ J. ("Schloner Decl.") [Doc. No. 81] ¶¶ 5.); *Rosenberger*, 515 U.S. at 834 (noting that "the University's own speech . . . is controlled by different principles" than those that govern "private persons whose speech [the University] facilitates").  Similarly, the Sanders campaign rally was hosted by a non-student group which, unlike SCV, bore the excess security costs associated with a move to a significantly larger venue.  (*See* Schloner Decl. ¶¶ 6–7; Decl. of Michael Berthelsen in Opp'n to Pls.' Mot. for Summ. J. ("Berthelsen Decl.") [Doc. No. 83] ¶¶ 4–5.)

Further, Plaintiffs have not presented any evidence that the University's proffered explanation for not moving Shapiro's speech—namely, that security planning and logistics were in place and could not be replicated for a new venue in Minneapolis in time—lacks

48

any basis in fact, much less that it changed over time.  Indeed, SCV's very first room request indicated the need for security, and the University was aware of a history of protest activity at Shapiro's other campus visits.  (*See* Defs. Ex. S at 134; Pls. Ex. 30 at 41–43; Pls. Ex. 31 at 50; Kaler Dep. at 28–29; *see also supra* § I(C)(1).)

Finally, Plaintiffs have not cited to any "clearly established" precedent that stands for the proposition that a student group has a First Amendment right to change their venue for a sold-out event, at the last minute, particularly where extensive, detailed security and logistical planning and resource management have already been implemented for the originally-scheduled venue, and where the student group has not requested a change in venue.  In fact, precedent in the Eighth Circuit holds otherwise:  "The First Amendment does not require that [a speaker] get unrestricted access to 'an ideal venue[.]' " *Josephine Havlak Photographer, Inc. v. Village of Twin Oaks*, 864 F.3d 905, 918 (8th Cir. 2018) (citation omitted); *see also Widmar*, 454 U.S. at 267 n.5 (noting that the Supreme Court has never held that "a university must grant free access to all of its grounds or buildings"); *Powell v. Noble*, 798 F.3d 690, 701 (8th Cir. 2015) ("[T]he First Amendment does not demand unrestricted access to a nonpublic forum merely because the use of that forum may be the most efficient means of delivering the speaker's message." (emphasis added) (citation omitted) (internal quotation marks omitted)).

In sum, there is no evidence in the record that Berthelsen engaged in viewpoint discrimination against Plaintiffs.  Moreover, Plaintiffs have not shown that Berthelsen violated any "clearly established" First Amendment right.  As such, Berthelsen is entitled

to qualified immunity from Plaintiffs' as-applied First Amendment claim, and the Court grants Defendants' motion for summary judgment on that issue.

### 3.    Defendant Clark

The Court now turns to whether Clark is entitled to qualified immunity.  Plaintiffs argue that the evidence demonstrates that Clark engaged in viewpoint discrimination by:

1)  sending several emails to the St. Paul Continuing Education and Conference Center indicating that "[t]he admin has asked that we try to move [Shapiro's] visit to the St. Paul campus," and that "the crowd size need[ed] to be limited to 500 and we will probably have protestors present" (Pls. Opp'n Mem. at 7, 10; *see also* Pls. Ex. 28 [Doc. No. 73-16] at 32.);

2)  deciding that Willey Hall was not a suitable venue for the Shapiro speech (*see* 2d Am. Compl. ¶ 116) and being unwilling to move Shapiro's speech to a larger venue after it sold out, despite the fact that the University did so for the subsequent Angela Davis and Sanders events (Pls. Opp'n Mem. at 42); and

3)  "enforc[ing] a textbook heckler's veto against Plaintiffs[']" viewpoint under the guise of security concerns.  (*Id.*)

Defendants respond that there is simply no evidence in the record that Clark had any role in deciding that Willey Hall was not suitable for the event.  (Defs. SJ Mem. at 30–31; Defs. Reply at 8.)  Moreover, it is undisputed that Clark's statements in the email at issue were based on his understanding that Buhta, Dussault, and SCV had reached an agreement as to crowd size and venue.  Finally, Defendants argue that the University's security concerns about the event were real and well founded based on the history of protests at Shapiro's campus visits, SCV's own concern that security might be necessary, and SCV's history of not engaging with the University on security needs until the last minute (i.e., the Lauren Southern event).  (Defs. Reply at 3–6.)

The Court finds that Clark is entitled to qualified immunity.  As an initial matter, Plaintiffs' arguments that Clark's unwillingness to move the Shapiro speech at the last minute to a different, larger venue, once it sold out, fail for the same reasons as discussed with respect to Berthelsen.  *See supra* § II(B)(2).  The Court also finds that Plaintiffs' argument that Clark decided that Willey Hall was not a suitable venue is contrary to the undisputed record evidence.  As he explained in his deposition, Clark cannot recall if he has ever been to Willey Hall, and that any comments he made about Willey Hall were "based on the assessment that came from [] Buhta when he visited the site with the student group" and based on what "Dussault [had said] on how many people we'd need."  (Clark Dep. at 102.)  He also testified that he has never personally provided security for a student group event in Willey Hall and has never personally conducted a threat assessment or security assessment for that venue.  (*Id.* at 131.)  In fact, when asked whether Willey Hall could be secured, he stated that it may be "possible" but that he could not form an opinion as to how many officers would have been necessary to do so for the Shapiro event.  (*Id.* at 132.)

Plaintiffs' reliance on Clark's emails to the Continuing Education and Conference Center are similarly unavailing.  As discussed already, Clark's uncontroverted testimony is that no one in the University's Administration asked him to move Shapiro's speech to St. Paul.  (Clark Dep. at 94–95.)  Rather, Clark's statement reflected his "understanding" that there was "an agreement made between Troy Buhta, Erik Dussault, and the student group on where this was going to be, and the choice was between the . . . [Continuing Education and Conference Center] or [the] North Star Ballroom."  (Clark Dep. at 94–95.) He further stated that he had "cleared that with people above [him], as in the senior vice

president and Mike Berthelsen" because Clark reported directly to Berthelsen.  (*Id.* at 95–96.)

Clark also testified that his comment about the crowd size limit was based on his understanding, from Buhta, that SCV had agreed that the crowd for the Shapiro event would be approximately 500 people.  (*Id.* at 87–88; *see also* Buhta Dep. at 87 (noting that SCV wanted 450 to 500 people to attend the event); Shapiro Event Request [Doc. No. 17-1] at 1.)  Indeed, SCV itself indicated in December 2017 that they were "hoping for about 500 participants for their event" and that planning was progressing under the assumption that "this will obviously be much bigger in terms of crowd and reaction" than, for example, the Lauren Southern event.  (Defs. Ex. AA at 22.)  As for protestors, Clark explained that there was "no reason for [him] not to expect [the campus community] is going to protest" Shapiro's event when they had just protested Southern and another SCV-hosted speaker event (Clark Dep. at 91–92).  SCV itself informed the University of the need for security and their assumption that the event would be "much bigger in terms of crowd and reaction[.]"  (*See* Defs. Ex. S at 134; Defs. Ex. AA at 22.)

The Court also finds Plaintiffs' argument that Clark was enforcing a "heckler's veto" by planning the Shapiro event based on possible protest activity to be both legally and factually inapt.  The Eighth Circuit has observed that "[t]he 'heckler's veto' involves situations in which the government attempts to ban protected speech because it might provoke a violent response."  *Roe v. Crawford*, 514 F.3d 789, 796 n.3 (8th Cir. 2008), *cert. denied*, 555 U.S. 821 (2008).  In such situations, the mere "possibility" of a violent reaction to protected speech is "simply not a constitutional basis" on which to ban the speech itself.

*Id.* No speech was banned here. Instead, consistent with the law that governs "limited public forums," University officials put reasonable restrictions in place to insure the event was secure.

Plaintiffs argue, nonetheless, that those restrictions discriminated against them on the basis of viewpoint. On this question, the Eighth Circuit's decision in *Frye v. Kansas City Missouri Police Department*, 375 F.3d 785 (8th Cir. 2004) is instructive. In *Frye*, several individuals assembled at an intersection of two heavily trafficked streets holding "large, poster-sized signs" displaying "color photographs of aborted fetuses." *Id.* at 788. After several complaints were made about the "offensive signs," police officers were sent to the intersection and told protestors that they could continue to demonstrate so long as "they did not create a traffic hazard." *Id.* However, a few minutes later, the officers observed that traffic was being affected by the demonstration, and that the signs were impacting drivers' ability to safely control their vehicles. *Id.* The officers asked the demonstrators to "move further away from the road with the large photographs[,]" but they refused. *Id.* After refusing to either relocate, or cease displaying the photographs to drivers, the individuals were arrested. *Id.* The demonstrators filed a civil rights action alleging that the police officers had violated their First Amendment rights, arguing in part that the police officers' restrictions were content-based and constituted an "improper use of a 'heckler's veto' . . . [by] imposing the restrictions based on the motorists' adverse reactions[.]" *Id.* at 790.

The Eighth Circuit rejected the demonstrators' argument, noting that instead of "forbid[ding]" the individuals from "expressing their anti-abortion message" through a

heckler's vote, the officers "placed reasonable restrictions on the location of the signs in order to protect public safety" by giving the demonstrators the option of "staying by the side of the road if they did not display the large, graphic photographs" that were causing a public safety hazard, or by moving to "a location further from the road." *Id.* Those restrictions, the Court observed, were "narrowly tailored . . . and left open alternative channels of communicating their message." *Id.* The Court further noted that "the Supreme Court 'has regularly rejected the assertion that people who wish to [speak] have a constitutional right to do so whenever and however and wherever they please.' " *Id.* (quoting *Grace*, 461 U.S. at 177–78). By "allow[ing] every speaker to engage freely in any expressive activity communicating all messages and viewpoints subject only to reasonable place and manner restrictions[,]" the Court held, the police officers did not enforce a heckler's veto. *Id.* at 790–91.

Here, like *Frye*, the undisputed record evidence shows that Clark (and the other Defendants) did not enforce a "heckler's veto." Instead, they allowed Shapiro to "engage freely in [his] expressive activity" and communicate his "messages and viewpoints subject only to reasonable place . . . restrictions." *Id.* at 791 (citation omitted) (internal quotation marks omitted). Importantly, Shapiro did in fact speak on February 26, 2018 at the University, to a crowd of around 450 people. (*See* Dibble Dep. at 313–14, 320–21; Ziebarth Dep. at 128–29.) His speech "went smoothly" and was not interrupted. (Dibble Dep. at 320; Shapiro Dep. at 95.) Shapiro himself agreed that he was able to "share [his] views on political issues and answer the questions of the students who show[ed] up[,]" all without any violence. (Shapiro Dep. at 96–97.) Moreover, for anyone not able to view the

54

speech in person, Shapiro's message was conveyed through a video livestream.  (Dibble Dep. at 322.)  The very fact that Shapiro spoke makes clear that University officials did not "allow a hostile audience" to serve as a heckler's veto and "silence a speaker[.]" *Phelps-Roper v. Ricketts*, 867 F.3d 883, 900 (8th Cir. 2017) (citation omitted) (internal quotation marks omitted), *cert. denied*, ___ U.S. ___, 138 S. Ct. 477 (2017).

Additionally, there is no evidence that the choice of venue, agreed to by SCV, resulted from an effort by the University to silence or restrict Shapiro's speech.  It was a content-neutral place restriction in furtherance of public safety.  University officials— particularly their police officers or security personnel—have "the duty to not ratify and effectuate a heckler's veto . . . [and] [i]nstead . . . must take reasonable action to *protect from violence* persons exercising their constitutional rights."  *Id.* (citation omitted) (internal quotation marks omitted) (emphasis in original).  This job is "complicated by the fact that [any] crowd [that opposes a speaker's viewpoint] has the same First Amendment rights as [the speaker himself], which law enforcement also has a duty to protect."  *Id.* at 900–901. To that end, SCV, Shapiro, and YAF are "not entitled to [their] own bubble-ensconced pedestal surrounded by chalk lines or yellow tape any more than those opposed to [their] messages are entitled to a heckler's veto."  *Id.* at 901.

Here, Clark and the other Defendants were made aware that potentially disruptive protest activity could occur at Shapiro's speech.  This information was provided to them by both SCV and CFACT.  From its very first request, SCV clearly stated that Shapiro's speech will "likely require security."  (*See* Defs. Ex. S at 134.)  Even prior to this request, CFACT President Ziebarth—who was involved in the planning process—informed

Dussault and Buhta that Shapiro's visit would be a "large speaking event" and indicated the need "to prepare for . . . a speaker that could produce some controversy . . . if brought to campus to hold an event like that." (Ziebarth at 72–74.) Ziebarth himself believed that Shapiro could produce some controversy if he came to campus, and that it was important that Shapiro himself, the speech attendees, any protestors, and the larger campus community be kept safe during such a speech.[13] (*Id.* at 74.) Importantly, this information was provided to the University while discussing last-minute preparations for the Lauren Southern event, which resulted in significant protest activity and a partial campus curfew. (*See* Berthelsen Dep. at 38; Dibble Dep. at 84; Ziebarth Dep. at 106.)

Additionally, the University's own due diligence revealed a potential safety and security concern for Shapiro's speech. As noted above, *see supra* § I(C)(1), the UMPD knew that several of Shapiro's prior campus speeches had resulted in significant, and sometimes disruptive, protest activity. (*See* Pls. Ex. 30 at 41–42; Pls. Ex. 31 at 50.) At least two of those visits—both of which occurred only five months prior to Shapiro's visit to the University—involved anywhere from 300 to 1000 protestors, significant security costs, fights between protestors and counter-protestors, and several arrests. (*See* Pls. Ex. 30 at 42–43; Pls. Ex. 31 at 50.) The Defendants' obligations were accordingly—at the very least—twofold. First, they had the "duty to not ratify and effectuate a heckler's veto" in the form of potential protest activity—an activity SCV told them was possible given

---

[13]     Both YAF and Shapiro echoed these security concerns as well. YAF expects student groups to coordinate with campus police on Shapiro's visits for safety reasons, and Shapiro noted it was typical for his security detail to work with local law enforcement prior to a campus visit. (Coyle Dep. at 87; Shapiro Dep. at 73–74.)

Shapiro's potential for controversy.  *Phelps-Roper*, 867 F.3d at 900 (citation omitted) (internal quotation marks omitted).  Second, they also had a duty to "take reasonable action to *protect from violence* persons exercising their constitutional rights[.]"  *Id.* (emphasis in original).  Importantly, in balancing these two duties, the University was "entitled to decide that the situation presented a danger before an [incident] occurred."  *Frye*, 375 F.3d at 791 (citing *ACORN v. St. Louis Cty.*, 930 F.2d 591, 596 (8th Cir. 1991) ("The government need not wait for accidents to justify safety regulations.")).  Such a decision does not violate a "clearly established" constitutional right.

Finally, the undisputed evidence shows that the Defendants *worked with SCV* through the entire process to determine where Shapiro's speech could be safely held.  (*See* Defs. Ex. AA at 22 (noting that Dibble was "very willing to work with" the University on venue).)  SCV initially sought to use the Mayo Auditorium—a location that even Buhta initially believed could work (*see id.*)—but then recent construction had rendered that venue difficult to secure.  (Buhta Dep. at 77–78.)  The University then suggested that SCV use Ferguson Hall on the West Bank, but Dibble rejected the idea because it was significantly smaller than the Mayo Auditorium.  (Dibble Dep. at 162–63.)  Willey Hall was requested by SCV, but Buhta noted that "Willey is not going to be a good option due to access from the skyway[.]"  (Defs. Ex. X at 10.)  He further explained that by "skyway," he meant both the skyway system used by the University on certain portions of campus, as well as the tunnels connected to Willey Hall.  (Buhta Dep. at 106.)  He noted that there were approximately "forty different ways to get [into] that tunnel system" and the "amount of personnel and resources . . . it would take to secure that building" exceeded other

buildings.  (*Id.*)  Furthermore, Buhta testified that "a large protest [at Willey Hall] . . . would interrupt the day-to-day operation of the University at the time [of the event]."  (*Id.*)

After Willey Hall was deemed ill-suited for Shapiro's speech, Dibble, on behalf of SCV, stated that "[it] looks like St. Paul will be our best option.  I am happy to walk through those two spaces with you," and requested that a hold be placed on both the North Star Ballroom and the Continuing Education and Conference Center venues.  (Defs. Ex. EE [Doc. No. 65-4] at 46.)  Dibble never told any University official that SCV did not want to host the event in St. Paul.  (Dibble Dep. at 167–69.)  She subsequently rejected the Continuing Education and Conference Center because of higher fees and smaller venue size (*see id.* at 167; Defs. Ex. FF at 52–53) and, following a walkthrough of the North Star Ballroom, reserved the venue for Shapiro's visit.  (Defs. Ex. GG at 55–57; *see also* Defs. Ex. HH at 66–67.)  These undisputed facts demonstrate that Defendants' conduct "did 'not provide for a heckler's veto but rather allowed [Shapiro] to engage freely in [his] expressive activity communicating [his] messages and viewpoints subject only to' reasonable place [] restrictions."  *Frye*, 375 F.3d at 791 (citation omitted).

In sum, Clark is entitled to qualified immunity from Plaintiffs' as-applied First Amendment claim, and the Court grants Defendants' motion for summary judgment on that issue.

### 4.    Defendants Dussault and Buhta

Finally, the Court turns to whether Dussault and Buhta hare entitled to qualified immunity.  As to Dussault, Plaintiffs argue that he impermissibly discriminated against them

by considering Shapiro to be controversial, by denying access to specific venues on campus, and by forcing them to obtain permission from the UMPD before approving any venue. (Pls. Opp'n Mem. at 31, 36.)   Plaintiffs also assert that Dussault engaged in viewpoint discrimination by exercising "unbridled discretion" and applying the LSEP to the Shapiro event without any information about the event other than Shapiro's name. (*Id.* at 30–31.) They also contend that Dussault's application of the LSEP was "inherently content-based" because its application was optional. (*Id.* at 37.) With respect to Buhta, Plaintiffs contend that he engaged in viewpoint discrimination by rejecting both the Mayo Auditorium and Willey Hall without sufficiently concrete information illustrating security concerns surrounding Shapiro's visit. (*Id.* at 14–15.) Finally, Plaintiffs claim that both Dussault and Buhta engaged in viewpoint discrimination by deciding that Shapiro's visit was a security concern on the same day they learned about it, and requiring SCV to work with them on planning for the event. (*Id.* at 12–13, 29.)

Defendants respond that Dussault and Buhta did nothing more than work collaboratively with SCV in planning the Shapiro event. (Defs. SJ Mem. at 32.) They note that SCV itself set most of the parameters for an ideal venue for their event, including crowd size, and the date of the event (which informed which venues were available). (*Id.* at 32 n.17 & 32–33.) Defendants also note that SCV itself recognized that the event could draw protests and raised security concerns. In that context, Dussault and Buhta contend that they did nothing more than "work[] with SCV within those parameters to plan a safe and successful event." (*Id.* at 33.)

The Court finds that both Dussault and Buhta are entitled to qualified immunity.  As an initial matter, Plaintiffs' unsupported assertion that Dussault and Buhta engaged in viewpoint discrimination by immediately requiring Plaintiffs to work with them to identify a venue for Shapiro's speech is belied by uncontroverted facts in the record.  Both Dussault and Buhta first became aware of Shapiro's potential visit to campus while discussing last-minute preparations for the Lauren Southern event.  (Dussault Dep. at 91–92; Buhta Dep. at 72–73; *see supra* § I(C)(2).)  During one of those conversations, Dussault asked the students involved in the Lauren Southern event "whether there were any other events they were planning that needed this type of coordination[.]"  (Dussault Dep. at 92.)  Their answer was: "Ben Shapiro."  (*Id.*)  According to Ziebarth, who was at this meeting, the group then spent some time discussing comparable speaking events, potential issues for such an event, and the need "to prepare for . . . a speaker that could produce some controversy . . . if brought to campus to hold an event like that."  (Ziebarth Dep. at 73–74.)

There is simply no evidence in the record that either Buhta or Dussault knew much, if anything, about who Shapiro was at the time.  (*See* Dussault Dep. at 93 (noting that he had "heard the name before" but knew nothing about Shapiro beyond that), 123 (indicating a lack of knowledge about Shapiro's political views); Buhta Dep. at 73 (noting that he had "[n]ot really" heard of Shapiro when his name was first mentioned)).  The context in which Shapiro's speech was raised is important.   While engaged in last-minute security discussions for the Lauren Southern event—which resulted in substantial disruptions to campus and significant protest activity—Dussault and Buhta were informed of Shapiro's visit, and told by Ziebarth that the University should prepare for Shapiro's event, which

60

was going to be larger than Lauren Southern's speech.  (*See* Ziebarth Dep. at 55, 73–74 (noting the "need to prepare" for Shapiro's event).)

Plaintiffs' arguments regarding Dussault are similarly unavailing.  There is no evidence that Dussault ever described Shapiro as "controversial" or that any decisions related to Shapiro's speech were based on his political viewpoint or beliefs.  Moreover, Dussault did not "deny" Plaintiffs access to venues on campus.  Plaintiffs contend that an email Dussault sent on December 6, 2017, advising OCM not to confirm SCV's venue requests for Shapiro's speech until after he met with the group, is evidence that he exercised his "unbridled discretion" to bar SCV's access to the University's forums.  (Pls. Opp'n Mem. at 31.)  However, Dussault communicated this message *after* SCV and Ziebarth agreed on the need for planning for Shapiro who, in their own words, could produce some "controversy" on campus.  (*See* Ziebarth Dep. at 55, 73–74.)  Accordingly, Dussault's email was certainly not an exercise of unbridled discretion or unique viewpoint-based scrutiny.  Rather, it aligned precisely with what SCV, Buhta, and Dussault already discussed—preparing for Shapiro's visit by planning extensively.

Plaintiffs' argument that Dussault engaged in viewpoint discrimination by applying the LSEP to them, but not to other purportedly similar groups, is also contrary to the record evidence.  As an initial matter, the fact that Dussault inquired as to the nature of the Shapiro speech to determine if the policy should be used to plan the event, does not, in and of itself, render that inquiry inherently content-based.  *See Veneklase v. City of Fargo*, 248 F.3d 738, 745 (8th Cir. 2001) ("We reject the argument that because an inquiry might be necessary to determine whether a person is [engaged in speech to which a policy or law applies], the

[policy or law] is therefore content-based."), *cert. denied*, 534 U.S. 815 (2001).  The LSEP itself contains criteria for determining when it should apply, so an initial inquiry into the nature of the planned event is, at the very least, required to determine the policy's applicability.  (*See* LSEP at 109.)

Further, there is no record evidence that SCV actually participated in the LSEP process, or was ever actually required to follow the LSEP's requirements.  SCV never filled out any LSEP forms related to the Shapiro event—beyond a venue reservation request— and did not prepare a LSEP proposal for either the Lauren Southern or Shapiro events. (Dibble Dep. at 100–101.)  Moreover, there is no evidence that an LSEP committee ever met to discuss the event, much less that a committee ever approved or denied Shapiro's visit.  In contrast, SCV did precisely what student groups typically do when planning events that raise security concerns—they work with SUA and the UMPD to ensure the event is hosted safely.  (*See* Olsen Dep. at 45–46.)

Finally, Plaintiffs' argument that Buhta engaged in viewpoint discrimination by rejecting both the Mayo Auditorium and Willey Hall for their event, but not for other purportedly similar events, is also contrary to the record evidence.  First, there is no evidence that either Willey Hall or the Mayo Auditorium were the best venue options given the significant security concerns.  Buhta testified that when planning for security for an event, "[e]verything [the UMPD] plan[s] for is maximum, worst case scenario[.]"  (Buhta Dep. at 18.)  He further explained that having been with the UMPD for 22 years, he does not like using Willey Hall for *any* events because "it's a huge building" and there are "seven different entrances."  (*Id.* at 9, 65–66.)  Notably, of the seven entrances, "four . . . have like a six-door

entrance" which makes it even harder to secure.  (*Id.* at 66.)  Additionally, Willey Hall is connected to the University's West Bank skyway system, as well as its tunnel system, and sits in an area where "all tunnels meet[.]"  (*Id.*)  As for the Mayo Auditorium, Buhta concluded that recent construction had rendered the venue difficult to secure for Shapiro's visit.  *See supra* § I(C)(3); (*see also* Buhta Dep. at 77–78.)

Second, the fact that the University has secured other events in both Willey Hall and the Mayo Auditorium in the past does not transform Buhta's concern about those venues into pretext.  For instance, Plaintiffs cite to a 2014 event hosted by a non-University group, the Somali Action Alliance, which brought the President of Somalia to Northrup Auditorium.  (Pls. SJ Mem. at 7.)  First, there is no evidence in the record that SCV sought out Northrup Auditorium as a venue for the Shapiro event.  Second, the sponsoring organization was not a registered student group, and the Somali Action Alliance covered all security costs (unlike SCV, which was not charged for security for Shapiro's event), which included coordination between the UMPD, federal agencies, and local law enforcement.  (Buhta Dep. at 28–29; *see also* Schloner Decl. ¶ 3.)  Plaintiffs also point to two other events—a speech by Shaun King, a Black Lives Matter activist, hosted by SDS, and a DFL gubernatorial forum hosted by the registered student group Queer Student Advocates—that took place in Willey Hall as evidence of pretext.  (Pls. SJ Mem. at 8.)  However, there is no evidence in the record indicating that either SDS or the Queer Student Advocates raised any security concerns for those events or that there was a recent history of protests at those events on other campuses.

Plaintiffs also cite three other events that bear mentioning.  They note that in March 2017, then-state-representative Ilhan Omar spoke in the Mayo Auditorium.  (*Id.* at 8.)  And, as discussed above, Plaintiffs point to a September 2018 visit by Angela Davis in Northrup Auditorium.  (*Id.*)  Finally, Plaintiffs discuss a second Ilhan Omar speech in the Mayo Auditorium in August 2019—this time as a U.S. Representative for Minnesota.  (*Id.* at 9.)  However, each of those events was hosted by the University itself,[14] and accordingly, as discussed previously, was governed by a different events policy, different considerations regarding the use of campus resources, and different legal principles than those that govern "private persons whose speech [the University] facilitates[.]"  *Rosenberger*, 515 U.S. at 834.[15]

In sum, both Dussault and Buhta are entitled to qualified immunity from Plaintiffs' as-applied First Amendment claim, and the Court grants Defendants' motion for summary judgment on that issue.

---

[14]    The 2017 Ilhan Omar speech was hosted by the University's Office for Equity and Diversity, while the 2019 Ilhan Omar speech was hosted by the University's School of Public Health.  (*See* Decl. of Amy Goetz in Opp'n to Pls.' Mot. for Summ. J. [Doc. No. 82] ¶ 8.)  Angela Davis's 2018 visit was hosted by the University's Office of Multicultural Student Engagement.  (Schloner Decl. ¶ 5.)

[15]    Plaintiffs also provide a list of events held in Willey Hall dating back to early 2014, which shows numerous student and non-student group events held in Willey Hall with up to 900 guests.  (*See* Pls. Ex. 25 [Doc. No. 73-16] at 2–24.)  However, the record contains no evidence that any of these events involved comparable security concerns to the Shapiro event, or that any of the sponsoring groups had a history of protest activity at their events.

### C.      Plaintiffs' Official Capacity Claims for Injunctive Relief

The Court now turns to Plaintiffs' as-applied First Amendment claim against Defendants Berthelsen, Clark, Buhta, and Dussault in their official capacities. The Court has already held that both Shapiro and YAF lack standing to sue for injunctive relief. *See Young America's Found.*, 370 F. Supp. 3d at 979. Accordingly, this claim concerns whether SCV is entitled to injunctive relief. "Claims against individuals in their official capacities . . . require proof that a policy or custom of the entity violated the plaintiff's rights . . . ." *Gorman*, 152 F.3d at 914 (citing *Hafer*, 502 U.S. at 24–27). Here, the only policy cited by Plaintiffs as being violative of their rights is the LSEP. (*See, e.g.*, 2d. Am. Compl. ¶¶ 3–5, 9, 12, 16.) However, as the Court explained *supra* § II(B)(4), there is no genuine dispute of material fact that SCV never followed the LSEP. SCV never filled out any LSEP forms related to the Shapiro event—beyond a standard venue reservation request—and did not prepare a LSEP proposal for either the Lauren Southern or Shapiro events. (Dibble Dep. at 100–101.) Rather, SCV did precisely what student groups typically do when planning events that raise security concerns—they work with SUA and the UMPD to ensure the event is hosted safely. (*See* Olsen Dep. at 45–46.)

Accordingly, there is no record evidence that any Defendant applied a University policy to SCV that violated their rights. As such, Defendants Berthelsen, Clark, Buhta, and Dussault are entitled to summary judgment on Plaintiffs' as-applied First Amendment claim against them in their official capacities.

### III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 62) is **GRANTED** in its entirety, and Plaintiffs' Motion for Summary Judgment (Doc. No. 68) is **DENIED**.   Plaintiffs' Second Amended Complaint (Doc. No. 58) against Defendants is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: August 28, 2020                                     s/Susan Richard Nelson
                                                                        SUSAN RICHARD NELSON
                                                                        United States District Judge